# Exhibit J

ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

FOUZIA JADA,

                    Plaintiff,

    -against-

COSTCO WHOLESALE CORPORATION and MBA-VERNON

BOULEVARD, LLC,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - x

                  VIDEO CONFERENCE VIA ZOOM
                  Remotely Conducted by:
                  LEX REPORTING SERVICE
                  New York, New York

                  October 22, 2021
                  11:02 a.m.

      **DEPOSITION** of **ALEJANDRA VICENCIO**, the
Non-Party Witness, in the above-entitled
action, held at the above time and place,
pursuant to Order, taken before Angela Rose
Signorile, a shorthand reporter and Notary
Public within and for the State of New York.



LEX #170152

# LEX REPORTING SERVICE, INC.
PROFESSIONAL REPORTING SINCE 1980
TOLL FREE 800.608.6085

2

A p p e a r a n c e s:


        MCMANUS ATESHOGLOU AIELLO &
        APOSTOLAKOS, PLLC
                Attorneys for Plaintiff
                48 Wall Street, 25th Floor
                New York, New York 10005
        BY:   JAMES MCGUIRE, ESQ.




        CONNELL FOLEY, LLP
                Attorneys for Defendants
                COSTCO WHOLESALE CORPORATION and
                MBA - VERNON BOULEVARD, LLC
                888 Seventh Avenue, 9th Floor
                New York, New York 10106
        BY:   SAMUEL P. QUATROMONI, ESQ.

3

## S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

4

THE REPORTER:  This deposition is being conducted via Zoom video conferencing.  All parties present are appearing remotely, and are confirming that they can hear and see through the video without any technical issues.

Would counsel and the witness please confirm.

MR. MCGUIRE:  Yes.

THE WITNESS:  Yes.

MR. QUATROMONI:  Yes.

THE REPORTER:  Before I swear in the witness, I will ask counsel to stipulate on the record that due to the national pandemic, the court reporter may swear in the deponent even though they are not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.

MR. MCGUIRE:  Correct.

MR. QUATROMONI:  Correct.

-oOo-

5

A L E J A N D R A   V I C E N C I O, the witness herein, having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. MCGUIRE:

Q     State your name for the record, please.

A     Alejandra Vicencio.

Q     State your address for the record, please.

A     3705 Hampton Road, Oceanside, New York 11572.

MR. MCGUIRE:  Counsel for defendant, if at the time of trial this individual is no lounger employed, or still employed, you would accept services of subpoena and/or provide the last known address so that we may serve the witness?

MR. QUATROMONI:  Yes.

MR. MCGUIRE:  Thank you.

Q     Good morning, ma'am.

A     Morning.

A. Vicencio                                6

Q        My name is Jim McGuire.  I am the attorney for the plaintiff in this lawsuit, and I have some questions for you today.

That address you just gave, where is that?  I know you said Oceanside, but is it your business, your home, something else?

A        It is a Costco location.

Q        It is a Costco in Oceanside?

A        Correct.

Q        I just want to go over some ground rules.

The best way, and the easiest and fastest way to conduct this is if we only have one voice speaking at a time.  Mainly because the technology picks up the first voice and stays with it.  Even if another voice joins in, it just gets blocked out. We'll just try, you and I and your attorney as well, to speak individually when there is gap in the talking.

If you have any questions about anything I ask you, or the question I ask you, please ask me to rephrase it or explain it if you don't you don't understand it.

A. Vicencio                                7

Do you understand that?

A        Yes.

Q        If, for any reason, you need to take a break or speak with your attorney, that's fine, provided there is not an open question.  That means that if there is not a question for you that you have not answered yet.

Do you understand that?

A        Yes.

Q        Can you briefly describe for me your educational background, ma'am?

A        I have an associate's degree from Nassau Community College.  And I was on my way for my bachelor's from Hofstra University in business administration.

Q        You are attending Hofstra now?

A        No.  This was a long time ago.  I never finished my bachelor's.

Q        When did you get the associate's degree from Nassau Community College?

A        1998.

Q        Have you received any other type of certifications or completion of

A. Vicencio                           8

professional degrees since your associate

degree from Nassau Community College?

  A  No.

  Q  Are you married?

  A  No.

  Q  Do you have any children?

  A  Yes.

  Q  How many children do you have?

  A  One.

  Q  May I have the first name and the age?

    MR. QUATROMONI:  How is this relevant?

  A  ████

    MR. QUATROMONI:  You can answer.

    I am going to object for you to go much further down this line.

    MR. MCGUIRE:  You know, her family setting; where she lives, what her background is.

    MR. QUATROMONI:  Okay.

    You can answer.

  Q  The age ma'am?

  A  Six.

A. Vicencio                                    9

Q        Where your residence is, who resides with you at that location?

A        My son and my brother.

Q        Is your brother employed?

A        Yes.

Q        What does he do?

A        He works with GEICO.

Q        What is his approximate age?

A        Forty.

Q        How long have you been working at Costco, at whatever location you have been working at?

A        I have been working at Costco for twenty-four years.

Q        So, it is safe to assume you were working for them in August of 2018?

A        Yes.

Q        Can you tell me what training you received from Costco to be employed by them?

          MR. QUATROMONI:  Objection to form.

          You can answer.

A        In what position?

Q        Any position.  How did it start for you?  Did you start as a sales associate,

A. Vicencio                    10

a cashier?

A        I started out as an hourly employee for ten years, and then I moved into management.

