# Exhibit N

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

FOUZIA JADA,

                              Plaintiff,

        -against-

COSTCO WHOLESALE CORPORATION and
MBA – VERNON BOULEVARD, LLC,

                              Defendants.

---

Docket No.: 21-CV-194 (MKB)(JRC)

**AFFIDAVIT**

STATE OF NEW JERSEY        )
                           ) ss.:
COUNTY OF MERCER           )

RICHARD THYPIN, being duly sworn, deposes and says:

1.      I am a designated representative of MBA-Vernon Boulevard, LLC ("MBA"). MBA owns the land located at 3250 Vernon Boulevard, Long Island City, New York 11106 ("Property").

2.      It is my understanding that the attorneys for Costco Wholesale Corporation and MBA in this litigation exchanged a true and correct copy of the Ground Lease that was in effect for the Property as of August 16, 2018, with the bates numbers COSTCO/MBA 0001-0102. An additional copy of the Ground Lease, with the bates numbers COSTCO/MBA 0001-0102 is attached hereto as **Exhibit A**.

3.      The copy of the Ground Lease that was exchanged in this litigation with the bates numbers COSTCO/MBA 0001-0102 and is also attached hereto as **Exhibit A**, is a true and correct copy of the Ground Lease for the Property signed by Costco Wholesale Corporation and Manhasset Bay Associates. The Ground Lease is maintained by MBA in the normal course of business.

6157901-1

4. The Ground Lease remained in effect following the transfer of ownership of the Property from Manhasset Bay Associates to MBA prior to August 16, 2018.

5. The Ground Lease was in effect on August 16, 2018.

RICHARD THYPIN

Sworn to before me this
19 day of September, 2022.

Notary Public

LAMIYA KHOKHAWALA
NOTARY PUBLIC
STATE OF NEW JERSEY
ID # 50185275
MY COMMISSION EXPIRES FEB. 11, 2027

-2-

6157901-1

## CERTIFICATE OF CONFORMITY

STATE OF NEW JERSEY    )
                                )ss.
COUNTY OF MERCER    )

I, _Lamiya Khokhawala_ , a notary public licensed in the State of New Jersey, affirm under penalty of perjury that I witnessed the signature of Richard Thypin as applied to the Affidavit annexed to this Certificate, which was signed and dated on _19 September 2022_ The manner in which same was signed was, and is, in accordance with, and conforms to, the laws for taking oaths and acknowledgments in the State of New Jersey.

Dated: _19-Sep-2022_

LAMIYA KHOKHAWALA
NOTARY PUBLIC
STATE OF NEW JERSEY
Notary Public
ID # 50185275
MY COMMISSION EXPIRES FEB. 11, 2027

-3-

6157901-1

# Exhibit A to Affidavit of Richard Thypin

ORIGINAL

GROUND LEASE

Between

**MANHASSET BAY ASSOCIATES**

as Landlord

and

**COSTCO WHOLESALE CORPORATION**

as Tenant

**PREMISES:**

Vernon Boulevard between
Broadway and 33rd Road
Queens, New York

Dated: April 12, 1996

[c: ASL] THYPIN.10

COSTCO/MBA 0001

## TABLE OF CONTENTS

SECTION 1   DEFINED TERMS . . . . . . . . . . . . . . . . . . . . 1

SECTION 2   PREMISES . . . . . . . . . . . . . . . . . . . . . 7

SECTION 3   RENTAL . . . . . . . . . . . . . . . . . . . . . . 12

SECTION 4   CONTINGENCIES AND FEASIBILITY PERIOD;
CONDITIONS TO THE COMMENCEMENT DATE;
STREET PARKING . . . . . . . . . . . . . . . . . . . 18

SECTION 5   ASSESSMENTS AND UTILITIES: TAXES;
CONTEST OF IMPOSITIONS . . . . . . . . . . . . . . 28

SECTION 6   CONSTRUCTION OF IMPROVEMENTS . . . . . . . . . . . 30

SECTION 7   DAMAGE OR DESTRUCTION . . . . . . . . . . . . . . 33

SECTION 8   INSURANCE . . . . . . . . . . . . . . . . . . . . 34

SECTION 9   CONDEMNATION . . . . . . . . . . . . . . . . . . . 38

SECTION 10   TENANT TO COMPLY WITH LAWS;
REPAIRS AND MAINTENANCE . . . . . . . . . . . . . 42

SECTION 11   TENANT FINANCING . . . . . . . . . . . . . . . . 43

SECTION 12   ASSIGNMENT AND SUBLETTING . . . . . . . . . . . . 55

SECTION 13   QUIET ENJOYMENT . . . . . . . . . . . . . . . . . 58

SECTION 14   DEFAULT . . . . . . . . . . . . . . . . . . . . . 58

SECTION 15   ARBITRATION . . . . . . . . . . . . . . . . . . . 62

SECTION 16   RIGHT OF FIRST REFUSAL . . . . . . . . . . . . . 64

SECTION 17   LANDLORD AND TENANT TO FURNISH STATEMENT . . . . 66

SECTION 18   NON-COMPETE; LIMITATION IN TRADE AREA . . . . . 67

SECTION 19   INDEMNIFICATION . . . . . . . . . . . . . . . . . 68

SECTION 20   ENVIRONMENTAL INDEMNITY . . . . . . . . . . . . . 69

SECTION 21   MISCELLANEOUS . . . . . . . . . . . . . . . . . . 70

SECTION 22   FEE MORTGAGES . . . . . . . . . . . . . . . . . . 76

[c: ASL] THYPIN.10

COSTCO/MBA 0002

SECTION 23  INSPECTION OF PREMISES  . . . . . . . . . . . . . . 77

EXHIBITS:

| | |
|---|---|
| EXHIBIT "A" | Property |
| EXHIBIT "B" | Permitted Exceptions |
| EXHIBIT "C" | Site Plan |
| EXHIBIT "D" | Permits |
| EXHIBIT "E" | Wetlands |
| EXHIBIT "F" | Form of Commencement Agreement |
| EXHIBIT "G" | Personalty to be Removed |
| EXHIBIT "H" | Manhattan Non-Compete Area |
| EXHIBIT "I" | Queens Non-Compete Area |
| EXHIBIT "J" | Form of Memorandum of Lease |
| EXHIBIT "K" | Form of Non-Disturbance Agreement |

[c: ASL] THYPIN.10

COSTCO/MBA 0003

## GROUND LEASE

THIS LEASE made and entered into this 12th day of April, 1996, by and between **MANHASSET BAY ASSOCIATES**, a New York general partnership (**"Landlord"**), and **COSTCO WHOLESALE CORPORATION**, a Washington corporation (**"Tenant"**).

Tenant desires to lease from Landlord, and Landlord agrees to lease to Tenant, the Premises (as defined below), for the term and upon the conditions set forth herein.

NOW, THEREFORE, Landlord and Tenant hereby agree:

## SECTION 1

## DEFINED TERMS

1.01 Definitions. The following terms shall have the following meaning, when used in this Lease:

**"Additional Rent"** shall mean all payments, other than Minimum Rent or Excess Rent, to be made by Tenant under this Lease, either to Landlord or to third parties and whether or not such payments shall be designated as Additional Rent.

**"Alterations"** shall mean any alterations, additions, restorations, changes, replacements and installations in, of, or to the Premises as Tenant deems necessary or desirable, structural or non-structural.

**"Building"** shall mean, collectively, the buildings located on the Property.

**"Building Permit"** shall mean the permit issued by the Buildings Department for the Alterations of the Improvements contemplated by the Site Plan.

**"Buildings Department"** shall mean the Buildings Department for The City of New York.

**"Commencement Date"** shall mean the date which is ten (10) days after the date that the conditions set forth in Section 4.04 below are satisfied.

**"Default Rate"** shall mean a rate of interest equal to two (2) percentage points in excess of the prime lending rate as

[c: ASL] THYPIN.10                               1

COSTCO/MBA 0004



announced from time to time in The Wall Street Journal (or if The Wall Street Journal ceases to be published, an alternate publication selected by Landlord and approved by Tenant acting reasonably).

"**Depository**" shall mean any institutional lender or trustee in the greater metropolitan New York area which is prepared to hold insurance proceeds and condemnation awards for disbursement in accordance with normal and customary construction loan-type provisions.

"**Environmental Laws**" shall mean all federal, state and local laws, statutes, rules, regulations, directives and ordinances (whether now existing or hereafter enacted or promulgated) relating to public health, safety or the environment, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 and any amendments thereof or the regulations promulgated thereunder.

"**Execution Date**" shall mean the date on which a fully executed copy of this Lease is actually received by Tenant's counsel, irrespective of the date Landlord or Tenant actually executes this Lease.

"**Expiration Date**" shall mean the later of (a) the last day of the Initial Term or (y) the expiration date of the latest Renewal Period for which Tenant shall have exercised its option to renew.

"**Fee Estate**" shall mean all of Landlord's right, title and interest in and to the Premises.

"**Fee Mortgage**" shall mean a mortgage on Landlord's Fee Estate or any part thereof.

"**Fiscal Year**" shall mean a 52/53 week fiscal year, consisting of 13 four-week periods and ending on the Sunday nearest the end of August. The first, second and third quarters consist of three periods each, and the fourth quarter consists of four periods (five weeks in the thirteenth period in a 53-week year).

"**Force Majeure Events**" shall mean delays due to strikes, lockouts, shortages of labor or materials after due diligence in obtaining the same, governmental restrictions, fire, casualty, riot, act of God, act of the public enemy, or other causes beyond the reasonable control of Tenant after the exercise of due diligence, including diligence in contracting, and the exercise

[c: ASL] THYPIN.10                    2

COSTCO/MBA 0005

of rights under contracts, with contractors and suppliers.

**"Gross Floor Area"** shall mean the gross floor area of the Building, which is to be determined based upon the gross floor area as set forth in the Building Permit for the Building and as set forth in any building permits for any subsequent Alterations; it being understood that Minimum Rent is to be based upon a deemed Gross Floor Area of one hundred twenty thousand (120,000) square feet in accordance with Section 3.01.4.

**"Gross Receipts"** shall mean (a) sales actually made by Tenant, and its licensees, concessionaires and subtenants (subject, however, to any Sales Exclusion), of goods, wares and merchandise at the Premises during each Fiscal Year, (b) warehouse membership fees collected by Tenant which are allocated by Tenant to the Premises in good faith consistent with its general corporate practice, (c) rent or other occupancy charges received from those subtenants, concessionaires, or licensees whose sales are not included in the computation of Gross Receipts and (d) any other income derived by Tenant at the Premises, but excluding therefrom all Sales Exclusions.

**"Governmental Authority"** shall mean any one or more of the United States, the State of New York, the County of Queens, the City of New York and any political subdivision thereof, and any agency, department, commission, board, bureau or instrumentality of any of them.

**"Hazardous Substances"** shall mean hazardous substances as defined in the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 and any amendments thereof or the regulations promulgated thereunder, and any other hazardous substances, hydrocarbons, hazardous materials, asbestos, polychlorinated biphenyls, urea formaldehyde, industrial waste, toxic waste, chemical contaminants or any other substances which are designated as hazardous or toxic under any Environmental Laws, or is defined as hazardous, dangerous or toxic by any Governmental Authority having jurisdiction over the Property.

**"Improvements"** shall mean all improvements on, or to be constructed at, the Property.

**"Initial Term"** shall mean the period commencing on the Rent Commencement Date and continuing twenty five (25) years from the last day of the month in which the Rent Commencement Date occurs.

[c: ASL] THYPIN.10                    3

COSTCO/MBA 0006

**"Landlord"** shall mean only the fee owner of the Premises at the time in question, so that in the event that the named Landlord or any successor thereto ceases to have any interest in the Premises or sells, transfers or otherwise disposes of its interest in the Premises, said Landlord or such successor, as the case may be, shall be and hereby is entirely freed and relieved of all agreements, covenants and obligations of Landlord hereunder accruing from and after the date of such sale, transfer or other disposition other than the disposition or payment over of any funds or monies in its possession for which it is not entitled (including, by way of example, rent for any period from and after its period of ownership or proceeds on account of a casualty or condemnation).

**"Lease Year"** shall mean a period of twelve calendar months; provided, however, the first Lease Year shall begin on the Rent Commencement Date and shall end on the last day of the twelfth (12th) month following the Rent Commencement Date. The second Lease Year shall commence on the day following the last day of the first Lease Year.

**"Legal Requirements"** shall mean laws, statutes and ordinances of all Governmental Authorities, and orders, rules, directives and regulations issued pursuant thereto.

**"Minimum Rent"** shall mean the rent payable as provided in Section 3.01.1.

**"Original Tenant"** shall mean Costco Wholesale Corporation.

**"Permits"** shall include, but shall not be limited to, the Building Permit, the permits and other approvals listed on Exhibit "D" and such other permits, authorizations and approvals from all governmental and quasi-governmental authorities having or asserting jurisdiction over the Property and the Building which are required or necessary, so that upon Tenant's completion of Alterations to the existing Improvements consistent with the Site Plan, Tenant shall have the right to use the Premises throughout the Term under a Use Group 10A designation as set forth in Section 32-19 of The City of New York Zoning Resolution for the operation of a  wholesale and retail warehouse membership sales and tire center. Tenant acknowledges that any permits or licenses necessary for the operation of any of the departments within the Improvements (such as meat, bakery and pharmacy) shall not be included within the definition of Permits. Landlord acknowledges that the Permits shall include the necessary permits, authorizations or approvals described in the first sentence of Section 4.06, and Landlord shall use its best

[c: ASL] THYPIN.10                            4

COSTCO/MBA 0007

reasonable efforts to obtain the balance of the permits, consents or authorizations described in Section 4.06.

**"Permitted Exceptions"** shall mean the exceptions to title set forth on Exhibit "B".

**"Plans"** shall mean the plans and specifications required by the Buildings Department for The City of New York in order for said Department to issue the Building Permit.

**"Premises"** shall mean the Property together with all Improvements.

**"Property"** shall mean certain real property located at Vernon Boulevard between Broadway and 33rd Road, Queens, New York consisting of approximately 7.73 acres situated in County of Queens, City and State of New York, as identified on the tax map of Queens County as Block 313, Lot 1 and more specifically described on Exhibit "A".

**"Reminder Notice"** shall mean the notice from Landlord to Tenant that Tenant has failed to give its notice extending the Term for each and any Renewal Period.

**"Renewal Period"** shall mean each of four (4) consecutive periods of five (5) years each and one (1) period equal to the time period remaining when the aggregate of the Initial Term and each prior Renewal Period of five (5) years is subtracted from the maximum Term of forty-eight (48) years and ten (10) months.

**"Rent Commencement Date"** shall mean the earlier of (a) the date on which Tenant opens the Building to the public for business, or (b) one hundred eighty (180) days after the Building Permit is issued.

**"Sales Exclusions"** shall mean (a) sales consummated at the Building by licensees, concessionaires or subtenants of Tenant in which Tenant has no right, title or interest (i.e. such sales are not paid for at the registers maintained by Tenant for the payment of its sales, or if such sales are so paid for, then where the gross proceeds of such sales are paid over directly to the licensee, concessionaire or subtenant); (b) the actual amount of dishonored or bad checks and uncollectible credit accounts (provided that such amounts will be included in Gross Receipts for the Fiscal Year when and if actually collected); (c) exchanges of merchandise between stores of Tenant where such exchanges are made solely for the convenient operation of Tenant's business and not for the purposes of consummating a sale

[c: ASL] THYPIN.10                        5

which has been made at, in, or from the Premises; (d) the sale of fixtures, equipment or related property which are not stock in trade, after their use in the conduct of Tenant's business in the Premises; (e) the purchase price of merchandise returned by Tenant, whether for cash or other merchandise and allowance; (f) the amount of any sums and credit received in settlement of claims for loss or damage to merchandise or property; (g) the amount of discounts, coupons and cash or credit refunds made upon transactions included within Gross Receipts; (h) that portion of any revenue generated by vending machines of any type or pay telephones other than any payments made by vendors thereof to Tenant; if Tenant shall own or operate for its own account said vending machines or telephones, then all of the revenue generated shall be included in Gross Receipts and shall not constitute a Sales Exclusion; (i) returns and refunds in fact made by Tenant upon transactions included within Gross Receipts, but only in an amount not exceeding the selling price of the merchandise returned by the customer and accepted by Tenant; (j) the amount of any city, county, state or federal sales, luxury, liquor, value added, gross receipts, or excise tax on such sales or any similar taxes now or hereafter imposed which is both added to the selling price (or absorbed therein) and paid to the taxing authority by Tenant (but not by any vendor of Tenant); <u>provided, however</u>, no franchise or capital stock tax and no income, business license or similar tax based upon income or profits as such, shall be deducted from Gross Receipts in any event whatsoever; (k) warehouse club membership fees except as specifically provided for in the definition of Gross Receipts; (l) sales discounts or non-cash donations to nonprofit, charitable or religious organizations; (m) service and interest charges for time payment accounts and charge accounts; (n) direct expenses of credit card sales paid by Tenant to the issuers of such credit cards; (o) rent or other occupancy charges received from those subtenants, concessionaires, or licensees whose sales are included in the computation of Gross Receipts; and (p) advertising or promotional revenue received by Tenant or any affiliate with respect to advertising material distributed at the Premises, unless such materials relate exclusively to Tenant's business at the Premises.  Tenant agrees that it shall not in bad faith enter into any license, concession agreement or sublease for the purpose of excluding sales from Gross Receipts.

**"Site Plan"** shall mean the site plan dated August 2, 1995 prepared by Tenant and annexed hereto as <u>Exhibit "C"</u>.

**"Term"** shall mean the Initial Term and any Renewal Periods, it being expressly understood, however, that in no event shall

COSTCO/MBA 0009

Case 1:21-cv-00194-MKB-JRC    Document 29-15    Filed 11/07/22    Page 15 of 107
PageID #: 488

the Term of this Lease exceed forty eight (48) years and ten (10) months in the aggregate.

**"Title Company"** shall mean any title company or abstract agency licensed in the State of New York.

**"Title Policy"** shall mean an ALTA extended coverage leasehold owners title insurance policy.

## SECTION 2

### PREMISES

2.01  <u>Description</u>.  For and in consideration of Tenant's covenant to pay the rental and other sums provided for herein, and the performance of the other obligations of Tenant hereunder, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises, subject only to the Permitted Exceptions.

2.02  <u>Term</u>.  This Lease shall commence on the Commencement Date and shall continue through and including the Expiration Date; <u>provided</u>, <u>however</u>, that it is subject to early termination in accordance with the terms of <u>Section 4</u> hereof.

2.03  <u>Tenant's Right to Extend the Term</u>.  Provided Tenant shall not then be in default of this Lease beyond any applicable notice or grace period, Tenant shall have the right to extend the Term of this Lease, commencing at the expiration of the Initial Term, for each of the Renewal Periods, by giving notice as provided in <u>Section 2.03.1</u>.

2.03.1  <u>Notice</u>.  Tenant may from time to time exercise any one or more of the Renewal Periods by giving notice of such election to Landlord not less than twenty four (24) months before the beginning of the first Renewal Period and not less than twelve (12) months before the beginning of each subsequent Renewal Period.  If Tenant shall not have given such notice on a timely basis as required herein, Landlord may, at any time thereafter, give the Reminder Notice to Tenant, and notwithstanding anything to the contrary contained in the preceding sentence, Tenant's time to extend the Term for a Renewal Period shall continue until thirty (30) days after receipt of the Reminder Notice from Landlord.  If Landlord does not give the Reminder Notice to Tenant by the date which is twelve (12) months before the then Expiration Date, the Lease Term shall be extended until the earlier of (a) thirteen (13) months after the Reminder Notice is given by Landlord, or (b)

[c: ASL] THYPIN.10                              7

COSTCO/MBA 0010

twelve (12) months after Tenant notifies Landlord that it does not intend to exercise a renewal option, and the Expiration Date shall occur at the end of such extended period; provided, however, that in no event and under no circumstances shall the Term of this Lease exceed forty eight (48) years and ten (10) months in the aggregate.  If Tenant elects to exercise any one or more of said options, the Lease Term shall be automatically extended for the Renewal Period or Periods covered by the option or options so exercised without execution of an extension or renewal lease and without the necessity of any act on the part of Landlord (but Landlord agrees that on request it will acknowledge such exercise).  The commencement date of any Renewal Period for which Tenant exercises its option to renew shall be deemed to be that set forth in the Commencement Agreement (as defined in Section 3.05), irrespective of any such extension of the Term past the initial Expiration Date.  Each Renewal Period or extension of the Term past the initial Expiration Date shall be on all of the same terms and conditions as are in effect hereunder immediately preceding the commencement date of such Renewal Period or extension, as the case may be, except that the number of options to extend the Term shall be reduced by each Renewal Period which has been exercised by Tenant, and except that the Rent shall be as provided in Section 3.01.2.

2.03.2  Terms and Conditions.  Tenant's occupancy during the Renewal Periods, whether as a result of Tenant's exercise of an option to so extend the Term or the deemed extension as provided in Section 2.03.1 shall be upon the same terms and conditions as provided in this Lease, but at the applicable rental rate which is set forth in Section 3.01.2.

2.03.3  Term to be Inclusive.  Whenever the word **"Term"** is used in this Lease, it shall be deemed to include the Initial Term, any exercised Renewal Period and any period through an Extension Date.

2.04  Landlord's Warranties.  Landlord represents and warrants the following as of the date hereof, which shall also be true and correct as of the Commencement Date:

(a)    Power and Authority.  Landlord has the authority and power to enter into this Lease and to consummate the transaction provided for herein.  This Lease and all other documents executed and delivered by Landlord to Tenant in connection herewith constitute legal, valid, binding and enforceable obligations of Landlord, and there are no claims or defenses, personal or otherwise, or offsets whatsoever to the enforceability or validity of this Lease or such documents.

[c: ASL] THYPIN.10                           8

COSTCO/MBA 0011

(b)        No Violations and Actions.  The execution, delivery and performance by Landlord of its obligations under this Lease will not conflict with or result in a breach of any law, governmental rule, regulation, judgment, decree or order by which the Landlord is bound, or by any provision of any contract to which Landlord is a party or by which Landlord is bound or by Landlord's declaration of trust, certificate of incorporation, bylaws or partnership agreement, as the case may be.  There is no action, suit, proceeding or investigation pending, or to the best of Landlord's knowledge threatened, before any agency, court, arbitration panel or other judicial or quasi-judicial body which relates to the Property or the use thereof.

(c)        Hazardous Substances.  Landlord has no knowledge of the existence of Hazardous Substances at the Property except as disclosed in that certain report prepared by AKRF, Inc., a true, correct and complete copy of which has been delivered to Tenant prior to the execution hereof.

(d)        Liens and Encumbrances.  Landlord shall not, between the date hereof and the Commencement Date, agree to or create or permit or suffer to be created any liens or encumbrances on the Premises, and Landlord shall, at or prior to the commencement of the Term, cause the Premises to be free of all liens and encumbrances except as set forth on Exhibit "B".

(e)        Condemnation.  Landlord has received no written notice, and has no knowledge, of any threatened condemnation proceeding affecting the Property or any portion thereof.