Q        You've been working for management for approximately fourteen years?

A        Correct.

Q        I guess going backwards, how long have you worked at the Oceanside location?

A        Approximately three years.

Q        And before that?

A        Long Island City.

Q        How long were you there?

A        About two years.

Q        When you moved from hourly employee to management, did you have to take any type of classes or in-house courses to be considered or hired as management, that you had to successfully complete?

A        No.

Q        Did they offer any classes to you when you made the switch from hourly employee to management?

A        There was some type of training

A. Vicencio                          11

for career development when you first became a manager.

Q      What did that training consist of?

A      Settling into your role, and knowing how to speak to employees, and how to manage different types of employees in different sections of the building.  It was about a twelve-week course, once a week.

Q      Twelve weeks.

Is it one hour a week?

A      It is approximately a day's worth.

Q      Did you successfully complete that?

A      Yes.

Q      My questions, I am going to focus now on August 16th, 2018.

Did you work on that date?

A      Yes.

Q      Where did you work?

A      At the Long Island City location.

Q      What shift were you working, or what hours did you work?

A. Vicencio                              12

A        It started at 10:00 a.m.

Q        If it started at 10:00 a.m., when did it conclude?

A        I don't recall what time I left that day, but on paper it says I end at 7:00, but I was still at the building working.

Q        To neaten that up, it would have been a 10:00 to 7:00 type of day?

A        Correct.

Q        At that time, were you working forty hours a week or something else?

A        During that time, I was probably working sixty hours that week.

Q        Was that the standard workweek for management?

A        About fifty.

Q        Was there a reason you were working sixty hours at that time?

A        It was the week of inventory.

Q        Is that a common practice, you work extra hours when inventory is being done at the store?

A        Yes.

Q        Ma'am, do you know Fouzia Jada?

A. Vicencio                                13

A        Personally, no.

Q        Have you ever met her?

A        I am assuming I did, according to the paperwork.

MR. QUATROMONI:  Don't assume.  Just what you recall going forward.

THE WITNESS:  Okay.

Q        What paperwork led you to believe you met Fouzia Jada?

A        The member incident report.

MR. MCGUIRE:  Reporter, I think you have that exhibit already.  It was previously marked at the plaintiff's deposition.

Q        Do you see that document up on your computer?

A        Yes.

Q        Is that the document you are referring to?

A        Yes.

Q        What did you describe that document as being?

A        The member incident report.

Q        Can you tell, by looking at that

A. Vicencio                                    14

document, who filled out the document?

    A    It looks like two different people.

    Q    Do you know what individual filled out that document?

    A    It looks like my handwriting in section eight and section eleven.

    Q    Who else filled in the other information?

    A    Jada.

    Q    Did any employee of Costco sign this or mark it, to indicate who input the information on the form?

    A    It doesn't say.

    Q    For example, you don't see any employee signature on there, correct?

    A    Correct.

    Q    I am looking at the top of the document, it says ML number.

    What is that about?

    A    When this documents gets keyed into the system, it generates a number.

    Q    Is that number 00012?

    A    No, it is usually a different

A. Vicencio                    15

number.

Q      There is also a spot for warehouse location number.

And there is no information contained in that spot; is that correct?

A      Correct.

Q      Is there any reason why that information is not contained in that spot?

A      I don't know why.

Q      Is this the only member first report regarding the information of Fouzia Jada?

MR. QUATROMONI:  Objection to form.

A      I don't know if there is another one.

Q      What about looking at this document leads you to believe, or you are unable to answer, as to whether or not there is another member first report regarding Fouzia Jada?

A      I don't know if there is another one.

Q      Well, you said you filled out section eight and section eleven; is that

                        A. Vicencio                        16

correct?

        A       I said it looks like my handwriting.

        Q       You think it was the individual, Ms. Jada, who input the personal information listed in the other spots?

        A       I don't recall.

        Q       But it looks like it is personal information, date of the birth, e-mail address, address, home phone number?

        A       Yes.

        Q       Membership number, it looks like date of incident and time of incident, and then signature, and date and time on the bottom; is that correct?

        A       Correct.

        MR. QUATROMONI:  Objection to form. The document speaks for itself.

        Q       Ma'am, do you recall filling out a separate member first report on the Fouzia Jada incident, before this document which you have before you on the computer screen?

        A       No.

        Q       I am going to ask you, number

A. Vicencio                    17

eight on the form, you indicated that appears to be in your handwriting; is that correct?

A    Correct.

Q    Can you read that for me, and just read it slow.  It says, description of incident, and then the handwriting portion.

A    Member was running to register, carrying her stuff.  Said berries were on the floor.  She was coming -- Danish and chicken -- oh, carrying.  I am sorry, carrying Danish and chicken.

Q    You said "said berries."  What berries are you referring to?

MR. QUATROMONI:  Objection to form.

She read the document.

But you can answer.

Q    He said you can answer.

MR. QUATROMONI:  Go ahead.

A    I'm sorry.  I couldn't hear.

Either blueberries, raspberries, or strawberries.

Q    You said berries, what berries are you referring to?

MR. QUATROMONI:  Objection to form.

A. Vicencio                    18

She read back the document.  She didn't have any specific recollection, other than reading back the document.

The document says, "said berries."

Q    "Said berries" usually means you are referring to something you referred to previously.  I am just saying, where did you get the berries, that information from?

MR. QUATROMONI:  Objection to form.

You can answer.

A    I don't think it said berries.  I think she said berries were on the floor.