(f)        Violations.  Landlord has received no written notice of any violation of any applicable law, ordinance, order or regulation (including but not limited to zoning or building codes) from any Governmental Authorities filed against the Premises.

(g)        Default, Breach, Access and Utilities.  There is no default or breach by Landlord under any covenant, condition, restriction, right-of-way, or easement which may affect the Property or any portion thereof.  No condition exists which would result in the termination or impairment of access to the Property or discontinuation of necessary sewer, water, electric, gas, telephone, or other utilities.

(h)        Work.  No work has been performed or is in progress at, and no materials have been furnished to, the Property which have not been, or by the Commencement Date will not be, paid for in full by Landlord.

[c: ASL] THYPIN.10                                    9

COSTCO/MBA 0012

(i)      Assessments.  Landlord has not received
written notice of any special assessments which are threatened
against all or any part of the Property.

(j)      Agreements and Contracts.  There are no
contracts or other agreements for services, supplies or
materials, affecting the use, operation or management of the
Property other than those which will be terminated on or prior to
the Commencement Date.

(k)      Wetlands.  Only that portion of the Property
identified on Exhibit "E" is designated as wetland or as in a
flood plain by the appropriate Governmental Authorities.

(l)      Buried Tanks.  To Landlord's knowledge, there
are no more than eight (8) underground storage tanks on the
Property. To Landlord's knowledge, no underground storage tanks
been removed from the Property.

(m)      Bankruptcy Matters.  Landlord has not made a
general assignment for the benefit of creditors, filed any
voluntary petition in bankruptcy or suffered the filing of an
involuntary petition by its creditors, suffered the appointment
of a receiver to take possession of substantially all of its
assets, suffered the attachment or other judicial seizure of
substantially all of its assets, admitted its inability to pay
its debts as they come due, or made an offer of settlement,
extension or composition to its creditors generally.

(n)      Misrepresentation and Adverse Facts.  The
representations and warranties in this paragraph (n) are
qualified and limited in their entirety by the actual knowledge
of Richard Thypin, Stuart Oltchick and Laurence Gilbert, and is
made by Landlord without any independent inquiry or duty to
inquire other than with the aforesaid persons.  Landlord has made
no untrue statements or representations in connection with this
Lease, and all documents or instruments delivered, or to be
delivered, to Tenant are true and correct copies of what they
purport to be.  Said documents or instruments have not been
amended or modified, other than as also delivered to Tenant, and
no items that should have been set forth as exhibits hereto or
delivered herewith to Tenant have not been so set forth or
delivered.  Landlord knows of no facts, nor has Landlord failed
to disclose any fact, which would prevent Tenant from using and
operating the Property in the manner in which it is intended to
be operated by Tenant.

(q)      Possession.  No person other than New York
City Industrial Development Agency and Thypin Steel Co., Inc.

[c: ASL] THYPIN.10                    10

COSTCO/MBA 0013

Landlord and Tenant has any right of possession to the Property or any part thereof, and no party has any right to acquire the Property.

2.05  Tenant's Warranties.  Tenant represents and warrants the following as of the date hereof, which shall also be true and correct as of the Commencement Date:

(a)  Power and Authority.  Tenant has the authority and power to enter into this Lease and to consummate the transaction provided for herein.  This Lease and all other documents executed and delivered by Tenant to Landlord in connection herewith constitute legal, valid, binding and enforceable obligations of Tenant, and there are no claims or defenses, personal or otherwise, or offsets whatsoever to the enforceability or validity of this Lease or such documents.

(b)  No Violations and Actions.  The execution, delivery and performance by Tenant of its obligations under this Lease will not conflict with or result in a breach of any law, governmental rule, regulation, judgment, decree or order by which the Tenant is bound, or by any provision of any contract to which Tenant is a party or by which Tenant is bound or by Tenant's declaration of trust, certificate of incorporation, bylaws or partnership agreement, as the case may be.  There is no action, suit, proceeding or investigation pending, or to the best of Tenant's knowledge threatened, before any agency, court, arbitration panel or other judicial or quasi-judicial body which relates to the Property or the use thereof.

2.06  Use.  The Premises is leased to Tenant for the operation of a Costco Wholesale Club wholesale and retail warehouse membership sales and tire center, including food service, meat cutting, photo processing, pharmacy and bakery operations, together with facilities for related purposes, parking fields or structures, and appurtenant fixtures, machinery and equipment, and all other lawful purposes.  In the event that the Property shall be used for any purpose other than retail purposes, Landlord shall have the rights set forth in Section 12.05.

2.07 As Is.  So long as Landlord shall have complied with the requirements of Sections 4 (including without limitation Section 4.04(g)) and 20, and subject to the representations, warranties and covenants of Landlord made in this Lease and subject to the rights of Tenant as set forth in Section 4.01(a), Tenant agrees to accept the Premises in its "as is" condition on the date hereof, reasonable wear and tear excepted.  Tenant acknowledges that other than as set forth in Sections 4 and 20,

[c: ASL] THYPIN.10                      11

COSTCO/MBA 0014

and subject to any representations or warranties made by Landlord
in this Lease, Landlord has no obligations with respect to the
physical condition of the Premises. Tenant further acknowledges
that, except as expressly provided for herein to the contrary,
Landlord has not made any representation as to such physical
condition of the Premises, or the expenses of operation or the
use which may be made thereof or any other matter or thing
affecting or relating to the Premises.

## SECTION 3

### RENTAL

3.01  Rent. Tenant covenants and agrees to pay Landlord the
following rent (the "Rent"):

3.01.1  Minimum Rent. Tenant shall pay to Landlord as
minimum rent hereunder (the "Minimum Rent"), in equal monthly
installments on or before the tenth (10th) day of each month:



Payment of Minimum Rent, during both the initial Term and the
Renewal Periods, shall be subject to increases as provided in
Section 3.01.4.

[c: ASL] THYPIN.10

12

COSTCO/MBA 0015

3.01.2  <u>Minimum Rent During Renewal Periods.</u>  If Tenant exercises its right to extend the Term to include any of the Renewal Periods (or if the Term is extended for any portion of an Renewal Period as provided in <u>Section 2.03</u>), the annual Minimum Rent for same shall be as follows:



3.01.3.  Excess Rent.

3.01.4  <u>Increase in Floor Area.</u>  The Minimum Rent set forth above is based upon a deemed Gross Floor Area of the Building of one hundred twenty thousand (120,000) square feet. In the event of an Alteration resulting in an increase in the actual Gross Floor Area of the Building above one hundred twenty thousand (120,000) square feet, then the annual Minimum Rent shall be increased, effective upon the taking of occupancy of the expanded area of the Building for the purpose of conducting business thereat, by an amount equal to the product of (a) the Gross Floor Area of the Building after completion of the

[c: ASL] THYPIN.10

13

COSTCO/MBA 0016

Alteration less one hundred twenty thousand (120,000) square feet multiplied by (b) the per square foot Minimum Rent noted in Section 3.01.1 and, if applicable Section 3.01.2; provided, however, that Tenant shall be entitled to a credit against the first increases in Minimum Rent as a result of said Alteration equal to the Deemed Excess Rent; it being understood that Minimum Rent payable pursuant to Sections 3.01.1 and 3.01.2 shall never be reduced as a consequence of the credit provided in this Section 3.01.4, which credit shall be applied against increases only in such Minimum Rent. **"Deemed Excess Rent"** is the amount, if any, derived by subtracting from (x) the aggregate Minimum Rents paid by Tenant from and after the Rent Commencement Date through the date of increase in the Minimum Rent due to the Alteration of the Building (y) an amount equal to the product of the per square foot Minimum Rent noted in Section 3.01.1 and, if applicable Section 3.01.2, multiplied by the actual Gross Floor Area of the Building prior to the Alteration.

3.01.5 Deposits. Prior to the date hereof, Tenant has deposited with Landlord's counsel the sum of ███████████████ ████████ Dollars (the **"Initial Deposit"**). In addition, on or about the Execution Date, Tenant is depositing with Landlord ███████████████████████████ Dollars (together with the Initial Deposit, the **"Deposit"**). Upon the Execution Date, Tenant acknowledges that the Initial Deposit is being released to Landlord. At the Rent Commencement Date, the Deposit will be applied in payment of the first Minimum Rents due hereunder. If the contingencies set forth in Section 4.1 are not satisfied, the Deposit shall be refunded to Tenant within five (5) days after Tenant's request.

3.02 Percentage Rent. In addition to the Minimum Rent,



3.02.1 Payment. Installments of Percentage Rent shall be due and payable annually within ninety (90) days after the last day of each Fiscal Year.

3.02.2 Accounting.

[c: ASL] THYPIN.10

14

COSTCO/MBA 0017

(a)  Tenant agrees to submit to Landlord on or before the sixtieth (60th) day following the end of each Fiscal Year or partial Fiscal Year a written statement (the **"Annual Percentage Rent Statement"**) showing the amount of Gross Receipts and Sales Exclusions during the preceding Fiscal Year or partial Fiscal Year.  The acceptance by Landlord of payments of Percentage Rent or reports thereof shall be without prejudice and shall in no event constitute a waiver of Landlord's right to claim a deficiency in the payment of Percentage Rent in the manner provided below.

(b)  Landlord shall have the right, upon thirty (30) days prior written notice and at any reasonable time, to audit any one or more or all statements of Gross Receipts; provided, however, any statements of Gross Receipts and Sales Exclusions shall be conclusive and binding upon Landlord unless Landlord shall (i) notify Tenant within one hundred twenty (120) days after its receipt of such statement that it disputes the correctness thereof, and (ii) submit its dispute to arbitration within two hundred ten (210) days after its receipt of such disputed statement if such dispute shall not theretofore be settled by agreement between Tenant and Landlord.  Any information obtained by Landlord as a result of such audit shall be treated as confidential, and Landlord agrees to instruct its employees, accountants and agents to treat all information in connection with any examination of such information as confidential and to not disclose it to any other person or party except as may be required by law or court order, or as may be necessary in connection with any arbitration or litigation between Landlord and Tenant.  Landlord will confirm or cause its accountants and agents to confirm such agreement in a separate written agreement if requested by Tenant.

(c)  In the event Landlord elects to audit a statement of Gross Receipts, Tenant agrees to use reasonable efforts to make back-up information for said statement available at the Premises for inspection by Landlord.  In the event that an extraordinary amount of paperwork shall be required, or if Landlord shall request a meeting to discuss any aspects of the statements, then said matters will be resolved at Tenant's principal office.  In addition, Tenant agrees to cooperate with Landlord on any audit made by Landlord in accordance with the terms hereof.

(d)  In the event that any audit shall evidence a clear error or mistake by Tenant in calculating Percentage Rent, then notwithstanding Landlord's failure to have disputed a prior statement, Landlord shall be entitled to dispute any statements

COSTCO/MBA 0018

of Gross Receipts for the three (3) year period immediately preceding the year for which said clear error or mistake was made.

(e)     If any such audit discloses that the actual amount of Gross Receipts exceeds the amount reported by Tenant by more than three (3%) percent, then Tenant shall pay the reasonable costs of said audit.

3.02.3  Remedies.  In the event that Tenant shall fail to make payment of Percentage Rent hereunder, Landlord shall have the same remedies against Tenant as a result of Tenant's failure to make payments of Minimum Rent.

3.03  Rent Payments.  Rent and other sums to be paid by Tenant shall be payable in lawful money of the United States of America.  All payments of Minimum Rent shall be made by Tenant to Landlord at the place provided in Section 21.12 without notice or demand, deduction or offset except as provided in Sections 4.01(c)(iii), 4.04(d)(iii), 4.06, 11.05.2, 11.14.2(b) and 21.11. If the party entitled to receive Minimum Rent, or such party's address, shall change, Tenant may, until receipt of notice of such change from the party entitled to receive Minimum Rent immediately preceding such change, continue to pay Minimum Rent and additional rent to the party to which, and in the manner in which, the preceding installment of Minimum Rent or additional rent, as the case may be, was paid.

3.04  Pro Rata Portions of a Month or Year.  If (i) the Term commences or ends, (ii) the Rent Commencement Date occurs, or (iii) there is to be an adjustment or partial abatement of Rent or an end to such abatement, effective on a date other than at the end or start of a calendar month or Lease Year, the Minimum Rent for such month or Lease Year shall be prorated for such month or Lease Year involved on the basis of the actual days in such month or Lease Year.

3.05  Commencement of Minimum Rent.  Minimum Rent shall commence on the Rent Commencement Date.  Within ten (10) days after request of either party after the Rent Commencement Date has been determined, Landlord and Tenant shall execute, acknowledge and deliver to each other duplicate originals of an agreement (the "Commencement Agreement") in the form of Exhibit "F" confirming the Commencement Date and Rent Commencement Date.

3.06  Lease Modification.  If the payments of annual Minimum Rent shall be modified as provided in Section 3.01.4, then Landlord and Tenant agree to enter into an amendment of this

[c: ASL] THYPIN.10                    16

Lease to provide for said modifications promptly after the determination of same.

3.07 <u>Late Charge.</u>   If any payment of Minimum Rent or Excess Rent (after the first and second monthly installments thereof) due hereunder shall not be paid more than ten (10) days after the same shall become due on more than two (2) occasions during any Lease year, a "late charge" equal to two (2%) percent of the overdue payment shall be due and payable to cover Landlord's additional overhead and administrative costs and expenses arising out of such late payment.  With respect to said first two (2) occasions, if Landlord shall not receive any payment of Minimum Rent or Excess Rent on the date due hereunder, then Landlord shall have the right to give notice thereof to Tenant, and the ten (10) day period after which a "late charge" shall be due shall commence on the date said notice shall be deemed given as provided in <u>Section 21.12</u>.

3.08 <u>Net Lease.</u>   It is the purpose and intent of Landlord and Tenant that this is a net lease and that the Minimum Rent shall be absolutely net to Landlord, so that this Lease shall yield, net to Landlord, the Minimum Rent and Excess Rent specified in this <u>Section 3</u> in each Lease Year, that all costs, expenses and obligations of every kind and nature whatsoever relating to the use and occupancy of the Premises which arise or become due during or out of the Lease Term shall be paid by Tenant, and Landlord shall not be required to make any payment, perform any obligation or incur any liability with respect to the Premises except as expressly set forth in this Lease. Notwithstanding the foregoing, (a) Tenant shall not be obligated to pay interest and amortization on any Fee Mortgages or any rental under any ground lease of the Land, (b) Tenant shall have the right of offset as specifically set forth in this Lease, (c) Tenant's liability with respect to environmental matters shall only be as set forth in <u>Section 20</u> hereof, (d) Tenant shall have no liability for the items described in <u>Section 5.04</u> which pursuant to said Section are the responsibility of Landlord and (e) Tenant shall not be liable or responsible for any transfer or transfer gains taxes in the event that Landlord shall convey or transfer the Premises or any right or interest of Landlord therein.

[c: ASL] THYPIN.10

17

COSTCO/MBA 0020

## SECTION 4

### CONTINGENCIES AND FEASIBILITY PERIOD; CONDITIONS TO THE COMMENCEMENT DATE; STREET PARKING

4.01   Contingencies.   Tenant's obligation to proceed to the Commencement Date is contingent upon the conditions set forth below being waived or satisfied on or before the dates provided for below.   If such conditions are not waived or satisfied by such dates, Tenant may terminate this Lease by notice given to Landlord within twenty (20) days after the date provided herein for such satisfaction.

(a)   Studies.   Prior to the date which is sixty (60) days following the Execution Date, Tenant shall cause to be performed, at Tenant's sole cost and expense, a Phase II or other environmental study of the Premises and additional major engineering studies as Tenant shall desire (collectively, the **"Additional Studies"**).   In the event that as a result of the Additional Studies, Tenant shall determine, acting reasonably, that the development, including the operation, of the Premises in accordance with the Site Plan is impracticable, then it shall have the right to terminate this Lease by notice to Landlord, in which event Landlord shall promptly return the Deposit to Tenant and this Lease shall be deemed terminated.   Factors in determining whether said development is "impracticable" shall include, but shall not be limited to, increases in costs in more than a de minimis amount and effects of more than a de minimis nature on Tenant's construction, maintenance and operations at the Premises.

(b)   Title and Survey.   (i)   Tenant and Landlord acknowledge receipt of the certificate for title insurance (the **"Title Commitment"**) prepared by Royal Abstract writing for Chicago Title Insurance Company under title number 802772 and the survey of the Premises prepared by A. Splescia, PLS and last revised February 8, 1982.

(ii)   In the event Tenant raises any objection to the title of the Property or the Survey which are not Permitted Exceptions, then Landlord shall have thirty (30) days after the receipt of Tenant's objections to give Tenant notice either that (x) Landlord shall remove, or cause the Title Company to insure over or provide affirmative insurance acceptable to Tenant with respect to any objectionable exceptions at no cost to Tenant, and Landlord shall promptly provide Tenant with evidence satisfactory to Tenant of Landlord's ability to so remove such exceptions; or (y) Landlord elects not to cause such exceptions to be removed.

[c: ASL] THYPIN.10                                      18

COSTCO/MBA 0021

If Landlord gives Tenant notice under clause (y), then Tenant may, by notice delivered to Landlord given within fifteen (15) days of Landlord's election notice, either waive such objections, in which event this Lease shall continue in full force and effect, or terminate this Lease.  Tenant acknowledges that Permitted Exceptions shall include any encumbrances to title which are part of the Permits acceptable to Tenant as provided in Section 3.01(d) below.

(iv)     Notwithstanding anything herein to the contrary, Landlord agrees that it shall cause to be discharged of record any liens, encumbrances or charges against the Property (x) which may be satisfied by the payment of a liquidated sum or (y) which are created on or after the Execution Date by Landlord or parties acting by, through or under Landlord.

(c)        Building Approvals.

(i)        Landlord acknowledges that it has received from Tenant certain zoning and egress drawings, which drawings Landlord is currently reviewing with the Buildings Department. Within seventy five (75) days following notice to Tenant by Landlord of approval by the Buildings Department of the zoning and egress drawings, or any modifications thereto required by said Department which are acceptable to Tenant in its sole discretion, Tenant shall deliver to Landlord a complete set of Plans for a development at the Premises substantially in accordance with the Site Plan, prepared in accordance with applicable code as it exists on the date hereof.  Landlord shall have a reasonable right of approval of the Plans only in the event that such Plans are not prepared substantially in accordance with the Site Plan.

(ii) Landlord agrees to use all reasonable efforts to obtain the Permits consistent with the Plans and this Lease within six (6) months after Tenant furnishes the Plans to Landlord.  If Landlord has not so secured the Permits by such date, Tenant shall have the right (A) to terminate this Lease, in which event Landlord shall promptly return the Deposit to Tenant and all obligations between Landlord and Tenant shall be deemed terminated, (B) to cause Landlord to continue to use all reasonable efforts to secure the Permits or (C) to use its reasonable efforts to secure the Permits, in which event Tenant shall have the right to set-off against the first Minimum Rents due hereunder all of Tenant's reasonable out-of-pocket expenses in securing the Permits.  If Tenant does not elect option (A), then Tenant shall have the right to terminate this Lease if the Permits are not issued within one (1) year following the Execution Date; provided, however, that Tenant shall have the

[c: ASL] THYPIN.10                    19

COSTCO/MBA 0022

sole and exclusive right to extend said one (1) year period by an additional six (6) months.

(iii)    Landlord agrees to use commercially reasonable efforts in obtaining the Permits on an "as-of-right" basis.    In connection therewith, Landlord agrees to use the firm of Winthrop Stimson Putnam & Roberts in order to prosecute the Building Permit and to permit the firm of Gold & Wachtel to prosecute all of the other Permits.    Counsel for both parties agree to cooperate with the other in prosecuting all of the Permits. Landlord, on behalf of itself and its counsel, consultants and expeditors, agrees not to commit or obligate Tenant to any conditions or limitations with respect to the construction, Alteration, operation or maintenance of the Premises without the prior consent of Tenant obtained in each instance, which consent may not be unreasonably withheld or delayed by Tenant.

(iv)    Landlord and Tenant agree to cooperate fully either directly or through their authorized agents in all reasonable respects to facilitate the procurement of the Permits, including, but not limited to, promptly (x) responding in writing, if required, to all reasonable inquiries, (y) executing all applications or submissions necessary to obtain the Permits so long as same are in accordance with the terms of this Lease, and (z) attending and actively participating in hearings, agency meetings or the like (upon prior notice) and the selection of experts for the approval process.    Landlord agrees to use all commercially reasonable efforts in diligent pursuit of the Permits and shall keep Tenant informed of the status of the applications for the Permits.

(v)    Any approvals and permits, including the Permits, shall not be deemed obtained or issued until the time, if any, to contest or appeal any such issuance has passed without the filing of a contest or appeal, or if a contest or appeal has been filed then after the issuance of a final and nonappealable order, decision or judgment, and the time frame in which to satisfy this contingency shall include the passage or final determination, as the case may be, of any appeal period.    In addition, any conditions to any of the Permits must be satisfactory to Tenant, acting reasonably.

4.02  Landlord's Covenants.    From the period commencing on the date hereof through the Commencement Date, Landlord covenants to perform in accordance with the following obligations:

(a)    Sell or Encumber Property.    Landlord shall not sell, assign, or convey any or all of its right, title, or interest in or to the Property to any third party or create or

[c: ASL] THYPIN.10                20

COSTCO/MBA 0023

permit to exist against Landlord's fee interest in and to the Property any lien, encumbrance, or charge thereon other than any Fee Mortgage existing as of the date hereof.

(b)    Representations and Warranties. Landlord shall not knowingly take any action, or omit to take any action, which action or omission would have the effect of violating or rendering untrue any of Landlord's representations, warranties, covenants and agreements contained herein.

(c)    Governmental Orders. Landlord shall not knowingly violate any lawful order or directive of a governmental agency with respect to the Property.

(d)    Sign. Upon request by Tenant, Landlord shall permit Tenant, at Tenant's sole cost and expense, to erect a sign on the Property advertising the proposed development of the Building.

(e)    Violations. Any violations of record, and fines assessed as a result thereof, affecting the Property as of the date hereof now noted or issued by any Governmental Authority, or which arise between the date hereof and the Commencement Date due to the affirmative acts of Landlord (including the work required of Landlord as provided in Section 4.02 (g)), shall be complied with by Landlord, so that the Property shall be free of same at the Commencement Date. Landlord shall have no obligation with respect to any violations, and fines assessed as a result thereof, affecting the Property which arise after the date hereof and which are not due to the affirmative acts of Landlord. In addition, Landlord shall have no obligation to cure any violations which will be cured by the Alterations to be performed by Tenant, except that Landlord shall be responsible for any fines, interest, penalties or the like as a result of said violations and any costs incurred by Tenant if the costs to perform the Alterations are increased as a result of the existence of the violations.