Q    I just asked you to read what you wrote, and I believe you said --

A    Yeah, member was running --

Q    Carrying her stuff, and said berries were on the floor.

I don't see a "she said" in there.  I just see "said berries."

Is that correct?

MR. QUATROMONI:  Objection.  You are asking her two different things.  You are asking her to read the document, and you are asking what "said berries" means.

A. Vicencio                          19

You are asking about what is in the document or what is the information on the document?  I am not clear what is the question.

MR. MCGUIRE:  And then she objected. She said, and that is not contained on the document.

MR. QUATROMONI:  The witness said she, Ms. Jada, said berries.  I am not clear what the question is.  You asked her to read the document.

MR. MCGUIRE:  No.  She is injecting "she" into that statement; otherwise, she said berries.

MR. QUATROMONI:  Is the question where the information came from that is in there?

MR. MCGUIRE:  I didn't get that far. I am having her read what she said, to clarify for me.

MR. QUATROMONI:  She read what she said.  I don't understand what the clarification question is.  I am not trying to be difficult.  I just don't

A. Vicencio                    20

understand what the question is.

MR. MCGUIRE:  She said what she wrote.

MR. QUATROMONI:  Yes.  Okay.  And then --

Q       Moving on to question eleven. Was anyone injured.  In the yes spot was Xed. And if yes, who.

Can you read what you wrote on that portion?

A       The person of incident, Jada. Knee is swollen.  I can't read the other word.  Bottom of foot hurts.  It looks like it says bruised.  It is knee is swollen, bruised, bottom of foot hurts.

Q       Have you ever seen the original document of this report?

A       No, just on e-mail.

Q       There is an original document of this report; is that correct?

A       The time that it was filled.

Q       Right.  And that is maintained somewhere in the Costco archives?

MR. QUATROMONI:  Objection to form.

A. Vicencio                                    21

A      I didn't hear.

Q      Did you answer?

MR. QUATROMONI:  I think she said, she could not hear.

Q      Did you review, somewhere in the possession of Costco --

A      In the Long Island City location. It is at the Long Island City location.

Q      Did you fill anything else out with respect to this form?

A      No.

Q      If you filled out a separate report, other than the one we are looking at, Exhibit A, would it be preserved for future reference?

MR. QUATROMONI:  Objection to form. It calls for speculation.

If she filled out another form, would it be preserved?  Do you want to ask her if she filled out another form?  You asked her that and she answered, no.

MR. MCGUIRE:  I don't think she answered clearly.  I think she said she does not recall filling out any other

A. Vicencio                                    22

report.

Q        My question is, if another report was filled out, would it have been destroyed, would it have been maintained for whatever reason?

MR. QUATROMONI:  Objection.

What kind of a form.

MR. MCGUIRE:  Perhaps she misspelled something or misquoted something, or perhaps the person involved in the incident said that is not correct, I am not signing that report, and another report was generated.

Q        To the extent you understand the question, you can answer.

A        It does not look like another report was filled out.  It looks like the member signed this report.  I would not have filled out another report if the member signed this report.

Q        I am talking about an incident where the person involved in the incident refuses to sign because the information is incorrect on the form.

A. Vicencio                          23

Would a second report be generated in which you changed the information to what the person involved in the incident said happened?

MR. QUATROMONI:  Objection to form. You can answer.

A      That's not something I would do. It would be filled out on the same form.  It would be crossed out and information is filled out on the same form.

Q      How did this incident come to your attention on the night of August 16th?

A      I was the assistant general manager in the building, and to what I recall, I must have been called over.

Q      As the assistant general manager, would you have been assigned to the portion of the building that would be your area to cover and responsible for?

A      I would be all over the building. The whole building was my responsibility.

Q      Were you the only manager on duty at that time?

A      It is not a duty position.

A. Vicencio                                    24

MR. QUATROMONI:  When you say "at that time," what time are you referring to?

MR. MCGUIRE:  Approximately 7:20 p.m.

A      I believe it was other managers in the building.

Q      I guess I am asking, how did you respond to it.

Were you specifically asked for, or were you just in that area when management was requested?

A      I must have been passing by in that area.

Q      What is the general practice of Costco, in or about August of 2018, with the number of managers or assistant managers that are on duty at approximately 7:00 or 7:30 p.m.?

A      I have to look at the schedule, but there would be at least three to four managers in the building at that time.

Q      What did you do upon learning a shopper had an incident in your store on

A. Vicencio                                25

August 16th, 2018 at approximately 7:20 p.m.?

        A       Repeat the question.

        Q       What did you do when you learned there was an incident in the store on August 16th, 2018?

        A       I went to the area where the member was, and most likely I had an employee bring me a member incident report, so that the member can fill it out.

        Q       Where was this report filled out with respect to your store?

        A       I don't recall on this day.

        Q       Does it indicate where the incident occurred anywhere on this document?

        MR. QUATROMONI:  Objection.

        The document speaks for itself.

        You can answer.

        A       The register.

        Q       Where does it say that?

        A       On number eight.

        Q       Where she was traveling to the register with her belongings?

        A       Correct.

        Q       It does not say she actually

A. Vicencio                    26

fell, does it?

MR. QUATROMONI:  Objection.

Document speaks for itself; but you can answer.

A    The word fell, doesn't say, but by her injuries, number eleven.

Q    Again, I am just referring to section eight.

And I think you just indicated that member was running to register, carrying her stuff, and said berries were on the floor.  She was carrying Danish and chicken.