(f)    Early Entry. (i) Upon request of Tenant, Landlord shall permit Tenant to enter upon the Premises from time to time for the purpose of performing certain work thereon, including by way of example interior demolition of those items for which Landlord is not obligated to remove as provided in Section 4.04(g) and removal of the exterior skin of the existing Improvements; provided, however, that Tenant shall not perform any work which may jeopardize the Permits which Landlord is obligated to obtain as provided in this Lease. Tenant agrees that its request shall set forth the nature of the work then to be performed by Tenant pursuant to this paragraph (f) and the

[c: ASL] THYPIN.10                      21

approximate date that Tenant intends to enter upon the Premises to perform such work.  Tenant's performance of said work shall be deemed an acknowledgement by Tenant that all of the provisions of this Lease with respect to Alterations shall be applicable to said work as if the Commencement Date shall have occurred, including without limitation the requirements hereunder as to the posting of insurance and indemnification of Landlord, and the lien-free performance of all of said work.  Tenant further agrees that the performance of said work shall constitute an acknowledgement and agreement that if the Commencement Date shall not occur for any reason whatsoever other than the willful default or gross negligence of Landlord, Tenant shall restore the Premises to a condition sufficient for Landlord to lease or sell the Premises without Landlord having to perform work to restore or replace the work performed by Tenant (e.g., Tenant shall have no obligation to restore the interior items demolished by Tenant unless such items are necessary for Landlord to lease or sell the Premises, or to restore the skin which was removed by Tenant so long as Tenant replaces said skin with materials either equal to or better than the skin so replaced).  If this Lease shall be terminated pursuant to its terms prior to the Commencement Date and such termination is not due to the willful default or gross negligence of Landlord, Tenant shall complete any restoration in the manner required under this paragraph as expeditiously as possible at its sole cost and expense.  In addition, in such event, Tenant shall have no claim for the value or cost of any work performed by it to the Premises.  The restoration obligations of this paragraph (f) shall survive the termination of this Lease.

(ii)  Landlord also agrees that upon notice from Tenant, Tenant shall be entitled to remove and dispose of those items set forth on Exhibit "G" which have no residual value to Landlord, such as, by way of example and not limitation, removal of asbestos and underground and above-ground storage tanks.  In such event, Landlord's obligation with respect to removal of the items in said notice shall be null and void.  Except for the costs described in paragraph (iii) below, the removal and disposal shall be performed at Landlord's cost and expense, so long as such costs and expenses are reasonable.  Landlord agrees to reimburse Tenant for such costs and expenses promptly after notice thereof by Tenant; if Landlord shall dispute the reasonableness of such costs and expenses, then such matter shall be settled by arbitration in accordance with Section 15.

(iii)  With respect to the abatement of the Hazardous Substances at the existing Building (including, without limitation, in the roof), Landlord shall obtain a bid or estimate

[c: ASL] THYPIN.10                          22

COSTCO/MBA 0025

(the **"Asbestos Bid"**) from an asbestos abatement firm licensed in the State of New York and reasonably acceptable to Tenant to perform such abatement.  With respect to the abandonment or removal of the underground and above-ground storage tanks, Landlord shall obtain a bid or estimate (the **"Tank Bid"**; the Tank Bid together with the Asbestos Bid are collectively referred to as the **"Bids"**) from a contractor licensed in the State of New York to perform such work and reasonably acceptable to Tenant to perform such work.  Landlord agrees to use its best efforts to obtain the Bids no later than April 19, 1996, but in any event to proceed diligently and obtain the Bids no later than May 3, 1996. If Tenant elects to have the abatement or tank abandonment or removal, as the case may be, performed by contractors selected by Tenant, Landlord shall pay to Tenant, at the Commencement Date, all of the expenses incurred by Tenant for such work but not to exceed the respective Bids.

(g)      Site Work.  Landlord shall perform the work required of it as set forth in Section 4.04 (d) and (g) in the manner set forth therein.

4.03  Items to be Delivered at the Commencement Date.  At the Commencement Date, the following documents shall be delivered by the appropriate parties in order for the Commencement Date to be effective:

(a)      Title Commitment.  Subject to Section 4.01(b), the Title Company shall, but for the payment of the premium and any other requirements to be satisfied by Tenant, be prepared to deliver to Tenant the Title Policy, insuring that leasehold title to the Property is vested in Tenant, subject to no encumbrances except for the terms and provisions of this Lease, the lien of real property taxes for the current year not then due and payable and the Permitted Encumbrances.

(b)      Affidavit of Title.  An affidavit of title from Landlord covering such matters as may be reasonably requested by the Title Company and other assurances requested by the Title Company to insure Tenant's title in the manner required herein.

(c)      Resolutions.  A consent of the partners of Landlord or a corporate resolution (including appropriate incumbency and secretary's certificates) in the event Landlord or its general partner is a corporation, and any partnerships or corporations comprising Landlord, authorizing this transaction.

[c: ASL] THYPIN.10                              23

COSTCO/MBA 0026

(d)      Certificates.  A certificate of the Landlord, executed by an authorized officer thereof, to the effect that all of the representations and warranties made by Landlord in this Lease are true and correct as of the Commencement Date.

(e)      Evidence of Transfer. Evidence that The City of New York Industrial Development Agency has conveyed fee simple title to the Premises to Landlord free and clear of any liens, encumbrances or charges other than the Permitted Exceptions.

(f)      Deleted prior to execution.

(g)      Socrates Park.  Landlord represents that it owns fee simple title to a portion of land to the north of the Premises across Broadway which is currently being used for a sculpture park commonly known as "Socrates Park" ("Landlord's Park Area").  That part of Broadway between the Premises and Socrates Park is currently unpaved.  Landlord agrees to use its best reasonable efforts to obtain the consent of the applicable Governmental Authorities to permit a portion of Broadway between the Premises and Socrates Park to be paved over (which portion is identified by the cross-hatching on the Site Plan), and if required by said Governmental Authorities as a consideration therefor, Landlord shall convey Landlord's Park Area to such Governmental Authority as Landlord is so directed.  The costs and expenses of obtaining said consents and the costs of conveyance shall be born by Landlord.  The costs of paving the portion of Broadway shall be borne by Tenant.

(h)      Other Documents.  All other documents or instruments that may be necessary or desirable to render this Lease and the transaction contemplated herein legally and practically effective.

4.04 Conditions to the Commencement Date.  The obligation of Tenant hereunder shall be subject to the fulfillment of the following conditions on or prior to the Commencement Date, each of which shall continue as conditions until the Commencement Date unless waived by Tenant:

(a)      Representations and Warranties.  The representations and warranties of Landlord contained in Section 1.04 shall be true and correct in all material respects as of the Commencement Date.

(b)      Performance by Landlord.  Landlord shall have performed all agreements, undertakings and obligations and complied with all conditions required in Sections 4.03 and 4.04 of

[c: ASL] THYPIN.10                          24

COSTCO/MBA 0027

this Lease to be performed and/or complied with by Landlord as of the Commencement Date.

(c)     Contingencies Satisfied.  The contingencies set forth in Section 4 shall have been fulfilled or waived on or before the dates provided therein.

(d)     Remediation; Underground Storage Tanks.  (i) Environmental assessments of the Premises have disclosed the existence of Hazardous Substance at the Premises.  If Tenant shall not have remediated same on behalf of the Landlord prior to the Commencement Date as provided in Section 4.02(f), then Landlord shall remediate such Hazardous Substances in a manner reasonably acceptable to Tenant pursuant to a plan approved by Tenant and applicable Government Authorities.  Landlord acknowledges that its obligation includes the abatement of the Hazardous Substances in the roof at the existing Building.  The respective rights and obligations of the parties with respect to the performance of the abatement of the Hazardous Substances are more particularly set forth in Section 4.02(f).  Landlord's reimbursement obligations to Tenant on account of such work is more particularly set forth in Section 4.02(f)(iii).

(ii)     With respect to underground storage tanks ("USTs") at the Premises (which includes tanks, if any, in the bed of 33rd Road relating to the Premises), as part of, and in addition to, the requirements of the preceding paragraph (i), Landlord agrees that as to any USTs of which the existence would act as a construction impediment to Tenant's Alterations, Tenant shall have the right, on Landlord's behalf, to remove same in accordance with the provisions of Section 4.02(f).  If Tenant does not so remove such tanks, then Landlord shall cause same to be removed from the Premises in accordance with all Environmental Laws.  With respect to all other USTs at the Premises, Tenant shall have the right, on Landlord's behalf, to abandon same in place in accordance with the provisions of Section 4.02(f).  If Tenant does not so abandon such tanks in place, then Landlord shall abandon same in place in accordance with all Environmental Laws.  Landlord's reimbursement obligations to Tenant on account of such work is more particularly set forth in Section 4.02(f)(iii), with the further proviso that if Tenant shall elect to remove any USTs which pursuant to this paragraph (ii) are only to be abandoned in place, Landlord shall reimburse Tenant for the costs Landlord would have incurred as provided in the Tank Bid to abandon same in place.

(iii)  As a condition to the Commencement Date, Landlord shall deliver to Tenant evidence reasonably acceptable to Tenant of compliance with this paragraph (d).  If the conditions to the Commencement Date shall have been satisfied or waived by Tenant other than as set forth in this paragraph (d), then Tenant shall have the right to perform such work as it deems necessary to satisfy Landlord's obligations hereunder, and to set

[c: ASL] THYPIN.10

25

COSTCO/MBA 0028

off against the first Rents due hereunder an amount equal to one hundred and twenty five (125%) percent of all of the costs and expenses incurred by Tenant in so performing.

(e)    Absence of Moratorium.  No moratorium, statute, order, regulation, ordinance, legislation, judgment, ruling or decree of any court or governmental agency shall have been enacted, adopted, issued, entered or pending that could materially and adversely affect the Property or Tenant's ability to operate its Building, or both.

(f)    Will Serve Letters.  Letters obtained by Landlord or Tenant, if necessary, from the companies providing service for gas, electricity, telephone, water (domestic and fire safety), cable television and other utilities stating that service for Tenant's intended use will be available to the Property upon the Commencement Date and are not subject to any conditions not otherwise provided for herein.  Both parties agree to cooperate with the other in obtaining said letters.

(g)    Condition of Premises.  On the Commencement Date, the Premises will be delivered to Tenant in substantially the same condition as it exists on the date hereof, reasonable wear and tear excepted, and with all personalty, cranes, equipment and the other items described on Exhibit "G" removed such that the Premises will be delivered vacant and broom clean. Seller agrees to repair any damage to the Premises caused by any removal.  If Landlord fails to perform in accordance with this paragraph (g), Tenant shall have the same rights as set forth in Section 4.04(d)(iii).

(h)    Title to Premises.  On or prior to the Commencement Date, Landlord shall have caused fee simple title to be conveyed to Landlord.

(i)    Permitting.  Tenant shall have determined, in good faith, that the improvements contemplated by the Permits obtained by Landlord and delivered to Tenant do not require any discretionary land use approvals such as, by way of example, special use permits, variances and authorizations pursuant to the New York City Zoning Resolution; provided, however, that Tenant shall have ten (10) days from receipt of said Permits to make such determination.

4.04.1    If the Commencement Date shall not have occurred for any reason on or before three (3) years from the Execution Date, this Lease shall terminate on the expiration of said three (3) year period.

[c: ASL] THYPIN.10                        26

COSTCO/MBA 0029

4.05 <u>Failure to Obtain Approvals</u>.   If this Lease shall
terminate pursuant to the provisions of <u>Section 4.01</u>, then for a
period of three (3) years thereafter, Landlord shall not have the
right to sell or lease the Premises for the operation of a retail
and wholesale membership club until Landlord first complies with
the provisions of <u>Section 16</u> (Landlord acknowledging that the
procedures in <u>Section 16</u> as to a sale of the Premises shall
equally apply to a lease transaction).

4.06 <u>33rd Road and Parking</u>.   Landlord acknowledges its
obligation to obtain from the applicable Governmental Authorities
written approvals for Tenant to pave over that portion of 33rd
Road bordering the Premises and to provide written assurances
that the Governmental Authorities shall permit parking on said
portion of 33rd Road during Tenant's regular business hours other
than as a result of emergencies, street repairs or limited hours
for street cleaning.   Notwithstanding the assurances or other
evidence Landlord shall deliver to Tenant with respect to said
parking, in the event that, at any time during the Term for
reasons other than emergencies, street repairs or limited hours
for street cleaning, parking is not permitted on said portion of
33rd Road during Tenant's regular business hours, Landlord agrees
to contribute to Tenant One Hundred Thousand ($100,000) Dollars
(the **"Replacement Contribution"**) to apply to the purchase or
lease of property selected by Tenant as replacement parking (the
**"Replacement Property"**) therefor.   Said funds shall be due upon
request of Tenant (a) no later than the day the Replacement
Property is purchased or (b) if the Replacement Property is
leased, then <u>pro-rata</u> based upon the rents due under said lease
over the first five years of the term thereof.   If Landlord shall
fail to make payment(s) timely, Tenant shall have the right to
setoff such amount from the next payments of Minimum Rent and
Excess Rent then due.   Any amounts so paid shall be non-
refundable for any reason, including the subsequent availability
of parking on said portion of 33rd Road.   If Tenant shall acquire
the Replacement Property, then the Replacement Property shall be
conveyed to Tenant, who shall have the sole right and authority
to make decisions with respect to, and shall be fully responsible
for, the Replacement Property, including without limitation
repairs, alterations, disputes and the disposition thereof.
Promptly following the sale or other disposition of the
Replacement Property by Tenant, Tenant shall pay over to Landlord
that portion of the net amount of any funds actually received by
Tenant on account of said sale or other disposition equal to the
amount by which the Replacement Contribution bears to the
purchase price of the Replacement Property.   Any amounts due
Landlord on account of such sale shall constitute Additional
Rent.   At the termination of this Lease, Tenant agrees to enter

COSTCO/MBA 0030

into an instrument in recordable form reasonably satisfactory to Landlord and Tenant evidencing Landlord's interest in the net proceeds of a sale or other disposition of the Replacement Property. The provisions of this Section 4.06 shall survive the expiration or earlier termination of this Lease.

## SECTION 5

### ASSESSMENTS AND UTILITIES:
### TAXES; CONTEST OF IMPOSITIONS

5.01  Utilities. Beginning on the Commencement Date, Tenant shall pay or cause to be paid when due, and shall indemnify, protect and hold harmless Landlord and the Premises from all charges for public or private utility services to or for the Premises, including without limiting the generality of the foregoing, all charges for heat, light, electricity, water, gas, telephone service, garbage collection and sewage and drainage service.

5.02  Taxes. Beginning on the Commencement Date, Tenant shall pay when due each and every one of the following thereafter arising during the Term ("Impositions"):

(a)    All real property taxes or payments in lieu thereof, and all sewer and water charges, due with respect to the Premises or any portion thereof;

(b)    Taxes due or which may be due upon or with respect to the leasehold estate created by this Lease, but excluding any tax measured by net or gross income upon Landlord;

(c)    All taxes imposed on or with respect to personal property and intangibles located in or used in connection with the Premises;

(d)    All assessments for public improvements or benefits which are assessed during the Term of this Lease, and similar assessments and charges with respect to the Premises; and

(e)    All other rents, rates and charges, excises, levies, license fees, permit fees, inspection fees and other authorization fees and other charges, in each case whether unforeseen, of every character (including interest and penalties thereon), which at any time during or in respect of the Term may be assessed, levied, confirmed or imposed on or in respect of or right or interest therein, or any occupancy, use or possession of or activity conducted on the Premises or any part thereof,

[c: ASL] THYPIN.10                            28

COSTCO/MBA 0031



expressly excluding, however, any such items with respect to any period prior to the commencement of the Term.

5.02.1  Installments.  If by law any Imposition may at the option of the taxpayer be paid in installments, Tenant may exercise such option, and shall pay all such installments (and interest, if any) becoming due during the Term as the same become due (including any installment with respect to any assessment which may be payable following the Commencement Date) and shall at the end of the term deposit with Landlord an amount sufficient to pay Tenant's pro rata share of all Impositions for the calendar year in which the Lease terminates.

5.02.2  Proof of Payment.  Tenant will furnish to Landlord, upon request, for inspection, within thirty (30) days after the date any Imposition would become delinquent (unless being contested in conformity with Section 5.03), official receipts of the appropriate taxing authority or other proof satisfactory to Landlord evidencing the payment of such Imposition.

5.02.3  Landlord's Right of Payment.  In the event that Tenant shall not pay any Imposition as required herein which Tenant has not contested as provided in Section 5.03, Landlord shall have the right, but not the obligation, to make such payment on behalf of Tenant.  In that event, Tenant shall promptly reimburse Landlord for such payment with interest at the rate provided for in Section 21.14.

5.03  Permitted Contests.  Tenant at its sole cost and expense may by appropriate legal proceedings conducted in good faith and with due diligence, contest the amount or validity or application, in whole or in part, of any Imposition or lien therefor, or any other lien, encumbrance or charge against the Premises arising from work done or materials provided to or for Tenant, if:

(a)    Such proceedings suspend the collection thereof from Landlord, Tenant and the Premises, unless Tenant has furnished security as provided in subparagraph (b) of this Section 5.03;

(b)    Tenant shall have furnished such security, if any, as may be required to guarantee payment in the proceedings; and

(c)    Tenant shall give Landlord reasonable notice of, and information pertaining to, such contest and regular progress reports with respect thereto.

[c: ASL] THYPIN.10

29

Tenant shall indemnify, protect and hold harmless Landlord and the Premises from any lien or liability with respect to the contest of any Imposition, including all costs and expenses related thereto.

5.04  Other Taxes.  Nothing herein contained shall require Tenant to pay municipal, state or federal income taxes assessed against Landlord, municipal, state or federal capital levy, gift, estate, succession, inheritance or transfer taxes of Landlord, or corporation excess profits or franchise taxes imposed upon any corporate owner of the fee of the Property, or any income, profits, or revenue tax, assessment or charge imposed upon rent as such; provided, however, that if at any time during the Term the method of taxation prevailing at the Commencement Date shall be altered so that any new tax, assessment, levy (including, but not limited to, any municipal, state or federal levy), imposition or charge, or any part thereof, shall be measured by or be based in whole or in part upon the rents or other income or other measure of value relating to, or arising from, the Premises and shall be imposed upon Landlord, then all such new taxes, assessments, levies, impositions or charges, or the part thereof, shall be deemed to be included within the term **"Impositions"** to the extent that such Impositions would be payable if the Premises were the only property of Landlord subject to such Impositions, and Tenant shall pay and discharge the same as herein provided in respect to the payment of Impositions.

## SECTION 6

## CONSTRUCTION OF IMPROVEMENTS

6.01  Initial Alterations.  Tenant agrees to commence Alterations of the Building consistent with the Plans within a reasonable period following the issuance of the Permits and to diligently complete said Alterations following any demolition of that portion of the Improvements contemplated to be demolished as provided for in the Plans, but subject to Force Majeure Events. Such work will include, but shall not be limited to, demolition and/or renovation of a portion of the existing structures and construction of at-grade parking and, to the extent Permits are delivered therefore, improvements to the road adjacent to the Premises.  All construction shall be performed in a good and workmanlike manner.  If the initial Alterations are not to be substantially consistent with the Plans, the provisions of Section 6.02 shall apply.

[c: ASL] THYPIN.10

30

COSTCO/MBA 0033

6.02  Other Alterations.  If (a) the initial Alterations are not to be substantially consistent with the Plans, (b) Tenant elects to perform substantial Alterations after any initial Alterations, or (c) Tenant elects to replace the Building in its entirety ((a), (b) or (c) being collectively referred to herein as a "Significant Change"), then it shall submit to Landlord for its approval plans and specifications for the Significant Change. Landlord's approval shall not be unreasonably withheld, and the plans and specifications therefor shall be reviewed and commented upon by Landlord within twenty (20) business days.  Tenant's submission, and Landlord's approval, shall be considered taking into account uses of property in the general vicinity of the Premises, Tenant's corporate purposes and the need to provide Tenant with a means to satisfy its obligations hereunder.  Tenant acknowledges that Landlord shall have no obligation to obtain Permits for any Significant Change.  The Rent Commencement Date shall not be affected by any Significant Change.

6.03  Liens.  Tenant shall not create or cause to be created and shall promptly discharge (by bond or otherwise) and remove of record within thirty (30) days of notice thereof any lien, encumbrance or charge upon the Premises or any part thereof, including but not limited to a mechanic's lien, for work claimed to have been performed for or on behalf of Tenant or materials claimed to have been furnished to or for Tenant (but such discharge shall not limit Tenant's right to contest same in good faith).

6.04  Hold Harmless.  Tenant shall indemnify, protect, defend and hold harmless Landlord and the Premises from and against all claims, loss, damage and liabilities arising by virtue of or relating to construction of the Improvements or the making of any Alteration.  If Tenant is required to defend any action or proceeding pursuant to this Section to which action or proceeding Landlord is made a party, Landlord shall also be entitled to appear, defend, or otherwise take part in the matter involved, at its election, by counsel of its own choosing, and to the extent Landlord is indemnified under this Section, Tenant shall bear the cost of Landlord's defense, including reasonable attorney's fees; provided, however, Tenant shall be liable for attorney's fees only if single legal counsel (or a single firm of legal counsel) cannot represent both Landlord and Tenant without there arising an actual or potential conflict of interests.

6.05  Permits; Compliance With Codes.  With respect to any Alterations subsequent to the initial Alterations and with respect to any Significant Change, Tenant shall acquire, at its sole cost and expense, all building permits and other permits,

COSTCO/MBA 0034

licenses, permissions, consents and approvals required to be obtained from Governmental Authorities or third parties. Landlord agrees to cooperate reasonably with Tenant and all Governmental Authorities having jurisdiction, at Tenant's sole cost and expense in order to obtain such permits, licenses, permissions, consents and approvals.  As part of making the Alterations, Tenant shall be entitled to make such applications and other submissions in its name or in the name of the Landlord, as it deems necessary in order to obtain the Permits for an Alteration, including variances to permit a greater Gross Floor Area than permitted pursuant to current zoning, additional parking, or a divergent configuration of the Building.

Tenant shall cause all work on the Premises during the Term to be performed in accordance with all Legal Requirements.

6.06  Ownership of Improvements.  During the Term of this Lease, the Improvements constructed by Tenant including without limitation all Alterations and all appurtenant fixtures, machinery and equipment installed therein shall be the property of Tenant.  At the expiration or earlier termination of this Lease, the Improvements and all Alterations and all appurtenant fixtures, machinery and equipment installed therein, excluding moveable trade fixtures and personal property of Tenant, shall become the property of Landlord.  The Improvements and any Alterations shall be performed in a good and workmanlike condition, at Tenant's sole cost and expense, and shall be of good quality and shall be at all times maintained in good operating condition.

6.07  Control and Indemnification.  Notwithstanding anything to the contrary in this Lease, during the Term of this Lease Tenant shall have exclusive control and possession of the Premises, Landlord shall have no liabilities, obligations or responsibilities whatsoever with respect thereto.  Tenant covenants and indemnifies, defends and holds harmless Landlord from and against any and all claims (including reasonable attorney's fees) arising out of or from Tenant's, any assignee's, or any subtenant's control, possession, and use of the Premises, or out of Tenant's activities with respect to the Premises.

6.08  Surrender Upon Termination.  Upon expiration or earlier termination of this Lease, Tenant shall remove Tenant's personal property and equipment unattached to the Improvements or the Property and shall surrender the Premises to Landlord broom clean.  Tenant's personal property and equipment not removed by Tenant at expiration or other termination or within a reasonable time thereafter shall be considered abandoned and Landlord may dispose of such property in accordance with the law governing

[c: ASL] THYPIN.10                              32

abandoned property in effect at the time of abandonment at
Tenant's cost (including costs for removal and disposition).