It does not indicate what happened to her, correct?

MR. QUATROMONI:  Objection.

Document speaks for itself.

A    Correct.

Q    You didn't put anything down anywhere indicating she claims she fell and what caused her to fall.

Is that contained on any documents that you generated with respect to this incident?

MR. QUATROMONI:  Objection to form.

A. Vicencio                                27

A       No.

Q       Did you make any notes, whether it is on a separate pad or anything, of your contact with Fouzia Jada with respect to this incident?

A       No.

Q       Are there any security cameras in the Long Island City Costco in use in August of 2018?

A       Yes.

Q       Where are they located?

A       Around the building, inside.

Q       Would any of them cover the areas of the registers?

A       I think there was maybe two cameras at the time.

Q       How many registers were in the store in August of 2018?

A       I don't remember.

Q       Did those security cameras record information or was it strictly a closed-captioned TV shot of what was going on?

Do you understand my question?

A. Vicencio                          28

A       Yes.  It would record.

Q       How often or how long did those recordings last?

A       I believe thirty days.

Q       Did you ever check the security cameras covering the register area with respect to the incident of Ms. Jada on August 16th, 2018, approximately at 7:00 to 7:30 p.m.?

A       I don't recall.

Q       Did you ask anyone to do it on your behalf?

A       I don't recall.  It was a long time ago.

Q       What is the Costco practice when an accident occurs in their store, regarding or reviewing their security cameras?

        MR. QUATROMONI:  Objection to form.

        You can answer.

A       If the insurance company Gallagher Bassett, they would call and ask for a video.

Q       Did that happen in this case?

A       I don't think so.  I don't know.

A. Vicencio                              29

Q       Did you ever see the recordings of the security cameras of the register area where the plaintiff claims she fell on August 16th, 2018, between 7:00 and 7:30 p.m.?

A       I don't recall.

Q       Is there any form that you would have filled out that indicated you reviewed the security camera film or footage with respect to this incident?

A       No.

Q       Who would be the person in the store at the time an incident happens that would review the security camera footage?

MR. QUATROMONI:  Objection to form.

You can answer.

A       They -- at that location, there is loss prevention.

Q       Did they actually sit at the desk and watch the TV cameras?

A       No.

Q       How would they be advised there was an incident in the store?

A       They have to be asked to review

A. Vicencio                         30

the camera.

        Q       Did you ask anyone to review the camera?

        A       I don't recall.

        Q       Did you physically go to the location where Ms. Jada had her incident?

        A       I believe I did.

        Q       What did you observe when you got to that area where Ms. Jada indicated she slipped and fallen?

        A       I don't recall this incident very clearly.  It was three years ago, and I don't recall every step that was taken.

        Q       During the hours before this incident, from approximately 12:00 p.m. noon to 7:00 or 7:30 p.m., did any management receive any complaints about the debris on the floor near the aisles of the registers?

        A       I don't know.

        Q       How would I find that out?  Who would have that information?

        A       That's not something that would be logged.

        Q       If management had been advised of

A. Vicencio                           31

the situation where there was debris on the ground in and around the registers and the aisles of the registers, what steps would be taken?

A       I would ask employees to regularly clean around the areas.  And we have maintenance that would be sweeping and cleaning the floor.

Q       How often does maintenance sweep and clean the floors around the aisles and registers?

A       I don't have the time frame, but it is a constant cleaning.

Q       It is not done regularly; it is done constantly?

MR. QUATROMONI:  Objection to form.

A       They are constantly on the floor sweeping the whole warehouse.

Q       It is not an hourly job where, they would go to a certain area of the store, and say at 2:00 p.m. clean the area of produce or meat or of some other designated area; is that correct?

MR. QUATROMONI:  When you say

A. Vicencio                                    32

"they," who are you referring to?

MR. MCGUIRE:  Maintenance.

MR. QUATROMONI:  Objection to form.

You can answer.

A      Maintenance would be cleaning constantly around the building.  There is no specific time or day that they would clean a specific area.  They are just constantly cleaning around the building, inside.

Q      How many maintenance workers did you have working on the day of August 16th, 2018?

A      I don't have that information.

Q      How would you find that out?  Is there a log kept somewhere of employees working on that day and their positions?

A      Yes.  You can ask for the employee schedule for that day, or the department schedule.

Q      Not only would maintenance clean respective areas of the store, but employees assigned to that area would also be cleaning that area of the store?

A      Correct.

A. Vicencio                    33

Q        What would the employees use to clean the area where they were working?

A        A broom and dustpan.

Q        Would they keep that broom and dustpan when they were working the floor?

A        There are at least two by the registers that would be used.

Q        Is there any written protocol or procedure followed by the employees with respect to maintaining the floors in or around the registers and the aisles of the registers?

A        Just verbally to keep a good housecleaning.

Q        Is there any log that the employees keep indicating at what time they clean the specific area during the course of the day?

A        No.

Q        Or an employee that addresses the situation in and around their area, that as of a certain time, at a certain date, I performed cleaning that consisted of whatever cleaning that was.

A. Vicencio                    34

Is there any log to that?

MR. QUATROMONI:  Objection to form.

A        Not a specific form.  But there is a floor walk that is done every hour.

Q        Who fills that out?

A        The member service employee.

Q        What information is contained on the floor walk that is performed every hour?

A        There is temperature, and there is actually visual of sections of the building, and checking the doors.

Q        I am talking about the interior of the building.

A        So am I.