## SECTION 7

### DAMAGE OR DESTRUCTION

7.01  Tenant's Obligation to Repair.  In the event of damage
to or destruction of any Improvements at the Premises, Tenant
shall effect such repair and reconstruction of the Improvement so
damaged or destroyed to substantially its condition prior to said
damage or destruction or, at Tenant's sole election, Tenant may
make such Alterations thereto as Tenant shall reasonably
determine prudent or valuable under the circumstances, including
any changes required to comply with applicable law, with the then
prevailing construction practices or financial or rental market
conditions applicable to the Premises.  The terms and conditions
of Section 6.02 shall be applicable to any such repair and
restoration.

7.02  Prompt Repair.  Any repair, replacement,
reconstruction or rebuilding of any Improvements shall be
effected at Tenant's cost and expense, and Tenant shall
diligently commence and continuously carry out such repair,
replacement, reconstruction or rebuilding, to full completion as
soon as possible, except to the extent of Force Majeure Delays.

7.03  No Rent Adjustment.  This Lease and the Term shall not
terminate or be terminated because of damage to or destruction of
any structure or improvement on or in the Premises except under
and in accordance with the provisions hereinabove contained, nor
shall Rent abate as a result of such damage or destruction.

7.04  Damage During Last Two (2) Years of Term.  If there
occurs during the last two (2) years of the Initial Term or of a
Renewal Period damage or destruction to any Improvements and the
costs of repairing, restoring, replacing or rebuilding the same
exceed Five Hundred Thousand ($500,000) Dollars (adjusted every
fifth Anniversary Date during the Term as provided in
Section 21.01), then Tenant may elect to terminate the Term and,
in such event, Tenant shall give notice to Landlord of its
election within sixty (60) days after the determination by the
insurance surveyor of the amount of damage, and the Term shall
thereupon terminate as of the date of such notice.

[c: ASL] THYPIN.10

33

COSTCO/MBA 0036

## SECTION 8

### INSURANCE

8.01   Acquisition of Insurance Policies.  Tenant shall, at its sole cost and expense, procure and maintain, or cause to be procured and maintained, during the entire Term the insurance described in this Section (or its then available equivalent), and shall name Landlord as an additional insured and shall provide that any loss payable thereunder shall be payable notwithstanding any act or negligence of Landlord or Tenant which might, in the absence of such an agreement, result in a forfeiture of all or part of the payment of such loss.  Policy limits shall be reviewed annually by Tenant and may be adjusted, at Tenant's election, if prudent considering levels of inflation, risk of loss, premium expenses, and other relevant factors.

8.02   Types of Required Insurance; Tenant.  Tenant shall procure and maintain the following:

8.02.01   Commercial General Liability Insurance. Commercial general liability insurance insuring against injuries or damages to persons or property sustained in, on or about the Premises and the appurtenances thereto, including the sidewalks and alleyways adjacent thereto, with limits of liability (which limits shall be adjusted as provided in Section 8.01 above) no less than the following:

Bodily Injury and Property Damage Liability
One Million Dollars ($1,000,000) each
occurrence and aggregate.

8.02.2   Automobile Liability Insurance.  Automobile bodily injury and property damage liability covering all owned, non-owned, and hired vehicles with limits of liability no less than the following:

One Million Dollars ($1,000,000) each
occurrence (no aggregate applicable).

8.02.3   Umbrella Liability Insurance.  Umbrella liability insurance in the amount of Ten Million ($10,000,000) Dollars.

8.02.4   Physical Property Damage Insurance.  Physical damage insurance covering all real and personal property, excluding property paid for by subtenants or paid for by Tenant for which subtenants have reimbursed Tenant and exclusive of foundations, excavations and footings, located on or in, or constituting a part of, the Premises, in an amount equal to at least one hundred (100%) percent of the new replacement cost of all such property (or such lesser amount as Landlord may approve in writing).  Such insurance shall (a) be provided on an "all

[c: ASL] THYPIN.10                    34

COSTCO/MBA 0037

risk" form of property coverage, (b) cover explosion of steam and pressure boilers and similar apparatus located in the Premises, and (c) contain rental interruption coverage for a period required for the restoration of the Building to a tenantable condition, subject in each case to deductibles no greater than for similar properties. Tenant shall not be required to maintain insurance for war risks; provided, however, if Tenant shall obtain any such coverages, then, for as long as such insurance is maintained by Tenant, Landlord shall be entitled to the benefits of the first sentence of Section 8.03.

8.02.5 Builder's Risk Insurance. During construction of the Building and during any subsequent Alterations that may be made by Tenant at a cost in excess of Three Hundred Thousand Dollars ($300,000) per job (adjusted every fifth Anniversary Date during the Term as provided in Section 21.01), contingent liability and builder's risk insurance upon the entire work on the Property to the current one hundred percent (100%) replacement value thereof against "all risks" of physical loss or damage to the property insured, excluding earthquake and/or other earth movements and flood.

8.02.6 Worker's Compensation Insurance. Worker's compensation insurance is subject to statutory limits in respect of any work or other operations on the Premises.

8.02.7 Other Insurance (a) Contractual liability insurance to cover Tenant's obligation to indemnify Landlord as required under this lease.

(b) Water damage and sprinkler leakage legal liability insurance.

(c) Rent insurance on an "All risks of physical loss" basis in an amount equal to at least one (1) year's current Minimum Rent, Excess Rent, Impositions, insurance premiums, and Percentage Rent for the immediately prior Fiscal Year.

8.03 Terms of Insurance. The policies required under Section 8.02 shall name Landlord as additional insured. Tenant shall provide to Landlord certificates of insurance and copies of policies obtained by Tenant hereunder promptly upon annual issuance or renewal, as applicable. Further, all policies of insurance described in Section 8.02 shall:

(a) Be written as primary policies not contributing with and not in excess of coverage that Landlord may carry.

[c: ASL] THYPIN.10                              35

COSTCO/MBA 0038

(b)   Contain an endorsement providing that, with respect to Landlord, the amount of coverage will not be reduced except after twenty (20) days prior written notice and will not be cancelled except after thirty (30) days' prior written notice in each instance to Landlord.

(c)   Expressly provide that Landlord shall have no liability for premiums.

(d)   Be written by insurance companies qualified to do business in the State of New York having a Best rating of "A1" or better, and such insurance companies shall be reasonably acceptable to Landlord.

8.04   <u>Landlord's Acquisition of Insurance</u>.   If, after request therefor, Tenant at any time during the Term fails to procure or maintain insurance required under <u>Section 8.02.3</u>, to pay the premiums therefor or to deliver replacement policies, Landlord shall have the right to procure the same and to pay any and all premiums thereon, and any amounts paid by Landlord in connection with the acquisition of insurance shall be immediately due and payable as additional rent, and Tenant shall pay to Landlord upon demand the full amount so paid and expended by Landlord.   Any policies of insurance obtained by Landlord covering physical damage to the Premises shall contain a waiver of subrogation against Tenant if and to the extent such waiver is obtainable and if Tenant pays to Landlord on demand the additional costs, if any, incurred in obtaining such waiver.

8.05   <u>Insurance Money and Other Funds Held in Trust</u>.   All insurance money, or condemnation proceeds to be used for restoration of the Premises as provided in this Lease, in excess of Five Hundred Thousand ($500,000) Dollars (adjusted every fifth Anniversary Date during the Term as provided in <u>Section 21.01</u>) shall be deposited with the Depository.   The Depository shall disburse said funds in accordance with normal and customary construction loan-type provisions which are reasonably acceptable to Tenant.   Any proceeds or condemnation award remaining with the Depository following completion of the repair or restoration to the Premises shall be promptly released to Tenant.   All insurance money or condemnation proceeds under Five Hundred Thousand ($500,000) Dollars (as adjusted every fifth Anniversary Date during the Term as provided in <u>Section 21.01</u>) and received by Tenant shall be held in trust by Tenant and applied for the purpose of defraying the cost of repairing, restoring, replacing and/or rebuilding any Improvements.   If the Leasehold Mortgagee shall not elect to be the Depository as provided in <u>Section 11.15</u>, then the Depository shall be selected by Tenant with the reasonable approval of Landlord.

[c: ASL] THYPIN.10                    36

COSTCO/MBA 0039

8.06  Distribution of Unutilized Proceeds.  At the termination of this Lease, if Tenant has failed to substantially restore or repair the Premises as a result of a casualty or condemnation in the manner required this Lease, any unused insurance proceeds or condemnation award which was otherwise to be applied to restoration shall be paid over to Landlord.  In all other events, such proceeds or award shall be and remain the property of Tenant.

8.07  Insurance Surveyor.  The determinations required under Section 7 and this Section 8 shall be made by an independent qualified insurance appraiser selected by the parties, whose decision shall not be subject to arbitration.  If the parties cannot agree on the insurance appraiser within thirty (30) days after the date of such damage or destruction, then the same shall be appointed by the presiding judge of the Supreme Court in New York County upon the application of either party.

8.08  Self Insurance by Tenant.  Notwithstanding anything herein to the contrary but subject to the last sentence of this Section 8.08, Tenant may self-insure for the insurance set forth in Section 8.02, provided that Tenant maintains at all times a program of self-insurance and provides Landlord, within twenty (20) days of Landlord's request, with a certified statement that such program is in full force and effect.  In the event that Tenant fails to satisfy the condition set forth above, Tenant immediately shall procure the insurance coverage required for risks against which Tenant previously self-insured.  If Tenant elects to self-insure as set forth in this Section, Tenant acknowledges and agrees that Landlord shall have no liability for such losses or damage which would otherwise have been covered by the general liability and property damage insurance which Tenant could have provided in accordance with this Lease, nor shall Tenant's failure to obtain general liability and property insurance have any effect on Tenant's obligations under this Lease.  Tenant agrees that in order to exercise the right to self-insure, Tenant must have a minimum net worth of $100,000,000 and it must be self insuring a majority of the membership clubs owned and leased by Tenant in the continental United States.

8.09  Waiver of Subrogation.  Landlord and Tenant hereby release each other from any and all liability or responsibility (to the other or anyone claiming through or under them by way of subrogation or otherwise) for any loss or damage to real or personal property on the Premises caused by fire or any other insured peril, even if such fire or other casualty shall have been caused by the fault or negligence of the other party or anyone for whom such party may be responsible.  Tenant, and Landlord to extent that Landlord shall have obtained any

[c: ASL] THYPIN.10

37

COSTCO/MBA 0040

insurance policies for the Premises as provided herein, shall procure insurance policies with such a waiver of subrogation and with a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies or prejudice the right of the releasor to recover thereunder; provided, however, if policies with such a clause or endorsement shall not be obtainable or shall be obtainable only at a premium over that chargeable without such waiver (any dispute regarding which shall be subject to arbitration pursuant to Section 15 of this Lease), the party seeking such policy shall notify the other thereof, and the latter shall have ten (10) days thereafter either (a) to procure such insurance in companies reasonably satisfactory to the other party or (b) to agree to pay such additional premium. If neither (a) nor (b) are done, this Section shall have no effect during such time as such policies shall not be obtainable or the party in whose favor a waiver of subrogation is desired shall refuse to pay the additional premium. If such policies shall at any time be unobtainable, but shall be subsequently obtainable, neither party shall be subsequently liable for a failure to obtain such insurance until a reasonable time after notification thereof by the other party. The provisions of this Section 8.09 shall not be applicable to the extent Tenant self-insures as provided in Section 8.08. In addition, the provisions of this Section 8.09 shall not limit or otherwise affect any indemnity of Tenant hereunder in favor of Landlord.

## SECTION 9

## CONDEMNATION

9.01 Total Taking. (a) In the event of the taking or condemnation by any competent authority for any public or quasi-public use or purpose of the whole of the Premises or materially all of the Premises (which, as used herein is defined in Section 9.02 below), then the Lease Term shall cease as of the date of possession by the condemnor, all rental and other payments shall be apportioned as of the date of title vesting in the condemnor and the award made as a result of said taking or condemnation shall be shared between Landlord and Tenant, with Landlord being entitled to the portion of the award as shall represent full compensation for the value of Landlord's Fee Estate, including, without limitation, the value of Landlord's reversionary interest in the Premises, as encumbered by this Lease ("Landlord's Condemnation Award") and Tenant being entitled to the portion of the award as shall represent full compensation for the value of Tenant's interest in this Lease ("Tenant's Condemnation Award").

[c: ASL] THYPIN.10

38

COSTCO/MBA 0041

(b)   Notwithstanding the foregoing provisions of Section 9.01 (a), (i) the first distribution of the award shall be made to Landlord on account of Landlord's Condemnation Award in an amount equal to, and in no event no less than, eighty (80%) percent of the appraised value of Landlord's Fee Estate (as encumbered by this Lease) as determined at the time of delivery of the first-in-priority Fee Mortgage (as set forth in a bona fide appraisal obtained by the Fee Mortgagee, which appraisal shall be delivered to Tenant promptly after receipt of same by said Fee Mortgagee) if at the time of the taking or condemnation there is a Fee Mortgage encumbering Landlord's Fee Estate; if at such time there is no Fee Mortgage, then the amount shall be equal to eighty (80%) percent of the appraised value of Landlord's Fee Estate (as encumbered by this Lease) at the date of title vesting in the condemnor as determined by an appraisal prepared by a bona fide independent appraiser retained by Landlord who is an MAI and a member of the American Institute of Real Estate Appraisers with at least ten (10) years experience appraising commercial real estate in the County of Queens; and (ii) the next distribution of the award shall be made to Tenant on account of Tenant's Condemnation Award in an amount equal to the sum of (aa) an amount equal to the square footage of the Improvements at the time that the Improvements shall be first opened to the general public by Tenant (the **"Opening Date"**) multiplied by $73.00 with respect to capital improvements commenced prior to the Opening Date, which amount shall be amortized monthly on a straight-line basis over thirty (30) years commencing on the Opening Date plus (bb) an amount equal to the increase in the square footage of the Improvements as a result of any Alteration contemplated by Section 3.01.4 multiplied by $73.00 with respect to said Alteration, which amount shall be amortized monthly on a straight-line basis over thirty (30) years commencing on the taking of occupancy of the expanded area of the Building after completion of the Alteration plus (cc) eighty (80%) percent of the costs of any other capital improvements commenced after the Opening Date and performed from time to time with respect to Alterations which are being made or contemplated to be made to warehouses owned or operated by Tenant or its affiliate The Price Company in the greater metropolitan New York area, which costs shall be amortized monthly on a straight-line basis over twenty (20) years commencing on the date said improvements are substantially complete.   The terms "capital improvements" and "Alterations" shall not include fixtures and trade fixtures for which claim is made by Tenant against the condemnor under Section 9.06.

9.01.1   Participation in Proceedings.   Tenant shall have the right to participate in any condemnation proceedings,

[c: ASL] THYPIN.10

COSTCO/MBA 0042

and Landlord shall not settle or compromise the amount of any award without the written consent of Tenant and any Leasehold Mortgagee.

9.01.2  Determination of Values.  If the value of Landlord's Condemnation Award and Tenant's Condemnation Award shall be separately determined in the proceeding pursuant to which the Premises shall have been taken or condemned, the value so determined shall be conclusive upon Landlord and Tenant.  If such value shall not be so determined, such value shall be fixed by agreement between Landlord and Tenant, or if they are unable to agree, such matter shall be settled by arbitration as provided in Section 15.

9.02  Substantial Taking.  In the event of the taking in condemnation of less than the whole of the Premises but nevertheless the remaining part of the Premises not so taken cannot be adequately restored, repaired or reconstructed so as to constitute a complete functional unit of property of substantially the same usefulness, design and construction of the Premises as immediately before such taking, capable of producing a fair and reasonable net annual income, as hereinafter determined, after the payment of all operating expenses thereof, the annual Minimum Rent (as adjusted pursuant to Section 9.03(a)) and other charges herein reserved, after the performance of all covenants, terms, agreements and provisions herein and by law provided to be performed and paid by the Tenant, and after taking into account the portion of any award to be paid to Tenant as provided herein for the repair and restoration of the Premises, then the Tenant shall have the right, to be exercised by written notice to the Landlord within sixty (60) days after the date of taking, to treat such taking as a total taking under Section 9.01 hereof and to terminate this Lease as to such remaining part of the Premises not so taken on a date to be specified in said notice which date shall not be earlier than the date of such taking.  The determination as to what constitutes a fair and reasonable net annual income shall be governed by the average net annual income produced by the Premises during the three (3) year period immediately preceding such taking.  Should the parties be unable to agree as to whether the part not taken is susceptible of adequate restoration, repair or reconstruction as aforesaid, such controversy shall be determined by arbitration in the manner provided in Section 15 of this Lease.

9.02.1  Effect of Substantial Taking.  In the event of a substantial taking pursuant to which this Lease shall terminate, there shall be paid from the condemnation award any expenses required with respect to the repair, demolition or removal of any remaining Improvements upon termination of the Lease and any

[c: ASL] THYPIN.10

40

balance of the award shall be distributed in accordance with Section 9.01. In addition, Tenant shall pay and satisfy all rent due and accrued hereunder up to such date of such termination and all other charges and shall perform all of the obligations of the Tenant hereunder to such date.

9.03 Partial Taking. In the event of a partial taking or condemnation, e.g., a taking that does not terminate this Lease pursuant to Sections 9.01 or 9.02;

(a) The Term of this Lease (except as hereinafter provided) shall nevertheless continue, but if Landlord shall be paid any portion of the award for such taking, then the annual Minimum Rent and Excess Rent to be paid by Tenant under Section 3 shall thereafter be reduced in the ratio that the rental value of the portion of the Premises taken or condemned bears to the rental value of the entire Premises immediately prior to the time of the taking or condemnation. If the parties cannot agree upon a just proportion of rent to be abated, the amount shall be determined in accordance with the Arbitration provision of Section 15.

(b) The award in respect of such partial taking shall be applied first to all of the costs incurred in restoring and repairing the Premises (including if applicable the Building) to the standard set forth in Section 9.02. The balance of said award shall be divided and shared by Landlord and Tenant as provided in Section 9.01 hereof.

(c) If any taking occurs during the last two (2) years of the Initial Term or of any Renewal Period, then the Tenant shall have the right, to be exercised by written notice to the Landlord within sixty (60) days after the date of taking, to terminate this Lease as to such remaining part of the Premises not so taken, on a date to be specified in said notice not earlier than the date of such taking. In such case the Tenant shall pay and satisfy all rent due and accrued hereunder up to such date of such termination and all other charges, and shall perform all of the obligations of the Tenant hereunder to such date, and thereupon this Lease shall terminate.

9.04 Successive Takings. In case of a second or any other additional partial taking or takings from time to time, the provisions hereinabove contained shall apply to each partial taking.

9.05 Temporary Taking. If the whole or any part of the Premises or of the Tenant's interest under this Lease be taken or condemned by any competent authority for its temporary use or

[c: ASL] THYPIN.10                                    41

occupancy, then Tenant shall continue to pay, in the manner and at the times herein specified, the full amounts of the Minimum Rent, Excess Rent and all Impositions and other charges payable by Tenant hereunder, and this Lease shall continue and, except only to the extent that Tenant may be prevented from so doing pursuant to the terms of the order of the condemning authority, Tenant shall perform and observe all of the other terms, covenants, conditions and obligations hereof upon the part of Tenant to be performed and observed, as though such taking or condemnation had not occurred. In the event of any such temporary taking or condemnation, Tenant shall be entitled to receive the entire amount of any award made for such taking, whether paid by way of damages, rent or otherwise, unless such period of temporary use or occupancy shall extend to or beyond the expiration date of the Term of this Lease, in which case such award shall be apportioned between the Landlord and the Tenant as of such date of expiration of the Term.

9.06 <u>Award for Personalty</u>. Nothing herein contained shall prevent Tenant from asserting a separate claim against the condemning authority to and receiving a separate award (independent of, and not in reduction of, Landlord's Condemnation Award) for all fixtures and trade fixtures owned by it.

## SECTION 10

## TENANT TO COMPLY WITH LAWS; REPAIRS AND MAINTENANCE

10.01  <u>Compliance with Laws</u>.

Tenant shall, throughout the term of this Lease, and at Tenant's sole cost and expense, promptly comply or cause compliance with all laws, rules, orders, ordinances, regulations and requirements now or hereafter enacted or promulgated which are applicable to the Premises and the business of Tenant conducted with respect thereto, foreseen or unforeseen, ordinary or extraordinary, and whether or not the same shall be presently within the contemplation of Landlord and Tenant or shall involve any change of governmental policy, or require structural or extraordinary repairs, alterations or additions, and irrespective of the cost thereof which may be applicable to the Premises.

10.02  <u>Repair and Maintenance</u>.

(a) Tenant shall, throughout the term of this Lease, at Tenant's cost and expense, take good care of and maintain the Premises and all roadways, sidewalks and curbs adjacent and appurtenant thereto, in good order and repair and shall promptly

[c: ASL] THYPIN.10                              42

COSTCO/MBA 0045

remove all accumulated snow, ice and debris from any and all roadways, sidewalks and curbs located upon or appurtenant to the Premises and all other sidewalks and curbs adjacent to the Premises.

(b)   Tenant shall not commit or suffer to be committed any waste upon or about the Premises and shall promptly at its cost and expense make all necessary replacements, restorations, renewals and repairs to the Premises and the appurtenances thereto whether interior or exterior, structural or non-structural, ordinary or extraordinary and foreseen or unforeseen, ordinary wear and tear excepted.

## SECTION 11

### TENANT FINANCING

11.01   Leasehold Mortgages Authorized.

11.01.1   On one or more occasions Tenant may take back a Purchase Money Leasehold Mortgage upon a sale and, subject to Landlord's rights as set forth in Section 12.05, assignment of the Leasehold Estate (as hereinafter defined) or may mortgage or otherwise encumber Tenant's Leasehold Estate to an Institutional Lender (as hereinafter defined) under one or more Leasehold Mortgages and assign this Lease as security for such Mortgage or Mortgages; provided, however, that in no event shall there be more than two (2) Leasehold Mortgages encumbering the Premises from time to time.

11.01.2   Tenant shall not place or create any mortgage, deed of trust, or other lien or encumbrance affecting Landlord's Fee Estate or Landlord's interest in this Lease, and all financing of the Premises by Tenant shall, to the extent the same is secured by the Premises, be secured by no more than two (2) Leasehold Mortgages pursuant to the terms of this Section 11.

11.01.3   Any Leasehold Mortgage shall provide the following:   (a) no purchaser at any foreclosure sale shall acquire any right to this Lease unless said purchaser assumes and agrees to perform under the Lease to the extent provided in Section 11.04.4(c) and (b) the Leasehold Mortgagee waives any right to retain and apply any insurance proceeds or condemnation award to the payment of the principal under the Leasehold Mortgage to the extent such proceeds are to be applied to the restoration of the Premises as provided herein or are allocated to Landlord as provided herein.