Q        People actually walk down the aisles at least once an hour and observe what there is to be observed?

A        Correct.

Q        That includes the register and aisle area for the registers?

A        It is not specifically on there, but they come to the areas to get the form signed.

Q        Who would sign the form?

                         A. Vicencio                    35

     A      A manager.

     Q      Did you sign any forms on August 16th, 2018?

     A      I have to see the forms to see if I signed it.

     Q      If an incident is reported to management, what steps would be taken to correct the information?

            MR. QUATROMONI:  When you say "incident," you mean the incident that the plaintiff is alleging?

            MR. MCGUIRE:  Anything that would cause a shopper in the store to be injured.

            MR. QUATROMONI:  Objection to form.

            You can answer.

     A      If there was a spill, you call maintenance to clean up the spill.  That would be noted on the floor walk, and who resolved it, and what manager signed off on it.

     Q      How about debris on the ground, on the floor?

     A      It depends if the person doing

A. Vicencio                              36

the floor walk saw it.

Q      That's what I am asking you. What would they do if they observed debris on the floor?

A      They would either sweep it up themselves or they would call maintenance over.

Q      If the area needed to be mopped or cleaned up, would that be documented?

A      If it is a big spill, yes.

Q      How about not a spill, how about debris on the floor, if food fell out of a basket, from a shelf, and it was something not solid, something that had been stepped on or dragged around by a cart, what would maintenance do to clean that area?

MR. QUATROMONI:  Objection to form.

A      They would clean it up with a broom or paper towel.

Q      Did they have to mop the area, if it was necessary?

A      If it is necessary.

Q      If they had to mop the area, would they put out signs indicating the area

A. Vicencio                          37

was wet or just been mopped?

    A    Yes.

    Q    Are there any records maintained by the Long Island City Costco indicating any mopping or cleaning up was performed in or around the aisles leading up to the registers on August 16th, 2018?

    A    It has to be checked on the member report -- I'm sorry, on the floor walk report.

    Q    So, the floor walk report would indicate what steps were taken to correct the situation?

    MR. QUATROMONI:  Objection.

    A    Yes.

    MR. QUATROMONI:  Are you talking about specifically mopping or generally?

    MR. MCGUIRE:  I guess both.  She said, they sweep, and if it is a situation where sweeping is not sufficient, I assume they would elevate it to a mopping situation.

    Q    Is that correct?  If it can't get cleaned up by a broom, it would have to be

A. Vicencio                    38

mopped up to be cleaned up; is that correct?

A      If it was something very large, yes.  If it was something small, that can be easily cleaned, it would not be documented; it would just be cleaned.

Q      The only way you would find that out is checking the floor walk report?

A      For a large spill type thing, yes.

Q      How do you designate large from not large; what is the criteria for that?

A      Something that the member service person wouldn't be able to handle at the moment.

Q      Do the security cameras cover strictly inside the store or are they outside as well?

MR. QUATROMONI:  You are talking about back at the time of the accident?

MR. MCGUIRE:  Yes.

Q      In August of 2018.

A      I think maybe right outside the exit door is a camera.

Q      I just want to get some general

A. Vicencio                          39

information.

This Costco, is there another store attached to it or adjacent to it?

A       Yes.  It is two buildings connected by a breezeway.

Q       What is the other building?

A       It is receding, the food cart and the tire center.

Q       But it is still Costco?

A       Correct.

Q       It is not a liquor store, it is not a florist, it is not some other --

A       There is a liquor store at the corner.  Sorry.

Q       Is that a Costco liquor or independent?

A       Independent liquor.

Q       When the shopper or member is in the process of checking out, is there anyone else working, other than the person working the register at that location, an employee of Costco?

MR. QUATROMONI:  Objection to form.

You can answer.

A. Vicencio                          40

A      What do you mean?   Working on the front end?

Q      Yes.   For example, someone that helps pack the items.

A      Yes.   There is an assistant packing with the cashier.

Q      Every cashier has an assistant helping pack the items purchased?

A      Yes.

Q      And at the time, back on August 16th, 2018, was this Costco in Long Island City, were they serving sample foods throughout the store?

A      They did, but I don't know at that time if they were still sampling.

Q      Is there a time frame that sampling is performed?

A      Yes.

Q      What is that time frame?

A      I don't know the specific time, but I believe, like, 4:00 or 5:00 it would end.

Q      Has it ever gone later than 4:00 or 5:00?

A. Vicencio                                    41

A        Not really.

Q        With respect to your produce, is that produce sold individually?  For example, apples, oranges, berries, bananas, are they individual or is everything wrapped in a bag?

A        Bag or plastic.

Q        Nothing is freestanding?

A        No.

Q        At or about August 16th, 2018, did you ever observe shoppers consuming food, that they intended to purchase, from their cart?

A        I don't recall seeing anything that day.

Q        Well, not that day.  That period, ma'am?

A        Of August 16th?

Q        Yes, within a month or two.

How about this.

Have you ever seen a shopper on August 16th, 2018, or prior to that time, during the number of years you worked at Costco, consuming food from their baskets, what they intended to pay for when they

                          A. Vicencio                    42

checked out?

        A      Yes.

        Q      Was there any practice employed
by Costco to advise that shopper not to
consume the food?

        A      We will ask, but we would not
press on it.  That's why we have loss
prevention.

        Q      Do you have loss prevention
personnel walking through the store?

        A      Yes.

        Q      If loss prevention observed an
incident via spill or debris on the ground,
would they report that to somebody?