[c: ASL] THYPIN.10

43

COSTCO/MBA 0046

11.02    Notice to Landlord.

11.02.1    Each time Tenant shall take back a Purchase Money Leasehold Mortgage upon a sale and assignment of the Leasehold Estate or shall mortgage Tenant's Leasehold Estate to an Institutional Lender, the holder of such Leasehold Mortgage shall provide Landlord with notice of such Leasehold Mortgage together with a true copy of such Leasehold Mortgage and the name and address of the Mortgagee.    Following receipt of such notice by Landlord, the provisions of this Section 11.02 shall apply in respect to such Leasehold Mortgage.    In the event of any assignment of a Leasehold Mortgage or in the event of a change of address of a Leasehold Mortgagee or of an assignee of such Mortgage, notice of the new name and address shall be provided to Landlord.

11.02.2    If requested by the terms of such notice, Landlord shall promptly upon receipt of a communication purporting to constitute the notice provided for by Section 11.02.1 above acknowledge in writing receipt of such communication as constituting the notice provided for by Section 11.02.1 above, or in the alternative, notify Tenant and the Leasehold Mortgagee of the rejection of such communication as not conforming with the provisions of Section 11.02.1 and specify the basis of such rejection.

11.02.3    After Landlord has received the notice provided for by Section 11.02.1 above, Tenant, upon being requested to do so by Landlord, shall with reasonable promptness provide Landlord with copies of the note or other obligation secured by such Leasehold Mortgage and or any other document pertinent to the Leasehold Mortgage.    Tenant shall thereafter also provide Landlord from time to time with a copy of each amendment or other modification or supplement to such instruments.    All documents shall be accompanied by a certification by Tenant that such documents are true and correct copies of the originals.    Copies of all recorded documents shall show the recording data.

11.03    Definitions.

11.03.1    **"Leasehold Estate"** shall mean the estate of Tenant created by this Lease upon and subject to all the terms and conditions of this Lease.

11.03.2    The term **"Institutional Lender"** as used in this Lease shall mean any of the following:

[c: ASL] THYPIN.10                              44

COSTCO/MBA 0047

(a)     a bank, savings and loan association, trust company or insurance company regulated by the Comptroller of currency of the United States or the insurance or banking department of any state in the United States or of a state or federal agency exercising similar regulatory powers,

(b)     a college or university pension fund,

(c)     a pension fund of a public company listed on a national securities exchange;

(d)     a federal, state or municipal pension or retirement fund which may make loans secured by real estate,

(e)     any other financial institution that is actively engaged in commercial real estate financing, and

(f)     a business entity, a substantial portion of whose business is the making of mortgage loans;

provided, however, that any of the foregoing (a) - (f) have assets in excess of $500,000,000 (as adjusted every fifth Anniversary Date during the Term as provided in Section 21.01), and

(g)     any partnership, corporation, trust or other legally recognized entity formed for the purpose of issuing debt, securities or other obligations, or an investor or investors purchasing units, bonds, notes or other obligations pursuant to an offering memorandum (whether or not the same shall be registered with any governmental authorities), registration statement or similar offer, in either event the proceeds of the sale of which shall be used to make a loan to be secured by, inter alia, a Leasehold Mortgage; provided, however, that in the event of (g), the notice to Landlord of the Institutional Investor need include only the name of a trustee or other party which shall be entitled to give and receive notices on behalf of all other persons or entities otherwise constituting an Institutional Investor, and Landlord shall be obliged to give notice only to such trustee or other party, and its counsel.

11.03.3   The term **"Leasehold Mortgage"** as used in this Lease shall include a mortgage, a deed of trust, and any other security instrument or instruments by which Tenant's Leasehold Estate is mortgaged, conveyed, assigned, or otherwise transferred, to secure a debt or other obligation, including, without limitation, a Purchase Money Leasehold Mortgage.

[c: ASL] THYPIN.10                    45

COSTCO/MBA 0048



11.03.4   The term **"Purchase Money Leasehold Mortgage"** shall mean a Leasehold Mortgage taken back, retained by, or granted to Tenant upon a sale and assignment of the Leasehold Estate to secure payment of any portion of the purchase price or any other obligations of the Tenant and assignee in connection with such sale and assignment.

11.03.5   The term **"Foreclosure"** as used in this Lease with respect to a Leasehold Mortgage shall include a judicial sale, nonjudicial sale, trustee's sale and other similar realization proceedings.

11.03.6   The terms **"Leasehold Mortgagee"** and **"Mortgagee"** as used in this Lease shall refer to a holder of a Leasehold Mortgage who has given notice to Landlord and whose notice has been received by Landlord as provided in Section 11.02.   A **"designee"** of a Mortgagee shall mean a subsidiary or other entity designated by a Mortgagee to acquire any interest in the Leasehold Estate as contemplated by this Section 11.

11.04   Protection of Leasehold Mortgagees.   If Tenant, or Tenant's successors or assigns, shall mortgage this Lease in compliance with the provisions of this Section 11, then so long as any such Leasehold Mortgage shall remain unsatisfied of record, the following provisions shall apply:

11.04.1   Consent.   No voluntary cancellation, surrender or modification of this Lease shall be effective as to any Leasehold Mortgagee unless consented to in writing by such Leasehold Mortgagee, except that such consent shall not be required with respect to a termination in accordance with this Section 11 or with Section 9 upon condemnation.

11.04.2   Notice of Default.   Landlord, upon providing Tenant any notice of:   (a) default under this Lease, or (b) a termination of this Lease, or (c) a matter on which Landlord may predicate or claim a default, shall at the same time provide a copy of such notice to every Leasehold Mortgagee of which Landlord has been provided notice in accordance with Section 11.02 above.   Landlord shall have no liability for the failure to give any such notice, except that no such notice by Landlord to Tenant shall be deemed to have been duly given unless and until a copy thereof has been so provided to every Leasehold Mortgagee of which Landlord has been provided notice in accordance with Section 11.02 above.   From and after such notice has been given to a Leasehold Mortgagee, such Leasehold Mortgagee shall have the same period, after the giving of such notice upon it, for remedying any default or acts or omissions which are the subject

[c: ASL] THYPIN.10                              46

COSTCO/MBA 0049

matter of such notice, or causing the same to be remedied, as is given Tenant after the giving of such notice to Tenant, plus in each instance, the additional periods of time specified in Sections 11.04.3 and 11.04.4 hereof to remedy, commence remedying or cause to be remedied the defaults or acts or omissions which are specified in such notice. Landlord shall accept such performance by or at the instigation of such Leasehold Mortgagee as if the same had been done by Tenant. Tenant authorizes each Leasehold Mortgagee to take any such action at such Leasehold Mortgagee's option and does hereby authorize entry upon the Land by the Leasehold Mortgagee for such purpose.

11.04.3 Notice to Mortgagee. Anything contained in this Lease to the contrary notwithstanding, if any default shall occur which entitles Landlord to terminate this Lease, Landlord shall have no right to terminate this Lease unless, following the expiration of the period of time given Tenant to cure such default or the act or omission which gave rise to such default, Landlord shall notify every Leasehold Mortgagee of Landlord's intent to so terminate at least thirty (30) days in advance of the proposed effective date of such termination if such default is capable of being cured by the payment of money, and at least ninety (90) days in advance of the proposed effective date of such termination if such default is not capable of being cured by the payment of money. The provisions of Section 11.04.4 below shall apply only if, during such 30 or 90-day termination notice period, any Leasehold Mortgagee shall:

(a) Notify Landlord of such Leasehold Mortgagee's desire to nullify such notice; and

(b) Pay or cause to be paid all Rent and other payments (i) then due and in arrears as specified in the termination notice to such Leasehold Mortgagee and (ii) any of the same which become due during such 30 or 90-day period as and when they become due; and

(c) Comply or in good faith, with reasonable diligence and continuity, commence to comply with all non-monetary requirements of this Lease then in default and reasonably susceptible of being complied with by such Leasehold Mortgagee; provided, however, that such Leasehold Mortgagee shall not be required during such 90-day period to cure or commence to cure any default consisting of Tenant's failure to satisfy and discharge any lien, charge or encumbrance against the Tenant's interest in this Lease or the Premises junior in priority to the lien of the mortgage held by such Leasehold Mortgagee. Nevertheless, promptly following the acquisition of the Leasehold Estate by the Leasehold Mortgagee or its designee, said party

[c: ASL] THYPIN.10                47

COSTCO/MBA 0050

agrees that it shall commence a foreclosure action against any junior lien to the extent necessary to cause such lien to be discharged as a lien against the Premises.

Any notice to be given by Landlord to a Leasehold Mortgagee pursuant to any provision of this Section 11.04 shall be deemed properly addressed if sent to the Leasehold Mortgagee who served the notice referred to in Section 11.02 unless notice of a change of Leasehold Mortgage ownership has been given to Landlord in writing.

11.04.4  Procedure on Default.

(a)    If Landlord shall elect to terminate this Lease by reason of any default of Tenant, and a Leasehold Mortgagee shall have proceeded in the manner provided for by Section 11.04.3, this Lease shall not be deemed terminated so long as such Leasehold Mortgagee shall:

(i)  Pay or cause to be paid the Rent and other monetary obligations of Tenant under this Lease as the same become due, and continue its good faith efforts to perform all of Tenant's other obligations under this Lease excepting (A) obligations of Tenant to satisfy or otherwise discharge any lien, charge or encumbrance against Tenant's interest in this Lease or the Leasehold Estate junior in priority to the lien of the Mortgage held by such Leasehold Mortgagee and (B) past non-monetary obligations then in default and not reasonably susceptible of being cured by such Leasehold Mortgagee (provided, however, that upon the acquisition of the Leasehold Estate by the Leasehold Mortgagee or its designee, said party agrees to use its best reasonable efforts to cure those non-monetary defaults then susceptible of being cured); and

(ii)  If not enjoined or stayed, take steps to acquire or sell Tenant's interest in this Lease by foreclosure of the Leasehold Mortgage or other appropriate means and prosecute the same with due diligence.

Nothing in this subsection (a) of this Section 11.04.4, however, shall be construed to extend this Lease beyond the original Term hereof, nor to require a Leasehold Mortgagee to continue such foreclosure proceedings after the default has been cured.  If the default shall be cured and the Leasehold Mortgagee shall discontinue such foreclosure proceedings, this Lease shall continue in full force and effect as if Tenant had not defaulted under this Lease.

[c: ASL] THYPIN.10                          48

(b)      If a Leasehold Mortgagee is complying with subsection (a) of this Section 11.04.4, upon the acquisition of the Leasehold Estate herein by such Leasehold Mortgagee or its designee or any other tenant at a foreclosure sale or otherwise and the discharge of any lien, charge or encumbrance against the Tenant's interest in this Lease or the Premises which is junior in priority to the lien of the Leasehold Mortgage held by such Leasehold Mortgagee and which the Tenant is obligated to satisfy and discharge by reason of the terms of this Lease, this Lease shall continue in full force and effect as if Tenant had not defaulted under this Lease.

(c)      The making of a Leasehold Mortgage shall not be deemed to constitute an assignment or transfer of this Lease or the Leasehold Estate hereby created, nor shall any Leasehold Mortgagee, as such, be deemed to be an assignee or transferee of this Lease or of the Leasehold Estate hereby created so as to require such Leasehold Mortgagee, as such, to assume the performance of any of the terms, covenants or conditions on the part of the Tenant to be performed hereunder, but the purchaser at any sale of this Lease and of the Leasehold Estate hereby created in any proceedings for the foreclosure of any Leasehold Mortgage, or the assignee or transferee of this Lease and of the Leasehold Estate hereby created under any instrument of assignment or transfer in lieu of the foreclosure of any Leasehold Mortgage, shall be deemed to be an assignee or transferee within the meaning of this Section 11.04.4 and shall be deemed to have assumed and to have agreed to perform all of the terms, covenants and conditions on the part of the Tenant to be performed hereunder from and after the date of such purchase and assignment only for as long as such purchaser or assignee is the holder of this Leasehold Estate.  If the Leasehold Mortgagee or its designee shall become holder of the Leasehold Estate and if the Premises shall have been or become materially damaged on, before or after the date of such purchase and assignment, the Leasehold Mortgagee or such designee shall be obligated to repair, replace or reconstruct the Improvements only to the extent Tenant is required to do so by the terms of Section 7.

(d)      Subject to the rights of Landlord as set forth in Section 12.05, any Leasehold Mortgagee or other acquirer of the Leasehold Estate pursuant to foreclosure, assignment in lieu of foreclosure or other proceedings, and any Tenant under a New Lease (as defined in Section 11.05 below), may, upon acquiring the Leasehold Estate, without further consent of Landlord sell and assign the Leasehold Estate on such terms and to such persons and organizations ("Subsequent Assignee") as are acceptable to such Leasehold Mortgagee or acquirer and thereafter

[c: ASL] THYPIN.10                                    49

COSTCO/MBA 0052

be relieved of all obligations under this Lease; provided such Subsequent Assignee has delivered to Landlord its written agreement to assume and be bound by all of the provisions of this Lease.

(e)   Notwithstanding any other provision of this Lease, any sale of this Lease and of the Leasehold Estate hereby created in any proceedings for the Foreclosure of any Leasehold Mortgage, or the assignment or transfer of this Lease and of the Leasehold Estate hereby created in lieu of the Foreclosure of any Leasehold Mortgage, shall be deemed to be a permitted sale, transfer or assignment of this Lease and of the Leasehold Estate hereby created.

11.05  New Lease.  In the event of the termination of this Lease as a result of Tenant's default, Landlord shall promptly, within a reasonable time, provide each Leasehold Mortgagee with written notice that the Lease has been terminated (**"New Lease Notice"**), together with a statement of all sums which would at that time be due under this Lease but for such termination, and of all other defaults, if any, then known to Landlord.  Landlord agrees to enter into a new lease (**"New Lease"**) of the Premises with such Leasehold Mortgagee or its designee for the remainder of the term of this Lease, effective as of the date of termination, at the same Rent and upon the terms, covenants and conditions of this Lease; provided:

11.05.1  Request.  Such Leasehold Mortgagee shall make written request upon Landlord for such New Lease within thirty (30) days after the date such Leasehold Mortgagee receives Landlord's New Lease Notice given pursuant to this Section 11.05.

11.05.2  Procedure.  Such Leasehold Mortgagee or its designee shall pay or cause to be paid to Landlord at the time of the execution and delivery of such New Lease, any and all sums which would at the time of execution and delivery thereof be due pursuant to this Lease, including interest as required under the terms of this Lease, but for such termination and, in addition thereto, all reasonable expenses, including reasonable attorneys' fees, which Landlord shall have incurred by reason of such termination and the execution and delivery of the New Lease and which have not otherwise been received by Landlord from Tenant or other party in interest under Tenant.  Upon the execution of such New Lease, Landlord shall allow to the Tenant named therein as an offset against the sums otherwise due under this Section 11.05.2 or under the New Lease, an amount equal to the net income received by Landlord from the Building during the period from the date of termination of this Lease to the date of the beginning of

[c: ASL] THYPIN.10                          50

COSTCO/MBA 0053

the term of such New Lease. In the event of a controversy as to the amount to be paid to Landlord pursuant to this Section 11.05.2, the payment obligation shall be satisfied if Landlord shall be paid the amount in controversy. The parties shall cooperate to determine any disputed amount promptly in accordance with the terms of this Lease. Any such disputes shall be subject to arbitration in accordance with Section 15 of this Lease. Upon settlement of the dispute, if any amounts are due to Leasehold Mortgagee or such designee, same shall be paid to said party within ten (10) days thereafter, failing which said party shall be entitled to offset any amounts due against the next Rents due hereunder.

11.05.3 Cure. Such Leasehold Mortgagee or such designee shall agree to remedy any of Tenant's defaults of which such Leasehold Mortgagee was notified by Landlord's New Lease Notice and which are reasonably capable of being so cured by Leasehold Mortgagee or such designee.

11.05.4 Priority. Any New Lease made pursuant to this Section 11.05 shall have the same priority with respect to any mortgage or other lien, charge or encumbrance on the Property and the Building as this Lease, and the Tenant under such New Lease shall have the same right, title and interest in and to the Property and the Improvements thereon as Tenant had under this Lease as of the date of the New Lease.

11.05.5 Guaranty. The liability of any guarantor of this Lease shall not be affected, modified or amended as a result of the entering into of any New Lease.

11.06 New Lease Priorities. If more than one Leasehold Mortgagee shall request a New Lease pursuant to Section 11.05, Landlord shall enter into such New Lease with the Leasehold Mortgagee whose Leasehold Mortgage is prior in lien, or with the designee of such Leasehold Mortgagee. Landlord, without liability to Tenant or any Leasehold Mortgagee with an adverse claim, may rely upon a mortgagee title insurance policy issued by a responsible title insurance company doing business in the state where the Premises is located as the basis for determining the appropriate Leasehold Mortgagee who is entitled to such New Lease and the Leasehold Mortgagee which executes the New Lease shall indemnify and hold Landlord harmless against any claims by Tenant or other Leasehold Mortgagee with respect to such determination.

11.07 Certain Defaults. Nothing herein contained shall require any Leasehold Mortgagee or its designee as a condition to its exercise of rights hereunder to cure any default of Tenant which by its terms is not reasonably susceptible of being cured

[c: ASL] THYPIN.10

51

COSTCO/MBA 0054

by such Leasehold Mortgagee or such designee in order to comply with the provisions of Sections 11.04.3 or 11.04.4 or as a condition of entering into the New Lease provided for by Section 11.05. The financial condition of any Leasehold Mortgagee or successor to Tenant's interest under this Lease or a New Lease shall not be a consideration in the determination of the reasonable susceptibility of cure of such a default. No default or Event of Default, the cure of which, and no obligation of Tenant, the performance of which, requires possession of the Premises shall be deemed reasonably susceptible of cure or performance by any Leasehold Mortgagee or successor to Tenant's interest under this Lease or a New Lease not in possession of the Premises, provided such holder is complying with the requirements described in Section 11.04.4(a)(ii) above, and upon obtaining possession promptly proceeds to cure any such default then reasonably susceptible of cure by such Leasehold Mortgagee or successor; nor shall any Leasehold Mortgagee be required to cure the bankruptcy, insolvency or any related or similar condition of Tenant.

11.08  **Eminent Domain.** Tenant's share, as provided by Section 9 of this Lease, of the proceeds arising from an exercise of the power of eminent domain shall, subject to the provisions of such Section 9, be disposed of as provided for by any Leasehold Mortgage.

11.09  **Insurance.** A Standard Mortgagee Clause naming each Leasehold Mortgagee may be added to any and all insurance policies required to be carried by Tenant hereunder on condition that the insurance proceeds are to be applied in the manner specified in this Lease and the Leasehold Mortgage shall so provide; except that the Leasehold Mortgage may provide a manner for the disposition of such proceeds, if any, otherwise payable directly to the Tenant pursuant to the provisions of this Lease.

11.10  **Arbitration.** Landlord shall give each Leasehold Mortgagee of which Landlord has notice prompt notice of any arbitration or legal proceedings between Landlord and Tenant involving obligations under this Lease. Each such Leasehold Mortgagee shall have the right to intervene, within thirty (30) days after receipt of such notice of arbitration or legal proceedings, in any such proceedings and be made a party to such proceedings, and the parties hereto do hereby consent to such intervention. Any intervening Leasehold Mortgagee shall be bound by the outcome of such proceedings. In the event that any Leasehold Mortgagee shall not elect to intervene or become a party to any such proceedings, Landlord shall give the Leasehold Mortgagee notice of, and a copy of any award or decision made in any such proceedings, which shall be binding on all Leasehold

[c: ASL] THYPIN.10                               52

Mortgagees not intervening after receipt of notice of such proceedings. In the event Tenant shall fail to appoint an arbitrator, as provided in Section 15.01 hereof, a Leasehold Mortgagee (in order of seniority if there be more than one) shall have an additional period of thirty (30) days, after notice by Landlord that Tenant has failed to appoint such arbitrator, to make such appointment, and the arbitrator so appointed shall thereupon be recognized in all respects as if he had been appointed by Tenant.

11.11  No Merger.  So long as any Leasehold Mortgage is in existence, unless all Leasehold Mortgagees shall otherwise expressly consent in writing, the fee title to the Premises and the Leasehold Estate of Tenant therein created by this Lease shall not merge but shall remain separate and distinct, notwithstanding the acquisition of said fee title and said Leasehold Estate by Landlord or by Tenant or by a third party, by purchase or otherwise.

11.12  Notices.  Notices from Landlord to the Leasehold Mortgagee shall be mailed to the address furnished Landlord pursuant to Section 11.02.1 and those from the Leasehold Mortgagee to Landlord shall be mailed to the address designated pursuant to the provisions of Section 17.12 hereof. Such notices, demands and requests shall be given in the manner described in Section 17.12 and shall in all respects be governed by the provisions of that section.

11.13  Erroneous Payments.  No payment made to Landlord by a Leasehold Mortgagee shall constitute agreement that such payment was, in fact, due under the terms of this Lease; and any Leasehold Mortgagee having made any payment to Landlord pursuant to Landlord's wrongful, improper or mistaken notice or demand shall be entitled to the return of any such payment or portion thereof provided he shall have made demand therefor not later than twelve (12) months after the date of its payment.

11.14  Bankruptcy.  In the event of any proceeding by either Landlord or Tenant under the United States Bankruptcy Code (Title 11 U.S.C.) as now or hereafter in effect:

11.14.1  If this Lease is rejected in connection with a bankruptcy proceeding by Tenant or a trustee in bankruptcy for Tenant, such rejection shall be deemed an assignment by Tenant to the Leasehold Mortgagee (or if there is more than one Leasehold Mortgagee, to the one highest in priority) of the Leasehold Estate and all of Tenant's interest under this Lease, and this Lease shall not terminate and the Leasehold Mortgagee shall have all the rights of the Leasehold Mortgagee under this Section 11

[c: ASL] THYPIN.10

53

COSTCO/MBA 0056

as if such bankruptcy proceeding had not occurred, unless such Leasehold Mortgagee shall reject such deemed assignment by notice in writing to Landlord within thirty (30) days following rejection of the Lease by Tenant or Tenant's trustee in bankruptcy. If any court of competent jurisdiction shall determine that this Lease shall have been terminated notwithstanding the terms of the preceding sentence as a result of rejection by Tenant or the trustee in connection with any such proceeding, the rights of any Leasehold Mortgagee to a New Lease from Landlord pursuant to Section 11.05 hereof shall not be affected thereby.

11.14.2  If the Lease is rejected by Landlord or by Landlord's trustee in bankruptcy:

(a)  Tenant shall not have the right to treat this Lease as terminated except with the prior written consent of all Leasehold Mortgagees' and the right to treat this Lease as terminated in such event shall be deemed assigned to each and every Leasehold Mortgagee, whether or not specifically set forth in any such Leasehold Mortgage, so that the concurrence in writing of Tenant and each Leasehold Mortgagee shall be required as a condition to treating this Lease as terminated in connection with such proceeding.

(b)  Unless this Lease is treated as terminated in accordance with Section 11.14.2(a) above, then this Lease shall continue in effect upon all the terms and conditions set forth herein, including Rent, but excluding requirements that are not then applicable or pertinent to the remainder of the Term. Thereafter, Tenant or its successors shall be entitled to any offsets against Rent payable hereunder for any damages arising from such rejection and any such offset properly made shall not be deemed a default under this Lease. The lien of any Leasehold Mortgage then in effect shall extend to the continuing possessory rights of Tenant following such rejection with the same priority as it would have enjoyed had such rejection not taken place.