        A      Yes.

        Q      Would that be the maintenance,
management, or someone else?

        A      They would call it over the
walkie to maintenance.

        Q      If maintenance had to respond
and clean up an area, would that generate
a report or an incident reporter or some
kind of documentation that maintenance was
there and cleaned the area at a certain

A. Vicencio                         43

date and time?

A    No.

Q    Can you just describe for me the general layout of Costco?  When you enter the store, you show your card, that you're a current member.  And can you describe the layout of the store, from the entrance to where they would exit the store as it existed in August of 2018.  I don't know if it changed since then or not.

A    I also don't know if it is changed since then.

But once you entered, as you remember, the building was like a rectangle.  So, there was two main aisles that the members can -- like a shoehorn.  They can go around and about and shop, and go around in and out of the aisles, and kind of make their way back up to the front end, where the cashiers are.

Q    I am specifically talking about what department areas you go through as you come in the store, through the entrance, whether you walk, then, through electronics

A. Vicencio                    44

or a pharmacy there and then --

A        Correct.

Q        -- there was clothing in the middle, snacking in the middle, whatever, hardware or lawn ware, what you would be selling would be in the middle.  What is on the side, would it be cleaning chemicals, frozen food, meat department, produce, bakery, ex cetera?

How was the layout of the store in and about August of 2018?

A        You walk through major sales, TVs, that type of stuff, computers, to health and beauty on the left-hand side.  And also on the left-hand side would be cleaning supplies, toilet paper, food.  After that is the food area, like the dry food area.

In that same vicinity, on the right-hand side, would be seasonal, whatever that season was.  It was about two aisles. On the right-hand side is clothing.

And after that, on the left-hand side, would be the refrigerated section, and then the frozen section.  On the right would

A. Vicencio                    45

be a section that we call hard lines, which would be cups and plates.

Q        Dry goods?

A        Yes, dry goods, candies and, you know, domestics, like rugs and towels and stuff like that.

And then you continue after the freezer, is more foods on the left-hand side. And on the right-hand side is the cereal and chip aisle, which would lead to the corner. And produce would be in the corner with the bakery. And meat and deli all on the back walls.

And then you turn the corner when you go around more towards the right, it would be the cases of the meat department, and a section that we call department nineteen, that are the cheeses and specially foods that are refrigerated.

And there is an aisle going down which is on the other side of candy and domestics, and so forth, until you reach the register.

Q        Did your store, meaning the

A. Vicencio                          46

Long Island City store, did you sell the roasted chickens in that store at all in August of 2018?

A       Yes.

Q       Where were they located?

A       In the back of the building, by the deli.

Q       The complete opposite end of the register?

MR. QUATROMONI:  Objection to form.

A       It is all of the way to the right of the register.

Q       Are the registers up by the exits?

A       Correct.

Q       And the meats are also in the back of the store?

A       Correct.

Q       Is that the opposite end of the store from where the registers are located?

A       The store is like a rectangle. It is on the short side of the rectangle, the meat department.  The registers are on the long side of the rectangle, like on the

A. Vicencio                                47

bottom.

Q      I don't know if you said where the bakery was located.

Can you tell me where the bakery is located?

A      If it is a rectangle, it is on the upper left-hand side of the rectangle.

Q      In relation to the roasted chicken --

A      The back of the store.

Q      Is that the back of the store?

A      Correct.  It was to the left of the chickens.

Q      If a shopper got up to the register and decided she wanted to go back, and/or advised there was a sale going on in the bakery department, she would have to walk all of the way to the back of the store to the bakery department and obtain her item, and then walk all of the way back to the front of the store where the aisles are located; is that correct?

A      Yes.

Q      Are there any pillars located

A. Vicencio                                    48

near the aisle where the registers are located?

A       Yes.

MR. QUATROMONI:  Time frame?  You said "are there."  Are we talking back at the time of the incident of August 2018, not currently, correct?

MR. MCGUIRE:  Yes.

Can your witness answer?

MR. QUATROMONI:  Yes.

A       Yes.

Q       Can you describe the pillars for me --

A       They were structural.

Q       -- as they existed in August of 2018?

A       They were structural pillars that had, like, square concrete on the bottom.

Q       Were they padded?

A       No.  They had a concrete base.

Q       Were the colors different than before?

A       They were gray.

Q       What color was the floor?

A. Vicencio                          49

A    A concrete dark color.

Q    So, a similar gray coloring?

A    One would be much darker than the other.

Q    Did the pillars have any information on them, signs, directions, department, location, any of that information, for shoppers to locate and decide what they needed to go in what part of the store?

You do you understand what I am asking?

A    Yes.  There was no type of directions on the pillars.  But sometimes there are pallets with items they are selling in front of them.

Q    Were the pillars numbered, ma'am?

A    No.

Q    Can you tell me where the produce department is located in the building from where the registers are located?

A    In the back corner of the building.

Q    You said the food cart or the

A. Vicencio                    50

area in the store that sold cooked food or snacks for the shoppers is not located in the building where the food is located, correct? It is in that breezeway, past the breezeway over by the tire shop, area?

A        Correct.  It is a separate building.

Q        Ma'am, for approximately one year prior to August 16th, 2018, did you receive any witness complaints or verbal complaints about debris being found around the register area?

A        Not written complaints.  It was our everyday job to make sure it was clean.

Q        If someone had a complaint that they found stuff on the floor in and around the aisles where the registers are located, they would tell either the employee working there or a manager, if they came across that person?