11.15  Mortgagee as Trustee.  A Leasehold Mortgagee (other than the Tenant under a Purchase Money Leasehold Mortgage) may hold and disburse any funds received as the proceeds of hazard insurance or condemnation subject to the provisions of this Lease governing disposition of such proceeds.

[c: ASL] THYPIN.10                54

COSTCO/MBA 0057

## SECTION 12

### ASSIGNMENT AND SUBLETTING

12.01  **Assignment.**  So long as there shall be no uncured Event of Default, Tenant shall have the right to assign this Lease on one or more occasions, from time to time, but subject to the terms and conditions set forth below.

12.01.1  **Notice of Default.**  If Tenant assigns this Lease, Landlord, when giving notice to said assignee or any future assignee of any default, shall also serve a copy of such notice on Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.  If this Lease terminates because of a default of such assignee, then, notwithstanding that Original Tenant has not cured such default and may have been joined in an eviction or similar proceeding, Landlord shall promptly give Original Tenant notice of such termination and Original Tenant shall have the option, exercisable by notice to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice of termination, to become Tenant under a new lease for the remainder of the Lease Term on all of the same terms and conditions as then remain under this Lease (including only those amendments thereto to which original Tenant has consented), provided any default in the payment of Minimum Rent, Excess Rent or additional rent is cured.  Such new lease shall commence on the date of termination of this Lease, except that if Landlord delivers to Original Tenant, together with Landlord's notice of termination, a release in favor of Original Tenant and Price/Costco, Inc. as to all liability under this Lease, Original Tenant shall not have the foregoing option.

12.02  **Subletting.** Tenant shall have the right to sublet, or license the use of, all or any part of the Premises, or all or portions of the Premises to one or more subtenants, licensees or concessionaires from time to time on such terms and conditions as it shall elect, but Tenant shall nevertheless remain liable hereunder.

12.03  **Performance by Subtenants.**  Within ten (10) days after Tenant's request, Landlord shall execute, acknowledge and deliver an agreement with any subtenants to the effect that in the event of, or at any time prior to, the termination of this Lease for any reason, Landlord will recognize the performance by any subtenant(s) at the Premises of all of the terms and conditions of this Lease and as a result thereof will permit the continued occupancy by such subtenant(s) of the Premises under the terms and conditions of this Lease up to the last day of the

[c: ASL] THYPIN.10                              55

COSTCO/MBA 0058

last exercised Renewal Period so long as such performance continues.

12.04  Conditions.

(a)       Any assignment of this Lease shall be conditioned upon the assignee executing and acknowledging a recordable agreement whereby the assignee:

(i)       shall assume all obligations, including but not limited to those pertaining to Rent and any additional rent, arising from and after the effective date of such assignment, and

(ii)       shall agree to be bound by the covenants, agreements, terms, provisions and conditions hereof, arising from and after the effective date of such assignment, on the part of Tenant to be fulfilled, performed or observed.

(b)       Tenant covenants that except as provided in Section 12.05, Tenant shall remain fully liable for the payment of Rent and any additional rent and for the other obligations of this Lease on the part of Tenant to be performed or observed notwithstanding any such assignment.

(c)       Within thirty (30) days following the effective date of said assignment, Tenant shall deliver a copy of the executed assignment to Landlord.

12.05  Landlord's Right of Recapture.  In the event that the Premises are not used for a retail use or Tenant elects to assign the Lease or sublet all or substantially all of the Premises (collectively, a **"Trigger Event"**), then at least thirty (30) days prior to the effective date of said Trigger Event, Tenant shall give Landlord notice thereof (**"Tenant's Assignment Notice"**), which notice shall also set forth the effective date (the **"Effective Date"**) of such Trigger Event and the amount of the Recapture Payment (as defined in Section 12.05.1 below) due to Tenant if Landlord exercises its recapture right as provided in this Section 12.05.  During the thirty (30) day period following the giving of Tenant's Assignment Notice (time being of the essence), Landlord shall have the right to give a notice to Tenant (the **"Recapture Notice"**) that it intends to recapture the Premises from Tenant and terminate this Lease on the Effective Date.  If Landlord fails to give the Recapture Notice, Tenant shall have the right to commence using the Premises for other than a retail use, to assign this Lease or sublet all or substantially all of the Premises at any time within two hundred ten (210) days after Landlord's receipt of Tenant's Assignment Notice, and all of the terms and conditions of this Lease other

[c: ASL] THYPIN.10                              56

COSTCO/MBA 0059

than this Section 12.05 shall continue to remain in full force and effect; following the consummation of a Trigger Event, the provisions of Section 12.05 shall no longer be in force or effect. If Landlord gives the Recapture Notice, Tenant shall have the right, exercised by notice given within thirty (30) days following receipt of the Recapture Notice, to negate Tenant's Assignment Notice, in which event the Trigger Event proposed in said notice shall be null and void. If Tenant does not negate the Recapture Notice, then Landlord shall pay to Tenant the Recapture Payment and except as provided below, the Expiration Date of this Lease shall be the Effective Date notwithstanding anything to the contrary contained herein (except that Landlord's liability to make the Recapture Payment shall survive the Expiration Date).

12.05.1    Recapture Payment. The Recapture Payment shall be an amount equal to the unamortized value of the costs of any Improvements to the Property (amortized over a twenty five (25) year period). If Landlord's Recapture Notice is not negated by Tenant, then the Recapture Payment shall be made on the Effective Date at a closing (the **"Recapture Closing"**) to be held at the offices of Tenant's counsel in New York City. At the Recapture Closing, (a) Tenant shall deliver to Landlord an assignment of Tenant's estate hereunder, (b) Tenant shall deliver to Landlord full possession of the Premises in the same manner as required at the Expiration Date, (b) Landlord shall pay to Tenant the Recapture Amount by wire-transferred funds, (c) each party shall deliver to the other a general release in favor of the releasee and such other parties claiming by, through and under the releasee on account of any obligations arising or in connection with this Lease (except that Landlord's liability to make the Recapture Payment shall survive the Expiration Date), (d) Rent, Impositions and other items customarily adjusted in commercial transaction shall be adjusted as of midnight the night before the date of the closing and (e) Landlord shall be liable for, and shall pay at the Recapture Closing, transfer taxes and transfer gains taxes, if any, due on account of the recapture by Landlord of this Lease in excess of said taxes which Tenant would have incurred had it assigned this Lease pursuant to the proposed assignment. If Landlord fails to perform at the Recapture Closing, then among Tenant's other remedies, Tenant shall have the following rights (which are not exclusive to each other): (w) to cause the Premises to be used for other than a retail use, to assign this Lease or to sublet all or substantially all of the Premises without giving Landlord any recapture right; (x) to have no further liabilities or obligations with respect to the Premises from and after the Effective Date except those provisions which by the terms of this Lease expressly survive the

[c: ASL] THYPIN.10                            57

COSTCO/MBA 0060

Expiration Date; (y) to remain at the Premises subject to the terms and conditions of this Lease, including without limitation the payment of Rent(in which instance, Tenant's claims against Landlord shall include its damages in suspending business at the Premises and the costs to re-establish operations at the Premises); and (z) to pursue such other rights and remedies as shall be available to it at law or in equity.

## SECTION 13

### QUIET ENJOYMENT

Landlord covenants that throughout the Lease Term Tenant may peaceably and quietly have, hold, occupy and enjoy the Premises, subject only to the terms, covenants and conditions of this Lease and without hindrance or molestation from Landlord or any person claiming by, through or under Landlord.

## SECTION 14

### DEFAULT

14.01 _Event of Default_. The occurrence of any of the following shall constitute an Event of Default:

14.01.1 _Payments to Landlord_. Failure of Tenant to make any payment owing to Landlord hereunder within five (5) days after same has become due and after written notice is given to Tenant by Landlord, or to pay any Imposition or any other payment which if not paid will result in a lien on the Property (except as and to the extent permitted under Section 5.03 of this Lease), or the failure to maintain any of the insurance coverage required hereunder or pay any of the premiums required to be paid with respect thereto, and such occurrence or failure continues for a period of fifteen (15) days after written notice thereof given to Tenant by Landlord.

14.01.2 _Other Covenants_. Tenant failing to perform, comply with, or observe any other term, covenant, warranty, condition, agreement or undertaking contained in or arising under this Lease and such failure continues for a period of thirty (30) days after notice thereof is given by Landlord or such longer period so long as Tenant commences to cure such failure within said thirty (30) day period and diligently prosecutes such cure to completion.

[c: ASL] THYPIN.10

58

COSTCO/MBA 0061

14.02  Termination of Lease.  In addition to all other rights and remedies available to Landlord by law or equity, Landlord may, at any time after the occurrence of any Event of Default on the part of Tenant, and while the same remains unremedied, give notice to Tenant of its intention to terminate this Lease, in which case, unless within fifteen (15) days after the giving of such notice, the condition creating or upon which is based such Event of Default is cured, this Lease shall terminate as of the expiration of such fifteen (15) days as if such date of expiration were the date originally established as the expiration date of this Lease and Landlord may reenter upon the Premises and have possession thereof.  Notwithstanding the foregoing provisions of this Section 14.02 or the provisions of Section 14.01.2 hereof, if the asserted default is of a non-monetary nature which is subject to arbitration pursuant hereto, and the existence of such default is being contested by the party assertedly in default, if and so long as such party is cooperating and acting in good faith to complete the arbitration proceeding with respect thereto as expeditiously as possible, the time for curing such default shall commence upon the rendering of the arbitration decision with respect thereto, or other resolution thereof, whichever occurs first; provided, however, if the matter being arbitrated is capable of performance to the extent not in dispute, performance to the extent not in dispute shall be a condition precedent to the effectiveness of this sentence.

14.03  Remedies.  So long as Landlord shall have given the notice provided in Section 14.02, then after the occurrence of an Event of Default and the failure by Tenant to avail itself of its rights as provided in Section 14.02:

(a) Landlord shall have the right to cancel and terminate this Lease, as well as all of the right, title and interest of Tenant hereunder, by giving to Tenant not less than five (5) days' notice of such cancellation and termination, and upon the expiration of the time fixed in such notice, this Lease and the Term hereof, as well as all of the right, title and interest of Tenant hereunder, shall expire in the same manner and with the same force and effect, except as to Tenant's liability, as if the expiration of the time fixed in such notice of cancellation and termination were the end of the term herein originally demised.

(b)  In the event of cancellation or termination of this Lease either by operation of law, by issuance of a dispossessory warrant, by service of notice of cancellation or termination as herein provided, or otherwise, Landlord may re-enter and repossess the Premises as permitted by law and Tenant shall nevertheless remain and continue liable to Landlord in a sum

[c: ASL] THYPIN.10                          59

COSTCO/MBA 0062

equal to all Rent and Additional Rent reserved herein for the remainder of the Term herein originally demised.  If Landlord shall so re-enter, Landlord may repair and alter the Premises in such manner as Landlord reasonably deems necessary or advisable, and/or let or relet the Premises or any parts thereof for the whole or any part of the remainder of the Term herein originally demised or for a longer period, in Landlord's name or as the agent of Tenant.  Any rent collected or received as a result of such letting or reletting shall be applied by Landlord first, to pay itself the cost and expense of retaking, repossessing, repairing and/or altering the Premises, and the cost and expense of removing all persons and property therefrom; and second, to pay itself the cost and expense sustained in securing any new tenants, and if Landlord shall maintain and operate the Premises the cost and expense of operating and maintaining the Premises. No re-entry by Landlord, whether had or taken under summary proceedings or otherwise, shall absolve or discharge Tenant from liability hereunder.  Tenant shall not be entitled to any of the excess over the Rent due hereunder.

(c)  Should any Rent so collected by Landlord after the aforementioned payments be insufficient to fully pay to Landlord a sum equal to all such Rent and Additional Rent reserved herein, the balance or deficiency shall be paid by Tenant on the rent days herein specified, that is, upon each of such rent days Tenant shall pay to Landlord the amount of the deficiency then existing; and Tenant shall be and remain liable for any such deficiency, and the right of Landlord to recover from Tenant the amount thereof, or a sum equal to all such rent and additional rent reserved herein, if there shall be no reletting, shall survive the issuance of any dispossessory warrant or other cancellation or termination hereof, and Landlord shall be entitled to retain any surplus Tenant hereby expressly waives any defense that might be predicated upon the issuance of such dispossessory warrant or other cancellation or termination hereof.

(d)  Suit or suits for the recovery of such deficiency or damages, or for a sum equal to any installment or installments of Rent and Additional Rent hereunder, may be brought by Landlord from time to time at Landlord's election, and nothing herein contained shall be deemed to require Landlord to await the date whereon this Lease or the Term hereof would have expired by limitation had there been so such Event of Default by Tenant or no such cancellation or termination.

(e)  Nothing in this Section 14 contained shall limit or prejudice the right of Landlord to prove and obtain as liquidated damages in any bankruptcy, insolvency, receivership,

[c: ASL] THYPIN.10                        60

reorganization or dissolution proceeding an amount equal to the maximum allowed by any statute or law governing such proceeding and in effect at the time when such damages are to be proved, whether or not such amount be greater, equal to or less than the amount of the damages referred to in either of the preceding sub-sections.

(f)  Any right or remedy herein conferred upon Landlord is not intended to be exclusive of any other right or remedy herein or by law provided, and shall be in addition to every other right or remedy given hereunder or now or hereafter existing at law, in equity or by statute.

(g)  Notwithstanding anything to the contrary contained above, Landlord agrees (i) to list the Premises for lease with reputable brokers for this type of property, and (ii) that to the extent it enters into a lease for the Premises or any portion thereof thereafter, Tenant shall be entitled to a credit against the amounts due hereunder for the rent and additional rent actually paid after Landlord uses reasonable and customary efforts to collect same, including the bringing and prosecution of a lawsuit, if necessary, net of the reasonable costs of collection.

14.04  **No Waivers.**  No failure by any party hereto to insist upon the strict performance of any provision of this Lease or to exercise any right, power or remedy consequent to any breach thereof, and no waiver of any such breach, or the acceptance of full or partial rent during the continuance thereof, shall constitute a waiver of any such breach or of any such provision.  No waiver of any breach shall affect or alter this Lease, which shall continue in full force and effect, or the rights of any party hereto with respect to any other then existing or subsequent breach.

14.05  **Payment by Landlord of Tenant's Defaulted Payments.** In case of default on the part of Tenant to pay any money, or do any act to satisfy any of the obligations or covenants which it is required to pay, do, or satisfy under the provisions of this Lease, Landlord may, at its option, after notice to Tenant, pay any or all such sums, or do any or all such acts which require the payment of money, or incur any expense whatsoever to remedy the failure of Tenant to perform any one or more of the covenants herein contained.  Tenant shall repay the same to Landlord on demand together with interest at the rate provided in Section 21.14 hereof, such interest to be calculated from the date payment is made by Landlord.

[c: ASL] THYPIN.10                           61

## SECTION 15

## ARBITRATION

15.01  Applicability.  Any dispute, controversy or claim arising out of this Lease shall be settled by expedited mandatory arbitration as set forth in this Section 15.  The arbitration shall be submitted to and administered by the American Arbitration Association (the "AAA") in accordance with the Commercial Arbitration Rules in effect as of the date of submission or such other applicable procedural rules of the AAA as the parties may agree upon.

15.02  Notice of Demand.  Either party may demand arbitration by notifying the other party in writing in accordance with the notice provisions of Section 21.12.  The notice shall describe the reasons for such demand, the amount involved, if any, and the particular remedy sought.  The notice shall also list the name of one arbitrator qualified in accordance with Section 15.04.

15.03  Response.  The party that has not demanded arbitration shall respond to the notice of demand within ten (10) calendar days of receipt of such notice by delivering a written response in accordance with the notice provisions of Section 21.12.  The response shall list the name of a second arbitrator qualified in accordance with Section 15.04.  The response shall also describe counterclaims, if any, the amount involved, and the particular remedy sought.  If a party fails to respond timely to the notice of demand, the arbitrator selected by the party making such demand under Section 15.02 shall resolve the dispute, controversy or claim within thirty (30) calendar days of the deadline for response.

15.04  Qualified Arbitrator.  Any arbitrator selected in accordance with Sections 15.02 and 15.03 shall be a natural person not employed by either of the parties or any parent or affiliated partnership, corporation or other enterprise thereof with at least ten (10) years experience arbitrating real estate matters in the County of Queens.

15.05  Appointment of Third Arbitrator.  If a party responds timely to a notice of demand for expedited arbitration under Section 15.03, the two arbitrators shall appoint a third arbitrator who shall be qualified in accordance with Section 15.04.  Such third arbitrator shall be appointed within ten (10) calendar days of receipt by the party demanding arbitration of notice of response provided for under

COSTCO/MBA 0065

Section 15.03.    If the two arbitrators fail to timely appoint a third arbitrator, the third arbitrator shall be appointed by the parties if they can agree within a period of ten (10) calendar days.    If the parties cannot timely agree, then either party may request the appointment of such third arbitrator by the presiding judge of the Supreme Court for the County of New York; provided that the other party shall not raise any question as to the Court's full power and jurisdiction to entertain such application and to make such appointment.

15.06    Arbitration Hearing; Discovery; Venue.    The arbitration hearing shall commence within thirty (30) calendar days of appointment of the third arbitrator as described in Section 15.05.    The hearing shall in no event last longer than two (2) calendar days.    There shall be no discovery or dispositive motion practice (such as motions for summary judgment or to dismiss or the like) except as may be permitted by the arbitrators; and any such discovery or dispositive motion practice permitted by the arbitrators shall not in any way conflict with the time limits contained herein.    The arbitrators shall not be bound by any rules of civil procedure or evidence, but rather shall consider such writings and oral presentations as reasonable business persons would use in the conduct of their day to day affairs, and may require the parties to submit some or all of their case by written declaration or such other manner of presentation as the arbitrators may determine to be appropriate. It is the intention of the parties to limit live testimony and cross examination to the extent absolutely necessary to insure a fair hearing to the parties on significant and material issues. Venue of any arbitration hearing pursuant to this Section 15 shall be in New York, New York.

15.07    Decision.    The arbitrators' decision shall be made in no event later than ten (10) calendar days after the commencement of the arbitration hearing described in Section 15.07.    The award shall be final and judgment may be entered in any court having jurisdiction thereof.    The arbitrators may award specific performance of this Agreement. The arbitrators may also require remedial measures as part of any award.    The arbitrators in their discretion may award attorneys' fees and costs to the more prevailing party.    The arbitrators shall have no authority to expand or modify the terms and conditions of this Lease in reaching their decision or in requiring any the remedial measures they may require.

COSTCO/MBA 0066

## SECTION 16

### RIGHT OF FIRST REFUSAL

16.01  Right of First Refusal.  So long as there shall be no uncured Event of Default, Tenant shall have a right of first refusal ("**Right Of First Refusal**") to purchase the Premises from Landlord or all or substantially all of the interests of Landlord or its constituent entities (the **"Interests"**).  In the event Landlord or its constituent entities receives a bona fide offer from, or is prepared to make a bona fide offer to, a third party to purchase the Premises or all or substantially all of the Interests, which Landlord or such entities intends to accept, the following shall apply:

16.01.1  Notice.  Landlord shall promptly deliver to Tenant a notice of such offer to sell, and Tenant may, within thirty (30) days after receipt thereof, offer to purchase the Premises or the Interests, on the same terms as those set forth in such notice.  Tenant agrees that it shall include in any agreement to purchase the Premises tax-free exchange provisions which are reasonably acceptable to Landlord and Tenant.

If Tenant fails to reply to Landlord's notice within the stipulated thirty (30) day period, Landlord may proceed to sell, or cause to be sold, as the case may be, the Premises or the Interests in accordance with the terms set forth in the notice to Tenant within two hundred seventy (270) days of Landlord's notice.  If Landlord shall not sell the Premises or Interests within such time frame, Tenant shall have the rights set forth in this Section 16.01 as if no notice had been sent by Landlord.

16.01.2  Modified Terms.  Tenant's Right of First Refusal shall remain applicable to an offer to purchase or exchange on modified terms if the purchase price under the offer to purchase or exchange on modified terms is equal to or more than two (2%) percent less than the monetary consideration set forth in the original offer to purchase or exchange or if the non-monetary provisions are materially more favorable to the purchaser than those set forth in the notice to Tenant.  In such event, Landlord shall give notice thereof to Tenant and Tenant shall be obligated to reply to Landlord's subsequent notice within ten (10) business days thereafter.  If Landlord shall sell the Property or if the Interests are sold after a failure of Tenant to exercise its right of first refusal, such sale shall be subject to this Lease and the right of first refusal shall continue and shall be applicable to subsequent offers to purchase the Property or the Interests.

[c: ASL] THYPIN.10                          64

If the Property or the Interests shall be conveyed to the Tenant under this Right of First Refusal, any prepaid rent shall be apportioned and applied on account of the purchase price.

16.01.3  Conditions of Sale.  If by the Tenant's reply to such notice Tenant shall agree to meet the offer to purchase or exchange, then with respect to the Property, Landlord, or with respect to the Interests, the constituent entities of Landlord, and Tenant shall promptly enter into a formal contract for the purchase and sale of the Property or the Interests, on the terms and conditions as are contained in such election and in accordance with Section 16.04 hereof.  Landlord agrees that it shall not dispose of its interest in the Premises except where a purchase price is established.

16.02  Deleted prior to execution.

16.03  Deleted prior to execution.

16.04  Terms of Purchase.  In the event that Landlord and Tenant engage in a purchase and sale pursuant to the terms of this Lease, the purchase and sale shall occur in accordance with the following terms and conditions:

(a)  The purchase price is to be paid in cash at closing, subject to the tax-free exchange provisions, if any, of said contract.

(b)  Closing is to occur on or before ninety (90) days after Tenant exercises its option to purchase the Property.

(c)  Closing shall occur at the offices of Landlord's New York counsel or, if Tenant shall have a lender, the offices of counsel to Tenant's lender.

(d)  On the date set for closing, Landlord shall deliver to Tenant or its designee (i) a bargain and sale deed with covenants against grantor's acts executed and acknowledged by Landlord in favor of Tenant or its designee and (ii) an ALTA owner's policy of title insurance in the amount of the purchase price issued by a title insurance company acceptable to Tenant insuring Tenant as fee owner of the Property or the Interests, as the case may be, subject only to the Permitted Encumbrances and such other exceptions as Tenant shall approve in its sole and absolute discretion.

(e)  Closing costs shall be paid as follows:

[c: ASL] THYPIN.10                       65

COSTCO/MBA 0068

(i)   Landlord is to pay for all transfer taxes and transfer gains taxes.

(ii)   Tenant is to pay for recording costs (except for Landlord's releases), title insurance and the costs, if any, to update Tenant's survey.

(f)   Subject to the last sentence of this paragraph (f), encumbrances on the Property (other than Permitted Encumbrances) that are subject to the purchase and sale shall be removed by Landlord, except Tenant shall be responsible for removing any encumbrances that Tenant and/or Tenant have placed or caused to be placed upon the Property including unpaid real estate taxes; provided that Tenant may, in its sole discretion, elect to purchase the Property subject to one or more of the encumbrances affecting the Property. The purchase price shall be adjusted as necessary to account for Tenant's assumption of encumbrances that Landlord is unable to or does not remove; it being understood that Landlord's obligation to so remove said encumbrances shall be limited to one half (1/2) of one (1%) percent of said purchase price unless such encumbrances are the result of the voluntary or affirmative acts of Landlord, in which event Landlord's obligations shall not be so limited.