            MR. QUATROMONI:  Objection to form.

A        Yes.

Q        That happened to you personally within that one-year period before

A. Vicencio                        51

August 16th, 2018?

MR. QUATROMONI:  Objection to form.

A      Yes.

Q      Would you document that, that you received the complaint with respect to debris being on the floor in and around the register area?

A      It is not required to be documented.

Q      Upon receiving such a complaint, would the procedure be you contact maintenance to go address the situation?

A      Yes.

Q      Is there any procedure to follow up, to make sure maintenance did, in fact, correct the situation?

A      There was no procedure, like, to follow up.  It was something, when I walk the floor, I make sure it was done.

Q      When you performed -- you do a floor walk?

MR. QUATROMONI:  Objection to form.

MR. MCGUIRE:  Unless you referred to it as something different.

A. Vicencio                          52

MR. QUATROMONI:  I don't think she testified she did the floor walk.

Q      Did managers or assistant managers, in or about August of 2018, perform floor walks and fill out reports of those floor walks?

A      Managers don't do floor walks. It would be member service employees.

Q      Would they document that a previously reported debris report was cleaned up by maintenance?

A      No, they would not report that on the paperwork.

Q      What would they do if they encountered a situation not addressed by maintenance?

A      They would either call it over a walkie or -- like I said before, if there was a large enough spill and they notated it at the time they saw it, there is a section that says resolved, who resolved it.

Q      Did you have a cell phone or own a cell phone on August 16th, 2018?

A      Yes, I had my personal cell

A. Vicencio                          53

phone.

Q        Did you receive one from Costco that you used throughout the store, or were your communications directly though walkie-talkies?

A        Yes, communications through walkie-talkies.

Q        When you responded to Ms. Jada, did you take any pictures of the area where she fell?

A        I don't recall taking pictures. I have a different cell phone, that I don't have any many pictures from 2018.

Q        I just asked if you took any pictures where she fell, ma'am.

A        I don't recall.

Q        Was it a procedure or a protocol that a responding employee, whether it be a member employee or maintenance or management, upon arriving on a scene of an incident, to document the incident with photographs?

A        Yes.

Q        But that was not done in this incident, correct?

A. Vicencio                    54

MR. QUATROMONI:  Objection to form.

A       No.  I said, I don't recall.  I have a different cell phone.

Q       Ma'am, if you had documented the area with photographs, would you then be required to fill them out or e-mail them to anybody in loss prevention or member services, to be preserved along with the incident report?

A       Not until Gallagher Bassett asked us for the pictures.

Q       Ma'am, once you took this report, this members services report dated, looks like, August 16th, 2018, is that forwarded to Gallagher Bassett, or what is done with the report once you take it?

A       It is usually keyed into the member incident report.

Q       Is Gallagher Bassett on that list of people who get that information?

A       Yes.

Q       Have you encountered an incident where Gallagher Bassett asked you for photographs in or around August 16th, 2018,

A. Vicencio                               55

asked you for photographs of an incident or copies of any security cameras footage of this incident?

    A        I can't recall about this incident.

    Q        Not this incident.  I am talking about incidents in general, around the time of this incident?

    A        They could have.  I don't have any recollections of which incident.

    Q        If they did request it, what procedure would Costco file with respect to the security camera film footage and any photographs that were taken of the area where the incident occurred, how would that be handled?

    A        The photograph would be e-mailed to whichever representative from Gallagher Bassett is working on that particular case. Video footage would usually be recorded on a thumb drive and sent to them.

    Q        As far as you are aware, there were no photographs taken of the scene where Ms. Jada fell on August 16th, 2018; is that

A. Vicencio                                56

correct?

MR. QUATROMONI:  Objection to form.

Asked and answered, and mischaracterized the testimony.

You can answer again.

A    I don't recall.

Q    You don't recall you taking any photographs.

Do you recall anyone taking photographs, either a member employee who worked in the area or maintenance?

A    I don't recall anyone taking pictures.

Q    When a shopper gets up to a register, and I am talking about in the period of on or about August 16th, 2018, if they suddenly decide they don't want to purchase food, what does the register person do with the food?

A    They either put it back to where it belongs, or they would give it to a supervisor, that would hold it in the front, like a shopping cart, to have someone put it away.

A. Vicencio                                57

Q        If a shopper comes up to a register and decides I am not going to purchase this item of food, take it off my list, he or she gives it to the person working the register, who then returns to the floor, or is there something else that person would do?

MR. QUATROMONI:  Objection to form.

Calls for speculation.

You can answer.

A        The assistant would either -- if it is a perishable item, would either put it back on the floor -- the assistant, not the cashier, and give it to the supervisor.  And they usually have a shopping cart they put the items back in.

Q        With respect to the Long Island City Costco store in August 2018, were there times of the day where your store was busier than other times of the day?

For example, what would you consider your busy times in the Long Island City store for the shoppers?

A        It depends on the day.  It is

A. Vicencio                        58

busy in the mornings, and slow down in the midafternoon, and then gets busy again in the evening.

Q      When you say "mornings," what time are you talking about?

A      When we open up the building, 10:00 a.m., about 12:00.

Q      And evening time?

A      After 6:00.

Q      When is your closing time?

A      8:30, Monday through Friday.

Q      Would you say 6:00 p.m. to 8:30?

A      Yes.

Q      When you were speaking to Ms. Jada and filling out the member first report of incident, at any time did you ask her if she wanted any medical attention?