## SECTION 17

### LANDLORD AND TENANT TO FURNISH STATEMENT

17.01   Landlord's Statement.   Landlord, within fifteen (15) days after written request to Landlord from Tenant or any Leasehold Mortgagee or prospective Leasehold Mortgagee, will furnish a written statement, duly acknowledged, as to the following items:

(a)   The amount of the rent due, if any;

(b)   Whether or not the Lease is unmodified and in full force and effect (or, if there have been modifications, whether or not the same are in full force and effect as modified and identifying the modifications);

(c)   Whether or not Landlord has sent to Tenant any notice of default under this Lease and if so, specifying the nature of any such default; and

[c: ASL] THYPIN.10                          66

COSTCO/MBA 0069

(d)   Such other matters as Tenant or the Leasehold Mortgagee may reasonably request and which relate to the actual knowledge of Landlord.

17.02   <u>Tenant's Statement</u>.   Tenant, within fifteen (15) days after written request of the Landlord, will furnish a written statement, duly acknowledged, as to:

(a)   Whether the Lease is unmodified and in full force and effect (or, if there have been modifications, whether or not the same are in full force and effect as modified and identifying the modifications);

(b)   Whether or not Tenant has set to Landlord any notice of default under this Lease and if so, specifying the nature of such defaults, if any; and

(c)   Such other matters as Landlord may reasonably request and which relate to the actual knowledge of Tenant.

17.03   <u>Failure to Furnish</u>.   Upon the failure of the Landlord or the Tenant, as the case may be, to furnish such statements within the said twenty (20) day period, it shall be conclusively presumed that the Lease is in full force and effect and that there are no defaults thereunder by the other party, except to the extent of facts actually known by the party to whom such statement was to be directed.

**SECTION 18**

**<u>NON-COMPETE; LIMITATION IN
TRADE AREA</u>**

18.01   For the period ending seven (7) years from the Rent Commencement Date, neither Landlord, nor any subsidiary, affiliate, parent or other entity which controls, is controlled by, or is under common control with Landlord (collectively, **"Landlord's Entities"**) shall sell, lease or otherwise transfer to any person or entity (including, without limitation, Sam's Wholesale Club, BJ's Wholesale Club, SourceClub and Price Savers), all or any portion of any property owned by any of Landlord or Landlord's Entities within the Non-Compete Area (as defined in <u>Section 18.02</u>) for the purpose of owning, leasing, sub-leasing, operating or managing a retail/wholesale operation or wholesale club which has a merchandising concept based upon a relatively limited number of stock keeping units in a large number of product categories and which has a warehouse-style

[c: ASL] THYPIN.10                              67

interior in competition with the operation of Tenant (collectively, a **"Membership Club"**).

18.02   For the period ending seven (7) years from the Rent Commencement Date, neither Tenant, nor any subsidiary, affiliate, parent or other entity which controls, is controlled by, or is under common control with Tenant (collectively, **"Tenant's Entities"**) shall purchase, lease or otherwise acquire all or any portion of any property within the Borough of Manhattan identified on Exhibit "H" or within the Borough of Queens as identified on Exhibit "I" (collectively the **"Non-Compete Area"**) for the purpose of owning, operating or managing a Membership Club.  Notwithstanding the foregoing, Tenant shall not be subject to the foregoing restriction and may own, operate or manage a competing Membership Club in the area shown on Exhibit "H" at any time and in the area shown on Exhibit "I" at any time from and after three (3) years from the Rent Commencement Date so long as: (a) Tenant pays to Landlord an amount equal to the lesser of (i) ten (10) times the average annual decrease, if any, in any Percentage Rent due Landlord for the two (2) full Fiscal Years following the opening of said competing Membership Club to the general public as compared with the two (2) full Fiscal Years preceding such opening or (ii) One Million ($1,000,000) Dollars, which payment shall be made within two (2) months following the determination of the amount so due; or (b) the Premises has achieved annual Gross Receipts in excess of Two Hundred Million ($200,000,000) Dollars; or (c) the Premises is not then being operated as a Membership Club.  In addition, the restrictions set forth in this Section 18.02 shall not apply with respect to any competing Membership Club which exists prior to the date of the acquisition by Tenant of its interest in said competing Membership Club.

18.02.1   If Tenant should violate this covenant, Landlord, as its sole remedy, may include the Gross Receipts of such competing Membership Club in the Gross Receipts transacted in the Premises for the purpose of computing Percentage Rent due hereunder, if any, as though said sales had actually been made from the Premises.

## SECTION 19

### INDEMNIFICATION

19.01   <u>Tenant to Indemnify Landlord</u>.   Tenant agrees to indemnify, defend and  hold harmless Landlord, its shareholders, officers and agents from and against any and all losses, costs and expenses of any kind or nature including reasonable

[c: ASL] THYPIN.10                      68

attorneys' fees which may be imposed upon or asserted against Landlord by any third party by reason of Tenant's occupancy and/or use of the Premises, including but not limited to the occurrence of any one or more of the following, or of facts or events which result in any one or more of the following:

19.01.1  Use or Occupancy.  Any accident, injury or damage to person and/or property arising from any use or occupancy of the Premises which Tenant may make, permit or suffer to be made or exist, or occasioned by any use, occupancy of, or activity on the Premises and/or on any sidewalk, street, alley, curb, passageway or space adjacent thereto, or any part thereof, by or for Tenant (or any subtenant, invitee, contractor, employee or agent of Tenant or any subtenant);

19.01.2  Tenant Negligence.  Any negligence or wrongful act or omission on the part of Tenant or its subtenants or any of their agents, contractors, servants, employees, licensees, sublessees or invitees, or anyone claiming through the foregoing;

19.01.3  Tenant Work.  Any work or thing done by or for Tenant in, on or about the Premises and/or on any sidewalk, plaza, street, alley, curb, passageway or space adjacent thereto, or any part thereof unless performed by Landlord or its agents.

19.02  Limitation.  The foregoing indemnity shall not apply to any loss, cost or expense to the extent caused by Landlord's breach of this Lease or Landlord's negligence or willful misconduct.

## SECTION 20

### ENVIRONMENTAL INDEMNITY

20.01  Tenant's Obligations.  Tenant covenants and agrees that from and after the Commencement Date, it shall not permit or maintain any Hazardous Substances in, on or about any portion of the Premises in violation of Environmental Laws.  Tenant covenants and agrees to indemnify, protect and save Landlord harmless against and from any and all damages, losses, costs, disbursements or expenses of any kind or of any nature whatsoever

[c: ASL] THYPIN.10

69

COSTCO/MBA 0072

(including, without limitation, attorneys' and experts' fees and disbursements) which may at any time be imposed upon or awarded against Landlord, arising from or out of any failure by Tenant to observe, perform or fulfill its obligations under the provisions of this paragraph.

20.02 <u>Landlord's Obligations</u>. Landlord covenants and agrees to indemnify, protect and save Tenant harmless against and from any and all damages, losses, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, attorneys' and experts, fees and disbursements) which may at any time be imposed upon, or awarded against Tenant and arising from or out of any Hazardous Substances on, in, under or affecting all or any portion of the Premises as of the date immediately prior to Commencement Date or thereafter if introduced by Landlord or any party claiming by, through or under Landlord; <u>provided</u>, <u>however</u>, that any claims under this <u>Section 20.02</u> first arising following the completion of the initial Alterations at the Premises shall be limited to any damages, losses, costs, disbursements or expenses arising from a violation of any Environmental Laws.

## SECTION 21

### MISCELLANEOUS

21.01 <u>Escalation</u>.

(a) <u>Standard of Measurement</u>. The dollar amounts stated in Sections 7.04, 8.02.5, 8.05 and 11.03 shall be adjusted on the fifth anniversary following the first Lease Year and every fifth Anniversary Date thereafter (**"Anniversary Date"**) during the Term of this Lease and any Renewal Period to a dollar amount which bears the same ratio to the original dollar amount set forth herein as the following-described index figure published for the latest date prior to the date such adjustment is to be effective bears to such index figure published for the latest month prior to the date hereof. The index figure to be utilized in calculating such adjustments shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (all Items, New York-Northeastern New Jersey) (1982-84=100), presently published by the United States Department of Labor (the **"Index"**). In the event the Index shall hereafter be converted to a different standard reference base or otherwise revised, the determination of the percentage increase shall be made with the use of such conversion factor, formula or table for converting the Index as may be published by the Bureau of Labor Statistics or, if said Bureau shall not publish the same, then with the use of such

[c: ASL] THYPIN.10

70

conversion factor, formula or table as may be published by Prentice Hall, Inc., or, failing such publication, by any other nationally recognized publisher of similar statistical information.  In the event the Index and/or a conversion factor shall cease to be published, then, for the purposes of this Lease, there shall be substituted for the Index such other index as Landlord and Tenant shall agree upon, and if they are unable to agree within ninety (90) days after the Index ceases to be published, such matter shall be determined by Arbitration in accordance with Section 15 of this Lease.

(b)  Any provision in subparagraph (a) notwithstanding, under no circumstances shall the dollar amounts identified in subparagraph (a) of this Section be less than stated in the sections referenced therein.

21.02  No Partnership.  Nothing contained herein or in any instrument relating hereto shall be construed as creating a partnership or joint venture between Landlord and Tenant or between Landlord and any other party, or cause Landlord to be responsible in any way for debts or obligations of Tenant or any other party.

21.03  Time of the Essence.  Time is hereby expressly declared to be of the essence of this Lease and of each and every term, covenant, agreement, condition and provision hereof.

21.04  Captions.  The captions of this Lease and the table of contents preceding this Lease are for convenience and reference only, and are not a part of this Lease, and in no way amplify, define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

21.05  Meaning of Terms.  Words of any gender in this Lease shall be held to include any other gender and words in the singular number shall be held to include the plural when the sense requires.

21.06  Lease Construed as a Whole.  The language in all parts of this Lease shall in all cases be construed as a whole according to its fair meaning and neither strictly for nor against Landlord or Tenant.

21.07  Severability.  If any provision of this Lease (other than those relating to payment of rent) or the application thereof to any person or circumstances shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not

[c: ASL] THYPIN.10

71

COSTCO/MBA 0074

be affected thereby, and each provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

21.08  Survival.  Each provision of this Lease which may require the payment of money by, to or on behalf of Landlord or Tenant or third parties after the expiration of the Term hereof or its earlier termination shall survive such expiration or earlier termination.

21.09  Memorandum of Lease.  The parties agree to execute and acknowledge an appropriate memorandum of this Lease in the form of Exhibit "J" for public recordation purposes, so that public notice shall be given of the Term of the Lease hereof and the existence of the rights of Sections 12 and 16 hereof and any other information required by the relevant provisions of applicable law.

21.10  Amendment.  This Lease may only be amended or modified by written instrument, executed by the party to be charged.

21.11  Commissions.  Each of the parties hereto represents to the other that it has not dealt with any brokers in connection with this transaction and has not dealt with any consultants other than Rothwood Real Estate Services, Inc. ("Rothwood"), Washington Square Partners ("WSP") and Northwest-Atlantic Partners, Inc. ("NWAP").  Landlord shall pay such fees to Rothwood and WSP as it shall have agreed pursuant to separate agreement.  Landlord shall pay a consultant's fee of Two Hundred Fifty Thousand ($250,000) Dollars to NWAP.  The fee to NWAP shall be payable on the Rent Commencement Date, and in the event said fee is not paid to NWAP, Landlord hereby irrevocably directs Tenant to pay the first Rents due hereunder to NWAP as a permitted offset to the Rents otherwise due and payable to Landlord.  Except for such fees, (i) Tenant shall save and hold Landlord harmless from any and all claims, demands or requests by real estate brokers, agents or finders with whom Tenant may have dealt in connection with this Lease; and (ii) Landlord shall save and hold Tenant harmless from any and all claims, demands, or requests by real estate brokers, agents or finders with whom Landlord may have dealt in connection with this Lease.  The indemnity and hold harmless of this Section 21.11 shall include all costs incurred by the indemnified party in connection with any such claims including, without limitation, reasonable attorney's fees and disbursements.

21.12  Notices.  All notices, demands, requests, or other writings in this Lease provided to be given or made or sent, or

[c: ASL] THYPIN.10                           72

which may be given or made or sent, by either party hereto to the other, or by any Mortgagee to either party shall be in writing and shall be given by hand or by any nationally recognized overnight delivery service in either event with all transmittal fees prepaid, properly addressed, and sent to the following addresses:

            Landlord:  Manhasset Bay Associates
                       49-49 Thirtieth Street
                       Long Island City, NY 11101
                       Attention:  Mr. Richard Thypin
                       Fax No.: (718) 706-4503

                       with copies to:

                       Thypin Steel Company, Inc.
                       49-49 Thirtieth Street
                       Long Island City, NY 11101
                       Attention:  Mr. Alan Aronovitz
                       Fax No.: (718) 706-4503

                                and

                       Stadtmauer Bailkin LLP
                       850 Third Avenue
                       New York, NY 10022
                       Attention:  Marshall J. Cohen, Esq.
                       Fax No.: (212) 980-9578

and with respect to any notices to Landlord sent prior to the Rent Commencement Date:

                       Washington Square Partners
                       110 East 59th Street
                       New York, New York 10022
                       Attention:  Mr. Paul Travis

            Tenant:    Price/Costco, Inc.
                       999 Lake Drive
                       Issaquah, Washington 98027
                       Attention:  Real Estate Counsel
                       Fax No.: (206) 313-8105

[c: ASL] THYPIN.10                  73

COSTCO/MBA 0076

With copies to:

Pryor, Cashman, Sherman & Flynn
410 Park Avenue
New York, New York  10022
Attention:  Andrew S. Levine, Esq.
Fax No.:  (212) 326-0806

and with respect to any notices to Tenant sent prior to the Rent Commencement Date:

Northwest-Atlantic Partners, Inc.
709 Westchester Avenue
White Plains, New York 10604
Attention:  Mr. Steven Kushner
Fax No.:  (914) 328-2121

or to such other address as either party may from time to time designate by written notice to the other or to any Mortgagee. Notices given (i) by overnight delivery service as aforesaid shall be deemed received on the next business day and (ii) by hand shall be deemed given on the date delivered so long as same is received on or prior to 5:00 p.m. on a business day (if sent later, then notice shall be deemed given on the next business day) and if the sending party receives a receipt verification or verification that either receipt was refused or that the notice was not deliverable.

21.13  Attorneys' Fees.  In any proceeding or controversy associated with or arising out of this Lease or a claimed or actual breach thereof, or in any proceeding to recover the possession of the Premises, the prevailing party shall be entitled to recover from the other party as a part of prevailing party's costs, reasonable attorney's fees, the amount of which shall be fixed by the court and shall be made a part of any judgment rendered.

21.14  Interest.  Except as otherwise specifically provided herein, any amounts due from one party to the other pursuant to the terms of this Lease, including amounts to be reimbursed one to the other, shall bear interest from the due date or the date the right to reimbursement accrues at the rate published or publicly announced most recently prior to such date as the lowest rate charged by Bank of America, or its successor, for commercial, short-term unsecured loans, plus two (2) percentage points; provided, however, that such rate shall not exceed, in any event, the highest rate of interest which may be charged under applicable law without the creation of liability for penalties or rights of offset or creation of defenses.  For

[c: ASL] THYPIN.10                          74

COSTCO/MBA 0077

purposes of interest calculations, the due date of amounts or the date the right to reimbursement accrues shall be deemed the date that it originally was owing but may have been disputed, as distinguished from the date of final settlement or the making of a judicial or arbitration award.

21.15  Governing Law.  This Lease, and the rights and obligations of the parties hereto, shall be interpreted and construed in accordance with the laws of the State of New York, without regard to any conflicts of law.

21.16  Exhibits.  Any reference in this Lease to Exhibits shall be to the Exhibits annexed hereto, which by this reference are made a part hereof.

21.17  Parties Bound.  The covenants, agreements, terms, provisions and conditions of this Lease shall bind and inure to the benefit of the respective successors and assigns of the parties hereto.

21.18  Section References.  Any reference in this Lease to a Section shall be to a Section of this Lease unless the content dictates otherwise.

21.19  Waiver of Distraint.  Landlord hereby expressly waives any and all rights granted by or under any present or future laws to levy or distrain for rent, in arrears, in advance or both, on any goods, merchandise, equipment, fixtures, furniture or other personal property of Tenant, or any subtenant or licensee of Tenant, in the Premises or to be delivered thereto.

21.20  Confidentiality.  Without the prior written consent of Tenant, Landlord shall not disclose, and Landlord shall direct its representatives, employees, agents and consultants not to disclose to any person or entity any of the terms, conditions or other facts with respect to this Lease.

21.21  Limitation of Landlord's Liability.  From and after the Commencement Date, (a) the liability of Landlord hereunder for damages or otherwise shall be limited to Landlord's Fee Estate which shall include, without limitation, the proceeds of any insurance policies covering or relating to the Premises, any awards payable in connection with any condemnation of the Premises or any part thereof, and any other rights, privileges, licenses, franchises, claims, causes of action or other interests, sums or receivables appurtenant to the Premises and (b) other than with respect to any insurance proceeds or condemnation awards received by Landlord to be made available to

[c: ASL] THYPIN.10                    75

COSTCO/MBA 0078

Tenant or to be made available for the restoration or repair of
the Premises as provided herein, Landlord shall have no personal
liability beyond Landlord's Fee Estate and no other property or
assets of Landlord, or of any partners or principals of Landlord,
or of any shareholder, officer or director of any partner or
principal of Landlord shall be subject to levy, execution or
other enforcement procedure for the satisfaction of Tenant's
remedies.  The liability of Landlord for any period prior to the
Commencement Date shall be similarly limited as provided in the
foregoing sentence unless Landlord's liability shall be due to
the willful default or wrongful acts of Landlord or anyone
claiming by, through or under Landlord.

## SECTION 22

### FEE MORTGAGES

22.01  Fee Mortgages.  At any time from and after the Rent
Commencement Date, this Lease shall become subject and
subordinate to one or more mortgages upon the fee of the Premises
(a "Fee Mortgage") only if, as and when an agreement
substantially in the form of Exhibit "K" (the "Non-Disturbance
Agreement") is entered into by Landlord, Tenant and the
mortgagee, and provided that the Fee Mortgage provides for (i)
the payment or disposition of insurance proceeds in the same
manner as provided for in or pursuant to this Lease, and (ii) the
payment and disposition of condemnation awards in the same manner
as provided in this Lease for payment and disposition thereof.
Tenant agrees to enter into a Non-Disturbance Agreement in said
form promptly upon request by Landlord.

[c: ASL] THYPIN.10                          76

COSTCO/MBA 0079

## SECTION 23

### INSPECTION OF PREMISES

Landlord and Landlord's agents and representatives shall be entitled (i) at any time in emergencies without notice, and (ii) from time to time, Monday through Friday from 9:00 a.m. to 5:00 p.m. (except for legal holidays), upon reasonable notice to Tenant (which notice may be given orally, in which event said notice is also to be given to the manager of the Building) to go upon and into the Premises accompanied by representatives of Tenant in order to (a) ascertain Tenant's compliance with the terms and conditions of this Lease, or (b) show the Premises to prospective mortgagees and/or purchasers and, during the last two years of the Term, prospective tenants.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:            MANHASSET BAY ASSOCIATES

                     By: _____

                     Its: Managing Partner

TENANT:              COSTCO WHOLESALE CORPORATION

                     By: _____

                     Its: Asst Secy.

COSTCO/MBA 0080

**EXHIBIT A**

**ALL THAT CERTAIN** plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough and County of Queens, City and State of New York, bounded and described as follows:-

**BEGINNING** at the point of the intersection of the southerly line of Broadway with the westerly line of Vernon Boulevard;

**THENCE** along said westerly line of Vernon Boulevard, South 35 degrees, 32 minutes, 12.7 seconds west, 677.71 feet to the intersection of the westerly line of Vernon Boulevard with the northerly line of 33rd Road (Sanford Street);

**THENCE** along said northerly line of 33rd Road, south 86 degrees, 20 minutes, 29.4 seconds west, 462.08 feet;

**THENCE** south 3 degrees 39 minutes 30.6 seconds east, 25 feet to the center line of 33rd Road;

**THENCE** along the prolongation of said center line, south 86 degrees, 20 minutes, 29.4 seconds west, 95.89 feet to the Pierhead and Bulkhead Line established by Chapter 763, Laws of 1857;

**THENCE** along said Pierhead and Bulkhead Line, which is also the westerly line of grant of land under water to John A. Stevens dated December 17, 1870, north 20 degrees, 11 minutes east, 103.83 feet; north 25 degrees, 02 minutes east, 200 feet; north 28 degrees, 45 minutes east, 200.25 feet, north 30 degrees, 53 minutes east, 149.08 feet; north 32 degrees, 10 minutes east, 77.17 feet; and north 33 degrees, 52 minutes east, 44.03 feet to the prolongation of the southerly line of Broadway;

**THENCE** along said prolongation, south 83 degrees, 02 minutes 34.6 seconds east, 594.61 feet to the point or place of **BEGINNING.**

COSTCO/MBA 0081

## EXHIBIT B

### PERMITTED EXCEPTIONS

1.     Taxes, tax liens, tax sales, water rates, sewer rents and assessments set forth in the tax search schedule of the title commitment issued by Royal Abstract title no. 802772, subject to adjustment as of the Commencement Date.

2.     Reservation and letters patent in Liber 432 cp 498, so long as such Letters Patent do not affect the use, occupancy or enjoyment of the Premises and Tenant's title insurance policy insures that they are unenforceable.

3.     Rights of the United States to reclaim and repossess itself of, and regulate and control the use and occupation of, so much of the Premises as were formally covered by tide water.

4.     Rights of the United States and of The City of New York and respective boards, agents and officers, to regulate and control the use and occupation of the bulkheads and the lands adjacent thereto and the lands under water in front thereof.

5.     Letters Patent issued to East River Basin Corp. recorded in New York State Department of State in Book 75 of Patents at page 51, so long as such Letters Patent do not effect the use, occupancy or enjoyment of the Premises and Tenant's title insurance policy insures that they are unenforceable.

[B:\SME#7\EXHIBITB.THY]

COSTCO/MBA 0082

EXHIBIT C





SITE PLAN
SCALE 1" = 40'-0"

0 20 40 80    120

VERNON ROAD

SITE AREA = 7.73 ACRES
PARKING = 500 STALLS
RACKS 91
CENTER 20,560 S.F.