A      I don't recall asking her specifically, but it is my practice to ask if they want any medical attention.

Q      Would it be reported on that report, if it was done and asked, for medical attention?

A      I don't think it would be

A. Vicencio                           59

recorded on the member incident report, but it will say transferred to ambulance or something to that affect on there.

Q    At the bottom of the sheet, number twelve, the question asks, do you intend to seek medical treatment.

Did you circle yes or did Ms. Jada circle yes?

A    I don't know.

Q    And the only item that indicates to you that you were involved with this document is that you recognize your handwriting in number eight and number eleven; is that correct?

A    Correct.

Q    There is no other indication on this that you had to sign or initial, you filled out the form or present with the person involved in the incident and the form was filled out?

A    Correct.

Q    Did you ever speak with the guest Tamara Arutian with respect to this incident, ma'am?

A. Vicencio                           60

A       I don't recall.

Q       Is there any reason why you wouldn't speak to her?

A       No.

Q       Do you see the document on the screen?

A       The affidavit?

Q       Yes.

A       Yes.

Q       Read it to yourself and review the document.

A       Okay.

Q       Have you ever seen that document before today, ma'am?

A       No.

Q       I am next going to ask you to look at Plaintiff's Exhibit 2.  Review that document, please.

A       Okay.

Q       Have you ever seen that document before, Plaintiff's Exhibit 2?

A       No.

Q       I don't know if I asked you this. What is your present title in

A. Vicencio                        61

Oceanside, ma'am?

A       Merchandizing manager.

Q       In the hierarchy of Costco, it is hourly employees, management, whether it is assistant manager, general manager, and then merchandizing manager, or some different hierarchy?

A       No.  It is hourly, supervisors, area managers, senior manager, assistant manager, GM.

Q       Where does merchandizing manager fit in there?

A       It is senior manager position.

Q       Is it your decision to switch locations, different Costco locations, or is that the company practice to move people around to different stores?

A       It is practice to move to different stores.

Q       What title did you have when you left the Long Island City location?

A       I was assistant GM in Long island City, and I was admin manager in Oceanside.

Q       I ask this question of everyone,

A. Vicencio                    62

and it is not meant to insult you or be demeaning.

Have you ever been convicted of a crime?

A    No.

Q    Since the date of the incident on August 16th, 2018, have you seen the plaintiff, Fouzia Jada, in any capacity?

A    No.

Q    Since this incident occurred, did you come across any incident reports, or reports or photographs, or security footage, depicting the accident that happened on August 16th, 2018 at approximately 7:00 to 7:30 p.m. at the Long Island City Costco?

A    Can you repeat that question?

MR. MCGUIRE:  Ms. Reporter, can you read it back.

(Whereupon, the requested portion was read back by the reporter.)

MR. QUATROMONI:  Other than Defendant's Exhibit A that we talked about today, yes?

MR. MCGUIRE:  Yes.

A. Vicencio                           63

THE WITNESS:  I seen the member incident report.

MR. MCGUIRE:  Thank you very much.

MR. QUATROMONI:  To the extent any questions that are about the interaction with Gallagher Bassett, they are attorney/client privilege.  I make that objection now.

I have one clarification question. You were asked before, previously, by plaintiff's counsel about the practice of returning items, if the customer decided he or she didn't want the item.

Do you recall that line of questioning?

THE WITNESS:  Yes.

MR. QUATROMONI:  And I believe the comment was made along the lines that the items are put back on the floor; is that correct?

THE WITNESS:  Yes.

MR. QUATROMONI:  What do you mean by that, put back on the floor?

THE WITNESS:  It is placed back

A. Vicencio                                        64

where it belonged.

MR. QUATROMONI:  As opposed to being put back on the floor by the cashier, it was put in warehouse, where it is sold?

THE WITNESS:  Right, to the position where it is being sold.

MR. QUATROMONI:  Thank you.

MR. MCGUIRE:  I am going to make the demand, and I'll follow up in writing, for a copy of the employee schedule for individuals working on the date of August 16th, 2018, the employee schedule, and then the department schedule for the employees for that same date, August 16th, 2018.  And also a demand for the floor walk report and/or maintenance reports for the Long Island City store for August 16th, 2018.

MR. QUATROMONI:  Please put the requests in writing, and we will take them under advisement.

MR. MCGUIRE:  I will follow up in writing.  I just wanted that on the record.

A. Vicencio                                    65

(Whereupon, the examination of Alejandra Vicencio was conclude at 12:36 p.m.)

_____

ALEJANDRA VICENCIO

Subscribed and sworn to before me this _____ day of _____, 20__.

_____
NOTARY PUBLIC

66

I N D E X

WITNESS              EXAMINATION BY                    PAGE

MS. VICENCIO     MR. MCGUIRE                             5

REQUESTS FOR PRODUCTION

DESCRIPTION                                            PAGE

Employee schedule from 8/16/18,                         64
department schedule from 8/16/18,
the floor walk report from 8/16/18 and
maintenance report from 8/16/18

67

## C E R T I F I C A T E

I, ANGELA ROSE SIGNORILE, a reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness(es) whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such witness(es).

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

_Angela Rose Signorile_

ANGELA ROSE SIGNORILE

68

<u>ERRATA SHEET</u>

The following are my corrections to the
attached transcript:


<u>PAGE</u>      <u>LINE</u>      <u>SHOULD READ</u>

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____

_____  *  _____      _____