33RD ROAD

BAKERY

MEAT

MAIN BUILDING

covered ramp

MEMBER

PLANT

line of office
mezzanine above

ENTRY

EXIT

RECEIVING

FOOD COURT

TIRE SALES

TIRE SALES

TIRE INSTALL

EAST RIVER

BROADWAY

VERNON BLVD.
QUEENS NEW YORK
USA
CONCEPTUAL DESIGN

PRELIMINARY
SITE PLAN

PRICE COSTCO

10809 120th AVENUE N E
P.O. BOX 9/077
KIRKLAND WASHINGTON
206/828-8100
(60)3-9777
FAX (206) 827-2756

COSTCO/MBA 0083

## EXHIBIT "D"

### ADDITIONAL PERMITS

Modification OF Article 7, Chapter 2 of the City of New York in form and content satisfactory to Tenant (Waterfront Obligations)

Approved Builder's paving plan

Approved SD1 and SD2

[c: ASL] THYPIN.10                              78

COSTCO/MBA 0084

## EXHIBIT F

## COMMENCEMENT DATE AND RENT COMMENCEMENT DATE AGREEMENT

**AGREEMENT** made as of                                    , 19
between the following parties (hereinafter respectively called
"Landlord" and "Tenant"):

LANDLORD:        MANHASSET BAY ASSOCIATES

TENANT:          COSTCO WHOLESALE CORPORATION

### R E C I T A L S

A.    By lease (hereinafter, with the amendments thereto, if
any, described in Recital B below, called the "Lease") dated
March __, 1996, Landlord leased to Tenant the premises described
in Schedule A annexed hereto and made a part hereof (hereinafter
called "Demised Premises"), a memorandum or short form of which
lease was recorded in the Queens County Clerk's Office, New York
on _____.

B.    The Lease has not been amended except as follows:

C.    Tenant is now in possession of the Demised Premises.

D. Under Section 3.05 of the Lease, Landlord and Tenant
agreed to execute, acknowledge and deliver to each other
duplicate originals of an agreement setting forth, among other
things, the date on which the term of the Lease commenced
(hereinafter called, and in the Lease defined as, "Commencement
Date"), the Rent Commencement Date, the Expiration Date of the
Initial Term and the commencement and expiration dates of the
Renewal Periods (as such terms are defined in the Lease).

**NOW, THEREFORE,** Landlord and Tenant agree as follows:

1.    The Commencement Date of the Lease, the Expiration
Date of the Initial Term thereof and the commencement and
expiration dates of each Renewal Period, if exercised, are as
follows:

        A.    Initial Term:

           (i)   Commencement Date:

           (ii)  Expiration Date:

[b:\sme#7\commagmt.thy]

COSTCO/MBA 0085

    B.    First Renewal Period;

        (i)   Commencement Date:

        (ii) Expiration Date:

    C.    Second Renewal Period:

        (i)   Commencement Date:

        (ii) Expiration Date:

    D.    Third Renewal Period:

        (i)   Commencement Date:

        (ii) Expiration Date:

    E.    Fourth Renewal Period:

        (i)   Commencement Date:

        (ii) Expiration Date:

    F.   Fifth Renewal Period:

        (i)   Commencement Date:

        (ii) Expiration Date:

2.  The Rent Commencement Date of the Lease is _____.

3.    Nothing in this Agreement is intended to change or modify the rights of the parties under the Lease.

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this Agreement to be executed as of the date first above written.

ATTEST:                        **MANHASSET BAY ASSOCIATES**

_____  By:_____
                                  Name:
                                  Title:

ATTEST:                        **COSTCO WHOLESALE CORPORATION**

_____  By:_____
                                  Name:
                                  Title:

[b:\sme#7\commagmt.thy]

COSTCO/MBA 0086

# MULVANNY PARTNERSHIP
### A R C H I T E C T S    P. S.

March 13, 1996

Mr. Douglas N. Riley, Esq.
PriceCostco, Inc.
10 State Street
Newburyport, MA  01950

RE:    PriceCostco, Vernon Blvd., Queens, N.Y.
       MP# 95-128

Dear Doug:

Per your request we have compiled a list of items that should be removed from the above
referenced building prior to PriceCostco's acceptance of the building as empty and broom
cleaned.  Please note that the amount of miscellaneous items and debris remaining in the building
is extensive and the list is representative of the types of items we feel should be removed.  This
list should not be considered as an all inclusive inventory.

In addition the list does not include environmental clean up issues although there are numerous
drums and other environmental issues to be dealt with on the site.  AKRF has completed a
Level II investigation.  Their report will be ready in approximately one week. This report will identify
environmental hazards at the site which should be addressed prior to PriceCostco's acceptance
of the site, or if agreeable to PriceCostco and the lessor, in conjunction with demolition with
agreed upon adjustments to the lease.

Please call me if you have questions regarding this list.

Sincerely,
MULVANNY PARTNERSHIP, P.S.

Walter H. Lynch, AIA

WHL/dmw

enclosure

cc:    Larry Harder          PriceCostco
       Keith Thompson        PriceCostco
       Mitch Smith           Mulvanny Partnership
       Justin Hill           Mulvanny Partnership
       Nancy Bennett Evans   Mulvanny Partnership
       Keith Jones           Mulvanny Partnership

**Douglas Mulvanny ▪ Jerry Quinn Lee ▪ Mitchell Smith ▪ Carol Simpson**

One Militia Drive, #10  ▪  Lexington, MA 02173  ▪  (617) 863-0099  ▪  FAX: (617) 863-1404

G–1

COSTCO/MBA 0087

A.    EXTERIOR:

1. Vehicles including one truck and two tractors
*2. Numerous 55 gal. drums.
3. Freestanding storage container adjacent to main building (west end of site)
4. Dumpster
5. Misc. scraps of lumber
6. Pallets
7. Steel face curbing
8. Misc. steel sheets
9. Steel grate sections
10. Steel pipe
11. Steel beams
12. Scale on 33rd Road
13. Misc. equipment abandoned on 33rd
14. Buckets of bolts

**Note:**  Steel items have salvage value and will not add to the cost of demolition for removal.

NORTHEAST CORNER EXISTING BUILDING: (WOOD SHOP)

1. Removal of all equipment (machines)
2. Steel banding
3. Metal desks
4. Chairs
5. Filing cabinets

C.    SHED STRUCTURE ON NORTH SIDE OF FUTURE RECEIVING BUILDING:

1. Metal cabinets
2. Metal storage racks
3. Hundreds of boxes of file records
4. Misc. metal debris
5. Propane heater units / refrigerator / misc. items not associated with the building structure of fit up

D.    FUTURE RECEIVING BUILDING:

1. Metal "HUT" control or supervisor stations. (These are box offices set at various locations on the floor and may be considered as fit up such as an office or restroom partition.)
2. Contents of "HUTS"
   - metal desks
   - chairs
   - cabinets
   - phones
3. Metal lockers
4. Saw horses
5. Numerous pallets
6. Palletized and scattered product (sheet steel)
7. Cardboard stock
8. Steel tie bands
9. Lumber stock (3 bundles of 2 x 4's)

G—2

COSTCO/MBA 0088

*10. Miscellaneous trash & debris
11. Five cranes
(Some of the cranes may remain. If they do remain they will have to be relocated to appropriate positions and permanently disabled with all potentially hazardous parts removed.)
12. Wood benches

E.    SMALL SHED AT CORNER OF FUTURE MAIN WAREHOUSE:

1. Tires
2. Boxes of bolts
3. Pallets
4. Misc. debris
5. Overhead hoisting beam and rails
*6. Above ground fuel tank

F.    EXISTING MAINTENANCE DEPT.:

*1. Motors
*2. Equipment
3. Small crane
4. Pallets
5. Cardboard & miscellaneous debris
6. Tires
7. Bags of road salt
8. Work benches
9. Table saw
10. Miscellaneous scraps of hardware

G.    FUTURE MAIN SALES AREA - NORTH HALF:

*1. Tables
*2. Lockers
3. Desks
4. Pallets and pallet debris
5. Steel plate scraps
6. Stored scaffolding pipe sections.
7. Misc. steel fabrications not connected to the structure
*8. Pallet bundling equipment, "DEXCO", & associated hydraulic piping
9. Flat bed truck trailer
10. Fork lift "HYSTER"
11. 3 small cranes
12. Table saw and bench
13. Steel cabinets.

H.    FUTURE MAIN SALES AREA - SOUTH HALF:

1. Ladders (not attached to the structure.)
*2. Presses
*3. Hydro pump
4. Compressed air tanks

G-3

COSTCO/MBA 0089

*5. Barrels of trash
*6. Trash within concrete pit
7. Steel cage
*8. Oil drums
9. Flat bed truck trailer
10. Lumber stock
11. Spool equipment
12. Supervisors "HUT" (See item D.I.)
13. Contents of "HUT"
   - Metal desk
   - Chair
   - Lockers
   - Cabinets
14. Misc. cabinets & lockers
15. Misc. large equipment stockpiled at west end of this space
16. Automobile parts in the interior metal shed
*17. Hydraulic compressor & burner unit
18. Saw horses
19. Office equipment (typewriter, TU, etc.)
20. Barbecue grill

* Potential environmental issues. Other environmental issues such as asbestos and
P.C.B's within existing transformers, etc. will be addressed in AKRF's report.

G—4

COSTCO/MBA 0090



COSTCO/MBA 0091



COSTCO/MBA 0092

## EXHIBIT J

## MEMORANDUM OF LEASE

**AGREEMENT** made this ___ day of _____, 1996 by and between **MANHASSET BAY ASSOCIATES**, a New York general partnership ("**Landlord**"), having an office at _____, _____, _____ and **COSTCO WHOLESALE CORPORATION**, a Washington corporation ("**Tenant**") having an address at 999 Lake Drive, Issaquah, Washington 98027.

## W I T N E S S E T H

1.    Landlord and Tenant entered into a Ground Lease on March ___, 1996 (the "**Lease**") covering the premises described on Schedule A annexed hereto (the "**Premises**").

2.    The Commencement Date under the Lease is _____, 199_, which is the date that the Initial Term of the Lease will commence. The Initial Term of the Lease will expire twenty five years from the last day of the month in which the Rent Commencement Date occurs.

3.    Tenant shall have the right to sublet, or license the use of, all or a part of the Premises, or assign the Lease pursuant to the terms and conditions of Section 12 of the Lease.

4.    Tenant shall have the right of first refusal to purchase the Premises upon the terms and provisions of Section 16 of the Lease. Landlord shall promptly notify Tenant of any bona fide offer from a third party to purchase the Premises or all or substantially all of the interests of Landlord (the "**Interests**"), which Landlord intends to accept. Tenant may, within thirty (30) days after receipt of such notice, offer to purchase the Premises or the Interests upon the same terms and conditions set forth in such notice.

5.    Landlord, in compliance with Section 13 of the Lien Law, covenants that it will receive the consideration for the Lease and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

6.    The rights, obligations and remedies of Landlord and Tenant, respectively, with respect to each other and to the Premises are fixed, determined and governed solely by the provisions of the Lease, this being the form of Memorandum of

[b:\sme#7\memolse.thy]

COSTCO/MBA 0093

Lease intended to be recorded and executed by the parties for the purpose of avoiding the necessity of recording the entire Lease. To the extent of any conflict between the provisions herein and the provisions of the Lease or to the extent that the provisions of the Lease more broadly or restrictively address any rights of Landlord and Tenant described herein, the provisions of the Lease shall govern.

**IN WITNESS WHEREOF,** the parties hereto have executed this Memorandum of Lease as of the day and year first above written.

**MANHASSET BAY ASSOCIATES**

By: _____
        Name:
        Title:


**COSTCO WHOLESALE CORPORATION**

By: _____
        Name:
        Title:

[b:\sme#7\memolse.thy]

STATE OF NEW YORK     )
                      )ss.:
COUNTY OF NEW YORK    )


        On this ___ day of _____, 1996, before me personally
came _____, to me known, who, being
duly sworn, did depose and say that he has an address at
_____, that he is the
_____ of **Costco Wholesale Corporation**, the corporation
described in and which executed the foregoing document, and that
he signed his name thereto by order of that corporation's Board
of Directors.


                                    _____
                                           Notary Public



STATE OF NEW YORK     )
                      )ss.:
COUNTY OF NEW YORK    )


        On this ___ day of _____, 1996, before me
personally came _____, to me known,
who being duly sworn, did depose and say that he is a partner of
**Manhasset Bay Associates**, the partnership described in and which
executed the foregoing instrument; and that he acknowledged to me
that he executed the same as the act and deed of said
partnership.


                                    _____
                                           Notary Public


[b:\sme#7\memolse.thy]

COSTCO/MBA 0095

MEMORANDUM OF LEASE


MANHASSET BAY ASSOCITES,

as Landlord


and


COSTCO WHOLESALE CORPORATION,

as Tenant



_____ ____, 199_



| | | | |
|---|---|---|---|
| County: | Queens | Block: | 313 |
| City: | New York | Lot: | 1 |
| Borough: | Queens | Address: | 33-26 Vernon Boulevard |


Record and Return to:

Pryor, Cashman, Sherman & Flynn
410 Park Avenue
New York, New York 10022
Attention: Andrew S. Levine, Esq.


[b:\sme#7\memolse.thy]

COSTCO/MBA 0096

EXHIBIT "K"

## SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

AGREEMENT made as of
among the following parties (hereinafter respectively referred to as "Mortgagee", "Landlord" and "Tenant"):

MORTGAGEE:

LANDLORD:

TENANT:

## R E C I T A L S

A.     Mortgagee is about to make, or has made, a loan to Landlord secured by a mortgage (hereinafter called the "Mortgage") covering the land owned by Landlord and described on Exhibit A annexed hereto and made part hereof, together with the improvements erected or to be erected thereon (said parcel of land and improvements being hereinafter called the "Premises").

B.     Pursuant to a lease entered into between Landlord and Tenant dated as of                                as amended by
(hereinafter called the "Lease"), a copy of which has been delivered to Mortgagee, Landlord has leased to Tenant the Premises.  Terms not otherwise defined herein shall have the same meanings as are ascribed to them in the Lease.

C.     A Memorandum of the Lease is intended to be, or has been, recorded in the Office of the                             of                         County, State of
                in Book             at page                 of
Deeds.

D.     Mortgagee desires that the Lease be subordinate to the lien of the Mortgage.

E.     The Lease provides that it shall become subject and subordinate to one or more mortgages upon the fee of the Premises, upon the parties' entering into a nondisturbance agreement in substantially the form of this agreement and the parties so desire to effect the subordination of the Lease to the Mortgage and to provide for the nondisturbance of Tenant by the holder of the Mortgage.

COSTCO/MBA 0097

NOW, THEREFORE, in consideration of the Premises and of the mutual covenants and agreements herein, the parties hereby agree as follows:

1.    Mortgagee hereby consents to and approves the Lease and the terms thereof, including the options to extend the Lease Term as set forth in the Lease, if any, and agrees that the exercise by Tenant of its rights, remedies and options therein shall not constitute a default under the Mortgage.

2.    Tenant agrees with Mortgagee that the Lease is hereby made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage and all sums secured thereby with the same force and effect as if the Mortgage had been executed and delivered prior to the execution and delivery of the Lease and without regard to the order of priority of recording the Mortgage and the Memorandum of Lease, subject, however, to the provisions of this Agreement.

3.    Mortgagee agrees that so long as the Lease shall be in full force and effect:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond, note or other obligation secured thereby provided that (i) Mortgagee is not required by statute, judicial decision or the court in which such action or proceeding has been commenced or is pending, as a condition precedent to commencing or proceeding with any such action to foreclose the Mortgage or obtain a receiver, so to name Tenant as a party defendant, in which event, any such naming of Tenant will not in any manner interfere with the protection extended or afforded to Tenant in this Agreement and (ii) at the time of the commencement of any such action or proceeding or the time of any such sale, the Lease shall be in full force and effect and the Tenant shall not be in default under any of the terms, covenants or conditions of the Lease or of this Agreement on the part of the Tenant to be observed or performed thereunder or hereunder, beyond any applicable grace, cure or notice period;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired, nor will the Lease or the term thereof be terminated or otherwise affected, by (i) any suit, action or proceeding on the Mortgage or the bond, note or other obligation secured thereby, (ii) the foreclosure of the Mortgage, (iii) the enforcement of any rights under the Mortgage, (iv) any judicial sale or execution or other sale of the Premises or any part thereof, or any deed given in lieu of the foreclosure, (v) the exercise of any other rights given to any holder of the Mortgage or such other documents as a matter of law, or (vi) any default under the Mortgage or the bond, note or other obligation secured thereby, provided that

-2-

COSTCO/MBA 0098

at the time of the commencement of any such action or proceeding or the time of any such sale the Lease shall be in full force and effect and the Tenant shall not be in default under any of the terms, covenants or conditions of the Lease or of this Agreement on the part of the Tenant to be observed or performed thereunder or hereunder, beyond any applicable grace cure notice period;

(c)     All condemnation awards and insurance proceeds paid or payable with respect to any part of the Premises and received or receivable by Mortgagee shall be applied and paid in the manner set forth in the Lease; and

(d)     Neither the Mortgage nor any other security instrument executed in connection therewith shall cover, or be construed as subjecting in any manner to the lien thereof, any trade fixtures, equipment, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on or in the Premises regardless of the manner of attachment thereof except to the extent such property is deemed to be Landlord's pursuant to the express terms of the Lease.

4.     If Mortgagee or any future holder of the Mortgage shall become the owner of the Premises by reason of foreclosure of the Mortgage or otherwise, or if the Premises shall be sold as a result of any actions or proceeding to foreclosure the Mortgage, or if ownership of the Premises shall be transferred by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing a new lease, as a direct lease between Tenant and the new owner of the Premises as landlord (herein called "New Owner"), on all of the same terms, covenants and provisions of the Lease, and in such event:

(a)     Tenant shall be bound to New Owner under all of the terms, covenants and provisions of the Lease for the remainder of the Lease Term (including the Renewal Periods, to the extent that Tenant shall elect or has elected to exercise any or all of its options to extend the Lease Term) and Tenant hereby agrees to attorn to New Owner and to recognize New Owner as "landlord" under the Lease; and

(b)     New Owner shall be bound to Tenant under, and shall perform all of the terms, covenants and provisions of, the Lease to be performed by the landlord thereunder for the remainder of the Lease Term (including the Renewal Periods to the extent that Tenant shall elect or has elected to exercise any or all of its options to extend the Lease Term), and Tenant shall, from and after the date New Owner succeeds to the interest of the landlord under the Lease, have the same remedies against New Owner for the breach of the Lease against Landlord if New Owner had not succeeded to the interest of Landlord, except that New Owner shall not be bound by (i) any Minimum

-3-

COSTCO/MBA 0099

Rent or additional rent which Tenant may have paid for more than one month in advance to any prior landlord (including Landlord); or (ii) any material amendment or modification of the Lease made without Mortgagee's consent including without limitation any amendments or modifications which would reduce (x) Minimum Rent, (y) any other monetary obligation of Tenant under the Lease or (z) the Lease Term.

(c)   Notwithstanding the foregoing, Mortgagee/New Owner shall not be (i) obligated to complete any construction work required to be done by Landlord pursuant to the provisions of the Lease or to reimburse the Tenant for any construction work done by the Tenant; (ii) liable for any obligation of the Landlord, or for any act or omission of the Landlord accrued prior to such foreclosure or sale, (iii) liable under any indemnity provision of whatever nature contained in the Lease, including, but not limited to, any environmental indemnification, (iv) required to make any repairs to the Premises as a result of fire or other casualty or by reason of condemnation, (v) required to make any capital improvements to the Premises which the Landlord may have agreed to make, but had not completed, or to perform or agreed to make, but had not completed, or to perform or provide any services not related to possession or quiet enjoyment of the Premises, (vi) subject to any claims or counterclaims which shall have accrued to the Tenant against the Landlord prior to the date on which the Mortgagee or its successor in interest shall become the owner of the Premises, provided that this clause (vi) shall not limit any right of offset provided in the Lease for the benefit of Tenant, or (vii) liable for any security deposit or other monies not actually received by the Mortgagee.  No limitation on the liabilities or obligations of the Mortgagee or the New Owner, as the case may be, shall limit the liability or obligation of the Landlord under the Lease to the extent therein provided.

5.    All notices, consents, approvals or other communications given under or pursuant to this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee set forth above or at such other address as Mortgagee may designate by notice to Landlord and Tenant, (b) if to Landlord, at the address of Landlord set forth above or at such other address as Landlord may designate by notice to Mortgagee and Tenant, or (c) if to Tenant, at the address of Tenant set forth above or at such other address or to such other persons as Tenant may designate by notice to Mortgagee and Landlord.  During the period of any postal strike or other interference with the mail, personal delivery shall be substituted for registered or certified mail.

6.    The Tenant shall not, without the prior written consent of the Mortgagee, (i) enter into any agreement amending or modifying in any material manner, or terminating the Lease, (ii) prepay any of the rents, additional rents or other sums

-4-

COSTCO/MBA 0100

due under the Lease for more than one (1) month in advance of the due date thereof, (iii) voluntarily surrender the Premises or terminate the Lease without cause or shorten the term thereof, except as otherwise permitted under the Lease or (iv) assign the Lease or sublet the Premises or any part thereof except as permitted under the Lease; and any such amendment, modification, termination, prepayment, voluntary surrender, assignment or subletting, without the prior written consent of the Mortgagee shall not be binding on the Mortgagee.

7.    The Tenant hereby certifies to the Mortgagee that as of the date hereof (i) the Tenant is the owner and holder of the Tenant's interest under the Lease, (ii) a true and complete copy of the Lease is annexed hereto and made a part hereof as Exhibit A and the Lease has not been modified or amended, (iii) the Lease is in full force and effect and the term thereof commenced pursuant to the provisions thereof, (iv) to Tenant's knowledge, the Landlord is not in default under any of the terms, covenants or provisions of the Lease (v) the Tenant has not commenced any action or given or received any notice for the purpose of terminating the Lease, (vi) all rents, additional rents and other sums due and payable under the Lease have been paid in full and no rents, additional rents or other sums payable under the Lease have been paid for more than one (1) month in advance of the due dates thereof, and (vii) to Tenant's knowledge, there are no offsets or defenses to the payment of the rents, additional rents, or other sums payable under the Lease, except as expressly noted by Tenant .

8.    The Tenant shall notify the Mortgagee of any default by the Landlord under the Lease which would entitle the Tenant to cancel or terminate the Lease or abate the rents, additional rents or other sums payable thereunder, and agrees that, notwithstanding any provisions of the Lease to the contrary, no notice of cancellation, termination or abatement thereof shall be effective as to the Mortgagee unless the Mortgagee shall have received notice of the default or other circumstance giving rise to such cancellation, termination or abatement and shall have failed to cure such default on a timely basis.  Failure by Tenant to give such notice to Mortgagee shall not in any manner invalidate or otherwise affect the notice given to Landlord and the obligation of Landlord to cure the default.

9.    This Agreement shall inure to the benefit of and be binding on and enforceable by the parties hereto and their respective heirs, personal representatives, successors and assigns (including New Owner).

10.    This Agreement contains the entire agreement among the parties with respect to the Premises and cannot be changed, modified, waived or cancelled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

-5-

COSTCO/MBA 0101

11.     This Agreement and the covenants herein are intended to run with and bind all lands affected hereby.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

Attest:                                                    Mortgagee:


_____          By:_____


(Corporate Seal):                                      Landlord:


_____          By:_____


Attest:                                                    Tenant:


_____          By:_____


D:\DOCS\SB\PERFETTO\EXH.F3

COSTCO/MBA 0102